UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                    20 Cr. 160 (MKV)

JASON SERVIS, et. al,

                              Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT JASON SERVIS'S MOTION TO SUPPRESS T-III WIRETAP**
**INTERCEPTIONS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 5

I.      LEGAL STANDARDS ................................................................................................ 22

II.     ARGUMENT ....................................................................................................... 26

        a.      The Government's material misstatements and omissions were deliberate or reckless and affected each issuing court's probable cause determination. ...... 26

                i.     The Government's misrepresentations concerning SGF-1000 and Clenbuterol were deliberate or, at the very least, made in reckless disregard for the truth ............................................................................. 27

                ii.    The Government's misrepresentations and omissions were necessary to each issuing court's determination of probable cause ......... 31

        b.      The Government's Title III application failed to demonstrate necessity in compliance with 18 U.S.C. § 2510, et seq. ........................................................ 33

        c.      The Government's Title III application relied exclusively on the fruits of a previous illegal wiretap ................................................................................ 43

CONCLUSION .................................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Berger v. New York*,
   388 U.S. 41 (1967) ........................................................................................................23

*Dalia v. United States*,
   441 U.S. 238 (1979) ........................................................................................23, 24, 33

*Franks v. Delaware*,
   438 U.S. 154 (1978) ................................................................................................ passim

*Gelbard v. United States*,
   408 U.S. 41 (1972) ...............................................................................................24, 25

*Katz v. United States*,
   389 U.S. 347 (1967) .............................................................................................23, 25

*Scott v. United States*,
   436 U.S. 128 (1978) ........................................................................................................24

*United States v. Abascal*,
   564 F.2d 821 (9th Cir. 1977) ...............................................................................38, 39

*United States v. Blackmon*,
   273 F.3d 1204 (9th Cir. 2001) .............................................................................33, 41

*United States v. Canfield*,
   212 F.3d 713 (2d Cir. 2000) ........................................................................................26

*United States v. Giordano*,
   416 U.S. 505 (1974) ......................................................................................24, 25, 39

*United States v. Goffer*,
   721 F.3d 113 (2d Cir. 2013) ........................................................................................32

*United States v. Kahn*,
   415 U.S. 143 (1974) ......................................................................................................33

*United States v. Lambus*,
   897 F.3d 368 (2d Cir. 2018) ...............................................................................25, 27

*United States v. Lilla*,
   699 F.2d 99 (2d Cir. 1983) .................................................................................33, 41

*United States v. Marion*,
   535 F.2d 697 (2d Cir. 1976) ........................................................................23, 31, 32

*United States v. Rajaratnam*,
   719 F.3d 139 (2d Cir. 2013) .................................................................................. passim

*United States v. Robinson*,
   698 F.2d 448 (D.C. 1983).............................................................................................33

*United States v. Whitley*,
   249 F.3d 614 (7th Cir. 2001) ...............................................................................27, 30

## Statutory Authorities

18 U.S.C. § 2510 ...........................................................................................................33, 43

18 U.S.C. § 2515 ...........................................................................................................25, 44

18 U.S.C. § 2516 ...................................................................................................................31

18 U.S.C. § 2517 ...........................................................................................................31, 32

18 U.S.C. § 2518 .............................................................................................................. passim

18 U.S.C. § 2561(1) ................................................................................................................32
21 U.S.C. §  352 ...............................................................................................................8, 32

**Rules and Regulations**

9 NYCRR § 4043.2(i)(3) ....................................................................................................17, 18
9 NYCRR § 4043.3(a)(5) ......................................................................................................17

## PRELIMINARY STATEMENT

Pursuant to a wiretap authorization order signed on April 30, 2019, and then extended three times, the Government intercepted thousands of communications of thoroughbred horse trainer Jason Servis: *a trainer whose horses did not fail any post-race drug tests since the FBI's investigation in this case began in 2017 and through the date of the March 9, 2020 Indictment.[1]* This material fact (among many other material facts)—in an investigation of what the FBI described to numerous judges was a scheme to "defraud racetracks, competitors, and the betting public by" racing horses that had been "secretly" administered prohibited chemical substances[2]—was never brought to the attention of any judge considering the wiretap applications. Moreover, the Government made material misrepresentations to the issuing courts about SGF-1000 and Clenbuterol, including that SGF-1000 was performance-enhancing and contained growth factors, such that the issuing courts were materially misled about the only two substances that Mr. Servis is alleged to have used. Thus, the wiretap interceptions must be suppressed.

The Government obtained the Court's authorization for a wiretap based on an April 30, 2019 sworn affidavit of an FBI agent that contained "deliberately or recklessly false

---

[1]    By contrast, horses trained by thoroughbred horse trainer Bob Baffert (who has never been criminally charged) have failed numerous post-race drug tests in the last several years, most recently failing a post-race drug test for the 2021 disqualified Kentucky Derby winner "Medina Spirit." *See* "Churchill Downs Suspends Baffert for Two Years After Medina Spirit's Confirmed Positive Test," June 2, 2021, https://www.si.com/horse-racing/2021/06/02/positive-test-confirmed-medina-spirit-kentucky-derby-bob-baffert, (noting that Baffert was suspended for two years by Churchill Downs after Kentucky Derby winner Medina Spirit failed a post-race drug test, and observing that Baffert's horses failed *four drug tests in the last 14 months*; Joe Drape, "Another Failed Drug Test Is Linked to a Bob Baffert Horse," *The New York Times*, Oct. 22, 2020, https://www.nytimes.com/2020/10/22/sports/horse-racing/baffert-drug-test.html (noting that, as of October 2020, Baffert trained-horses *failed post-race drug tests for the third time in last 6 months*, which was his 28th drug violation).

[2]    April 30, 2019 FBI agent affidavit at page 7, attached as Exhibit 1 to the accompanying affirmation of Rita M. Glavin (herein after the "Glavin Aff.").

statement[s]" and the material omission of statutorily and constitutionally required information. Mr. Servis respectfully moves, pursuant to 18 U.S.C. 2518(10) and *Franks v. Delaware*, 438 U.S. 154 (1978), to suppress all evidence of the calls intercepted over his cellular phone, and any evidence derived therefrom, on the ground that the evidence was obtained in violation of the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-2522.

Specifically, Mr. Servis seeks suppression of any and all evidence obtained as a result of: (1) wiretap authorizations for phones used by Mr. Servis, based on the April 30, 2019 agent affidavit and three subsequent Orders extending the wiretap based on agent affidavits dated May 29, 2019, June 27, 2019 and July 30, 2019; and (2) wiretap authorizations for phones used by Kristian Rhein (a veterinarian to racehorses trained by Jason Servis), based on an affidavit dated June 27, 2019 and one subsequent Order extending the wiretap based on an agent affidavit dated July 30, 2019.  Mr. Servis also joins in Erica Garcia's motion to suppress the wiretap evidence obtained from the Jorge Navarro wiretap, as well as any exhibits and factual statements made in support of that motion.  Dkt. 445, 446, and 447.  Mr. Servis's communications were unlawfully obtained as a result of those wiretaps, and he is an aggrieved party with standing to bring this motion pursuant to 18 § U.S.C. 2510(11).  Mr. Servis also joins in the motion to suppress wiretap evidence submitted by defendant Alexander Chan (a veterinarian who worked for Mr. Rhein and treated horses trained by Mr. Servis), as well as any exhibits and factual statements made in support of Mr. Chan's motion. Dkt. 452, 453, and 454.

First, the wiretap authorization order for Mr. Servis's phone was based on an FBI agent's April 30, 2019 Affidavit, which alleged that Mr. Servis was engaged in criminal activity by causing to be administered to horses under his care: (1) SGF-1000, which FBI Agent Robert

Berntsson stated "is a performance-enhancing substance known as a growth factor that promotes tissue repair" (Glavin Aff. Ex. 1 at 59); and (2) Clenbuterol, about which FBI Agent Berntsson stated:

> …. clenbuterol is used to treat asthma in horses and assist a horse's breathing, which enhances the horse's performance.  Under the Florida Rules, trainers are prohibited from administering performance-enhancing substances to affect the outcome of a race.  Fla. Stat. 550.235(2).  Clenbuterol is prohibited or banned under the New Jersey Rules and the New York Rules, absent certain exceptions; is considered a Class 3 substance under the Florida Rules, namely, a drug that "may or may not have generally accepted medical use in the racing horse"; and is considered a Class "B" Drug under the Kentucky Rules, namely a drug that has a "high potential to influence performance" but less of a potential that a Class "A" drug.

Glavin Aff., Ex. 1 at 55.  These statements regarding SGF-1000 and Clenbuterol were false and misleading, and material facts to put those statements in proper context were omitted.

The Government did not actually know what substances were in SGF-1000, and between 2014 and 2019, SGF-1000 was tested on numerous occasions by independent laboratories and found to contain *no* growth factors.  Instead, SGF-1000 tested as ovine (sheep) collagen, a substance which was unlikely to have *any* effect on a horse's performance at all.  As set forth in detail below, this information was known to The Jockey Club—which brought this investigation to the Government's attention in 2017 and collaborated with the Government throughout this investigation—and most certainly should have been known by the federal law enforcement officers who applied for the wiretap.  At a minimum, an email produced through discovery shows that at least by June 7, 2019, the Government had been explicitly told by the Hong Kong Jockey Club ("HKJC"), a world-renowned laboratory, that it had tested SGF-1000 and that SGF-1000 does not contain growth factors.  Yet, the Government: (1) kept repeating the false statement in subsequent periodic reports and wiretap applications that SGF-1000 contained growth factors and was performance-enhancing; and (2) failed to disclose in any of its T-III submissions for the Servis

phone (even after June 7) that it was aware that SGF-1000 had been tested and did not contain growth factors.

In its zeal to secure and maintain the wiretap, the Government also misled the issuing courts about Clenbuterol, wrongfully characterizing it as a performance-enhancing drug that was banned by various state regulators.  In fact, Clenbuterol was expressly permitted in the jurisdictions Mr. Servis's horses raced.  Although local rules of the relevant jurisdictions provide that a horse cannot race when Clenbuterol is present within their system above a certain threshold at the time of a race, none of Mr. Servis's horses failed a single post-race test during the period of the Government's investigation.  The Government withheld this critical fact from the issuing courts as well, and this fact was easily verifiable from various racing authorities and public sources. Indeed, before obtaining the wiretap and during the time the Government was eavesdropping on Mr. Servis's calls, the Government never bothered to subpoena the relevant racetracks for the post-race samples and corresponding test results for the horses trained by Mr. Servis.

Finally, the Government misled the courts about the necessity for a wiretap of Mr. Servis's phone in its requirement to explain that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).  Perhaps recognizing that its inquiry of Mr. Servis's alleged use of SGF-1000 and Clenbuterol would not justify a wiretap of his phone, the Government improperly broadened the purported need for a wiretap, littering its T-III application materials with allegations of conduct unrelated to Mr. Servis, as if its years-long, industry-wide horse racing investigation was a single, vast conspiracy.  The Government failed to take even the most basic of investigative steps with respect to Mr. Servis, and instead ran to the district court for a wiretap as essentially its *first* investigative step.  For example, the Government: conducted no surveillance of Mr. Servis until

June 2019; failed to subpoena racetracks for post-race samples from Mr. Servis's winning horses, particularly as they pertained to Clenbuterol; failed to purchase and test SGF-1000—which was available for purchase on the internet—before stating in sworn affidavits that it contained growth factors and was performance-enhancing; and failed to make any meaningful effort to identify potential confidential sources that might have pertinent information relating to Mr. Servis, or regarding the product SGF-1000.

For these reasons, the wiretaps and any evidence obtained as a result should be suppressed.  Alternatively, a *Franks* hearing must be held.

## FACTUAL BACKGROUND

I.   SGF-1000 Was Repeatedly Tested Prior to the Wiretap and Found to Contain No Performance Enhancing Substances

For years prior to the Government securing a wiretap of Mr. Servis's phone, Medivet Equine, a Kentucky company, had been marketing for sale "SGF 1000" on its website. Unbeknownst to Mr. Servis, his veterinarian, Kristian Rhein, held an ownership interest in that company.

Medivet's website described SGF-1000 as "an innovative formulation consisting of Regenerative Proteins, Cytokines, Peptides, potent Growth Factors and Signaling Molecules derived from Ovine Placental Extract."  *See* Glavin Aff., Ex. 5.  According to the website, such formulation worked "at the cellular level to promote faster, more complete healing and recovery from training and injury, resulting in increased general health and wellness."  *Id*.

In late 2013, the Jockey Club[3] purchased a package of SGF-1000 and submitted it to the Racing Medication & Testing Consortium ("RMTC")[4] for testing.  RMTC, in turn, arranged to have the sample tested by the HKJC.  As publicly reported, HKJC's testing did not detect performance-enhancing substances.  Glavin Aff., Ex. 6.  Dr. Dionne Benson, former Executive Director of the RMTC has "said the RMTC purchased SGF-1000 in 2014" and that "[s]amples were sent to three labs, including the highly respected Hong Kong Jockey Club lab," but that "[t]he RMTC did not find any obvious performance-enhancing effects with these samples and turned over its findings to the FDA." *Id.*

In 2015, testing was also conducted by Australian horse racing officials, who reached the same conclusion – *i.e.*, that SGF-1000 "didn't contain any prohibited substances or synthetic peptides."  *See* Glavin Aff., Exhibit 7.

The RMTC and Australian test results were consistent with SGF-1000 testing also performed several years ago by the UC Davis Maddy Laboratory.  Following the initial indictment in this case, the California Horse Racing Board ("CHRB"), the regulatory body that oversees horse racing in California, undertook an investigation into the use of SGF in California to determine whether the use of SGF violated any state laws.  The results of its investigation were detailed in a

---

[3]    The Jockey Club holds itself out as "an organization dedicated to the improvement of Thoroughbred breeding and racing."   Jockey Club Website available at: http://www.jockeyclub.com/default.asp?section=About&area=0.   Per the organization's website: "The Jockey Club's primary responsibility . . . is the maintenance of *The American Stud Book*," a registry of thoroughbred horses in the United States.  In addition, "[o]ver the course of the past 25 years or so, The Jockey Club has created and developed a group of commercial, for-profit subsidiaries and partnerships, each with a twofold purpose: to serve specific segments within the industry . . . and to generate profits that are used to support important industry initiatives."

[4]    The RMTC was formed in 2001 in order to promulgate standardized rules across the horseracing industry for the medication, care, and testing of racehorses.  *See* RMTC Website available at: https://rmtcnet.com/our-mission/.

June 2020 investigative report (the "Report"). *See* Glavin Aff., Ex. 8. The Report described the purpose of the investigation as follows: "Due to SGF-1000 being involved in the Federal Indictments in New York, the CHRB opened an investigation to determine if any CHRB rules or criminal laws were violated by any CHRB licensees [ ] related to this product's use." *Id*. After detailing the results of its investigation, the CHRB's Report concluded:

> *Given that a version of SGF-1000 was tested several years ago by the UC Davis Maddy Laboratory and no prohibited substances were found,* and there is no evidence to support that it was administered within the CHRB enclosure without the required Veterinarian Confidential report, it does not appear any CHRB rules or regulations have been violated.

*Id*.[5] (emphasis added).

II.   The Title III Wiretap Applications

In 2016, the Jockey Club—the same organization that had previously arranged for the testing of SGF 1000—commenced a wide-ranging investigation into horse doping. Glavin Aff., Ex. 10. In furtherance of that investigation, it retained a private investigative service called 5 Stones Intelligence. *Id*. Also involved in the investigation was ████████, the head of security at Meadowlands Racetrack in New Jersey. *Id*. In 2017, the FBI was approached by 5 Stones Intelligence, and became actively involved in the investigation as well. *Id*. ████████ actively worked with the FBI as a confidential source during its investigation, including obtaining various samples from Jason Servis-trained horses. *See* Glavin Aff., Ex. 11.

In connection with that investigation, the Government submitted its first application for a Title III wiretap of Mr. Servis's telephone on April 30, 2019, resulting in an Order of Interception authorizing a 30-day wiretap issued that same day. *See* Glavin Aff., Ex. 1. The

---

[5]   In November 2020, the CHRB provided the government with a copy of its Report, reiterating in an email enclosing the Report that the CHRB had "conducted an investigation into the purchase/use of SGF-1000 at California Race Tracks . . . [and] found no CHRB rule or California Penal Code violations in [its] review." Glavin Aff., Ex. 9.

Government then sought thirty-day extensions of the wiretap of Mr. Servis's phone on May 29, 2019; June 27, 2019; and July 30, 2019; all of which were granted by the issuing court via subsequent Orders of Interception.  *See* Glavin Aff., Exs. 2, 3, and 4, respectively.    The Government filed periodic reports concerning the status of the wiretap of Mr. Servis's phone on May 10, 2019; May 17, 2019; June 10, 2019; June 18, 2019; July 8, 2019; July 17, 2019; August 9, 2019; and August 19, 2019.  *See* Glavin Aff., Exs 1A, 1B, 2A, 2B, 3A, 3B, 4A, and 4B, respectively.

In its first wiretap application on April 30, 2019, the Government explained that a wiretap was intended to investigate "misbranding of drugs and devices, in violation of 21 U.S.C. § 352."  Glavin Aff., Ex. 1 at 7.  However, acknowledging that "[a] charge under 21 U.S.C. § 352 (misbranding of drugs) is not a predicate for a Title III wire intercept" under § 2516 (*id*. at n.9), the Government needed to look elsewhere to justify its request.  Thus, the Government alleged that probable cause existed to believe a sweeping list of "Target Subjects" were engaging in mail and wire fraud (and conspiracy to commit those offenses), all predicate offenses under § 2516, and that Mr. Servis's phone was being used as part of the scheme.[6]  *Id*. at 7. According to this theory, horse "doping" was chargeable under the mail and wire fraud statutes as a scheme to "defraud racetracks, competitors and the betting public . . ."  *Id*. at 3, 7.

In this way, the Government's mail and wire fraud theory—the legal basis for the Government's wiretap on Mr. Servis's telephone—hinged on a series of representations to various judges in the Southern District of New York that the "Target Subjects" administered performance

---

[6]    The Government also listed money laundering as a predicate offense.  Glavin Aff., Ex. 1 at 7.

enhancing drugs in a scheme to "dope" race horses to illegally improve their performance.  *See* Glavin Aff., Ex. 1 at 3, 7, 54-55, 59, 60.

III.     The Government Misled the Issuing Courts, Repeatedly Averring that SGF-1000 is a PED Consisting of Growth Factors and Withholding Information Reflecting the Opposite

In connection with its doping claims—and notwithstanding the aforementioned results of SGF-1000 testing to the contrary—starting in its initial wiretap application on April 30, 2019 and repeatedly thereafter, the Government explicitly asserted that SGF-1000 was a performance-enhancing drug composed of banned "growth factors":

- ". . . SGF-1000 is a performance enhancing substance known as a growth factor that promotes tissue repair."  Glavin Aff., Ex. 1 at 59 (April 30, 2019 Agent Affidavit).
- ". . . SGF-1000 is a performance enhancing substance known as a growth factor that promotes tissue repair." Glavin Aff., Ex. 2 at 62 (May 29, 2019 Agent Affidavit).
- "[A]gents believe that the 'SGF' might be a reference to 'SGF 1000,' an equine performance-enhancing substance[.]"  Glavin Aff., Ex. 2A at 11 (June 10, 2019 Periodic Report).
- "Agents have learned that SGF-1000 is a performance enhancing substance known as a growth factor that promotes tissue repair."  Glavin Aff., Ex. 2A at 11 (June 10, 2019 Periodic Report).
- ". . . SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue repair."  Glavin Aff., Ex. 3 at 66, 67-68, 76 (June 27, 2019 Agent Affidavit).
- Characterizing SGF-1000 multiple times as a "performance-enhancing substance[.]" Glavin Aff., Ex. 3 at 86 (June 27, 2019 Agent Affidavit).
- ". . . 'SGF-1000' is an equine performance-enhancing substance." Glavin Aff., Ex. 3 at 101 (June 27, 2019 Agent Affidavit).
- "[A]gents have learned that SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue repair."  Glavin Aff., Ex. 3A at 7 (July 8, 2019 Periodic Report).

- Characterizing SGF as a "performance-enhancing substance[.]"  Glavin Aff., Ex. 3B at 11, 12-13 (July 17, 2019 Periodic Report).

- " . . . SGF-1000 is a performance-enhancing substance which contains growth factors, and that growth factors, among other things, promote tissue repair."  Glavin Aff., Ex. 4 at 68 (July 30, 2019 Agent Affidavit).

- ". . .  SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue repair." Glavin Aff., Ex. 4 at 69, 98 (July 30, 2019 Agent Affidavit).

- Characterizing SGF as "a particular custom-made performance-enhancing substance[.]" Glavin Aff., Ex. 4 at 128, 137 (July 30, 2019 Agent Affidavit).

- Characterizing SGF as a "performance-enhancing substance[.]"  Glavin Aff., Ex. 4 at 129-130, 139 (July 30, 2019 Agent Affidavit).

- ". . .  'SGF' is a reference to SGF-1000, a custom-made performance-enhancing substance[.]"  Glavin Aff., Ex. 4A at 8 (August 9, 2019 Periodic Report).

- "'SGF-1000' is a custom-made performance-enhancing substance known as a growth factor[.]"  Glavin Aff., Ex. 4B at 6 (August 19, 2019 Periodic Report).[7]

---

[7]     Separately, the Government also sought to link SGF-1000's purported "performance-enhancing" nature to state regulatory regimes that ban the use of performance-enhancing drugs. *See* Glavin Aff., Ex. 4B at 7 (August 19, 2019 Periodic Report)  ("New York Rules would not permit the administration of an unlisted substance if its purpose is to enhance a horse's race performance, rather than to treat a medical need."); *see id*. at n. 7 ("New York Rules restrict the administration of 'other doping agents,' defined as a substance that . . .  'has a pharmacological potential to alter materially the performance of a horse[.]'"); *id*. at 11 (". . . SGF contains several ingredients prohibited under the New York Rules."); Glavin Aff., Ex. 2A at 15 (June 10, 2019 Periodic Report) ("[A] doping agent that is a 'protein- or peptide-based agent or drug that may ... enhance the performance of a horse beyond such horse's  natural ability,' the substance must be administered only in a 'time, place and for manner specifically permitted in writing by the [New York Racing] commission' and must be 'for a recognized therapeutic use.'") (citing New York Racing Regulations § 4043.12(c)(5));  Glavin Aff., Ex. 3 at 76 (June 27, 2019 Agent Affidavit) ("[G]rowth factors are on the 2017 Association of Racing Commission International's Model Rules of Racing classification of restricted substances."); Glavin Aff., Ex. 4 at 98 (July 30, 2019 Agent Affidavit) ("[G]rowth hormones and certain growth factors are performance-enhancing substances that are prohibited under certain states' racing rules and regulations.");  Glavin Aff., Ex. 4A at 8-9 (August 8, 2019 Periodic report) ("The New York Rules prohibit the use of 'fibroblast growth factors,' 'hepatocyte growth factor,' and growth hormone 'and its releasing factors.'"); Glavin Aff., Ex. 1 at 22 (April 30, 2019 Agent Affidavit) ("Under Chapter 550, Florida Statute, Sections 550.001 *et al*.,'[ a]ny person who attempts to affect the outcome of a horserace or dog race through administration of medication or drugs to a race animal as prohibited by law . . .  is guilty of a felony in the third degree.'").

These claims misled the issuing courts in several respects.

First, although the Government was representing to the courts that it knew what was in SGF-1000—averring in its first application on April 30, 2019 and thereafter that SGF-1000 was a "performance-enhancing" drug composed of growth factors—*the Government did not actually know what substances SGF-1000 contained*. Buried in its final period report on August 19, 2019, and without correcting any of the prior submissions, the Government disclosed for the first time that it did not know the contents of SGF, by casually stating: "Agents have [ ] obtained a sample of SGF-1000 and sent the substance to a laboratory in Hong Kong for testing to determine the precise chemical contents of that substance." Glavin Aff., Ex. 4B at 18-19 (August 19, 2019 Period Report).[8]

The Government's failure to disclose in its initial and subsequent submissions to the Courts that it did not know what was in SGF-1000, coupled with its affirmative claims concerning SGF's composition and performance-enhancing nature, made its SGF claims materially misleading. Notably, in its applications, the Government characterized statements from Mr. Rhein to Alexander Chan that SGF-1000 was compliant with state racing rules as "false" precisely because the Government claimed Rhein "[did] not know the precise chemical composition of SGF-1000, and [had] expressed interest in having the substance tested in the future." Glavin Aff., Ex. 4 at 129 (July 30, 2019 Agent Affidavit).

Worse still, the Government deliberately withheld from the issuing courts that it knew—by at least June 7, 2019—that SGF-100- had been tested by a world-renowned laboratory,

---

[8]     As discussed *infra*, even this disclosure was misleading because it misrepresented the government's efforts to learn what was within SGF-1000 and what it had learned from the HKJC on the subject.

which had told the Government that that growth factors were *not* present in SGF-1000.  Indeed,

not only did the Government withhold this information, it repeatedly and affirmatively averred in

its wiretap applications that SGF-1000 was actually a performance enhancing substance that

contained "growth factors."  *See*, *supra*, Section III, at 10-11.

On June 5, 2019, members of the New Jersey State Racing Commission—working

in conjunction with ████ ██[9] and the FBI—took a blood sample from one of Mr. Servis' horses,

"Maximum Security."  On that same day, the Government intercepted a telephone call between

Mr. Servis and Mr. Rhein wherein Mr. Rhein asserted that SGF-1000 had been tested by the Jockey

Club and that the results of that testing indicated that it did not contain any prohibited substances:

> . . . I met the guy inadvertently when the Jockey Club took a box of
> the SGF.  They took and I met the guy and I met the guy down at
> the conference and he goes "The Jockey Club" and he saw the hat
> that I had on was the same company and he goes "Oh man I just
> tested a box of that stuff" and I go "What stuff" and he goes
> "Medivet.  You've got a hat on.  SGF.  Yeah Jockey Club sent it to
> me out in California.  *Yeah it came back as just a bunch of collagen.*
> *Nothing interesting [U/I].  These guys think it's got something that*
> *can be like a performance enhancing drug."  He goes "There's*
> *nothing in it," and he was the actual head of the testing lab . . . And*
> *like I said we have had it done two or three times here.  Nothing.*

Glavin Aff., Ex. 2A at 11 (emphasis added).

On June 6, 2019, agents intercepted another call between Mr. Rhein and Mr. Servis,

wherein Mr. Rhein again told Mr. Servis:

> . . . between you and me because the testing, they called me from the test
> center here and I was like, "What's up?"  They go, "Do you know

---

[9]     ████████ is identified in news reports as ███████████████

████████████████████████  Glavin. Aff., Ex. 10.

██████████ is the "CS-1" identified in the Government's April 30, 2019 wiretap application as

█████████████████████████████████████

████████████████████████████ who has been working with the

FBI ████████████████████  *See* Glavin Aff., Ex.  1 at 18-19 (April 30, 2019

Agent Affidavit).

anything?" So what they called it, they called it "growth hormone." They were like, "You're using some sheep growth hormone." I go, "No it has no growth hormone what-so-ever in it." And I said, "It tested as collagen, which is a protein. A, a fine . . . there is nothing wrong with it." I told him the name of the gentleman that did it in California. I said, "His name is ▮▮▮▮▮▮▮▮."[10] He goes, "Oh, I know him." I said the Jockey Club had it tested.

. . .

[SGF] isn't even considered a drug. It has no drug in it, it is literally just a purified protein from a sheep's placenta. This isn't a drug, this isn't manufactured . . . So the Federal Drug Administration they wouldn't approve it anyway, just because it is not a drug.

.

Glavin Aff., Ex. 2A at 14-15.[11]



---

[10] ▮▮▮▮▮▮▮▮▮, who used to work at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[11]    Additional intercepted calls also make clear that Mr. Rhein continually reassured Mr. Servis that SGF-1000 was a permissible, legal product that promoted the well-being of horses by preventing injuries and did not contain any banned substances. The intercepted calls also reflect Mr. Rhein's deliberate efforts to conceal information from Mr. Servis and others because he feared they would discontinue purchasing SGF-1000 if they believed the product might be illegal. For instance, in July 9, 2019, in an intercepted call with Michael Kegley, Jr. (a Medivet sales representative) about SGF-1000, Mr. Rhein stated, among other things:

We just need to be aware of (sic) because you just don't want everybody to think it has some real negative. Cause they will run from it. I mean there is no doubt they will run from it. And then it just carries on and carries on. So we'll ride this one out quietly and see what happens.

Glavin Aff., Ex. 3B at 9.

Similarly, in an intercepted call on August 15, 2019, Mr. Rhein told Mr. Kegley: "What they are going to do Mike, is they are going to scare the shit out of these customers and the problem is these people talk to people . . . And the next thing you know, this going to be a fire and everybody is going to go 'I don't want to use that stuff.'" Glavin Aff., Ex. 17. And: "[F]or our clients we need to give them reassurance." *Id.* And: "Yeah, I mean, we'll be fine. I really, I'm not worried that

Also on June 6, 2019, ███████, acting on behalf of the FBI, informed the HKJC

that he had sent to the HKJC the blood sample agents had obtained from Maximum Security,

stating that the horse had received SGF-1000 days earlier.  Glavin Aff., Ex. 11.  The next day, on

June 7, 2019, a representative of HKJC responded to ███, informing him that SGF-1000 is not

actually a performance enhancing drug.  She wrote:

> Dear ████,
>
> We had analysed (sic) the content of the SGF 1000 from Medivet
> some years ago.  It is listed to contain a combination of growth
> factors, peptides, proteins and signal molecules obtained from ovine
> placental extract.  No detectable amount of growth factors was
> found but collagens common to ovine or bovine origin were
> detected.

*Id*.

Four days later, on June 11, 2019, ████████ forwarded the HKJC's email to FBI

Special Agent Bruce Turpin – not once, but twice.  Specifically, at 10:46 a.m., ███████ forwarded

the above email to Agent Turpin and Timothy Harrington of 5 Stones Investigations, without

comment.  *Id*.  Less than 10 minutes later, he forwarded the same email to Agent Turpin again,

adding, by way of commentary: "Apparently Kristian Rien [sic] did use HKJC to test their

product."  Glavin Aff., Ex. 12.[12]

On June 24, 2019, the HKJC reported the results of the testing of Maximum

Security's June 5 blood sample to ████████, who was actively working with the FBI.  Glavin

they will do it. But I think that we can keep them from ever damaging our business if we do this
right. That is what I am worried about."  *Id*.

[12]     This comment suggests ██████ and the FBI agents had been discussing Mr. Rhein's
assertions to Mr. Servis that the "Jockey Club" had tested SGF-1000 and found no prohibited
substances, and that the HKJC's email to ██████ had seemingly confirmed such testing had
occurred.

Aff., Ex. 13.  Nothing in those test results indicated the presence of a "growth factor."[13]  *Id*. ███

███ forwarded the results to Agent Turpin on the same day.  *Id*.  Four minutes later, Agent Turpin

forwarded the entire email chain with the HKJC—including the test results and the HKJC's

assertion that SGF contains only collagen—to FBI Special Agent Timothy Bergen and four other

colleagues at the FBI.  *See* Glavin Aff., Ex. 14.

           Notwithstanding the information provided to ███ on June 7th by the HKJC

(*i.e.*, that SGF had been tested and "[n]o detectable amount of growth factors was found" (Glavin

Aff., Ex. 11)), a few days later, on June 10th, the Government submitted a periodic report to the

court stating: "Agents have learned that SGF-1000 is a performance-enhancing substance known

as a growth factor that promotes tissue repair."  Glavin Aff., Ex. 2A at 11 (June 10, 2019 Periodic

Report).  Later that month, in connection with an application to renew the wiretap on Mr. Servis's

phone—*and an initial application for a wiretap on Kristian Rhein's phone*—the Government

submitted a June 27, 2019 sworn affidavit from FBI Agent Timothy Bergen in which he repeatedly

described SGF-1000 to the court as a "growth factor" and "performance enhancing substance."

Indeed, Agent Bergen averred under oath as follows:

> Based on my training and experience and my participation in this
> investigation, including my review of prior and subsequent intercepts, I
> have learned that SGF-1000 is a performance enhancing substance known
> as a grown factor that promotes tissue repair.  I have learned that growth
> factors are on the 2017 Association of Racing Commission International's
> Model Rule of Racing classification of restricted substances.

Glavin Aff., Ex. 3 at 66 (June 27, 2019 Agent Affidavit); *see also id.* at 67-68

---

[13]    The HKJC reported that Maximum Security's blood sample was "screened to contain clenbuterol," though it notably did not state at what level clenbuterol was detected in the blood. Glavin Aff., Ex. 13.  Maximum Security raced on June 16, 2019, at Monmouth Park and placed second.  *See* Equibase Horse Profile for Maximum Security, available at: https://www.equibase.com/profiles/Results.cfm?type=Horse&refno=10109949&registry=T&rbt =TB**.**  *There is no evidence that Maximum Security failed any post-race drug test—either in connection with that June 16, 2019 race, or any other race.*

The Government did not reveal the contrary information which the FBI had obtained from the HKJC. Nor did it reveal the results of the June 5, 2019 blood testing on Maximum Security. To the contrary, Agent Bergen's June 27, 2019 affidavit affirmatively misrepresented to the court that the June 5, 2019 blood sample of Maximum Security was "undergoing analysis to determine the presence of any performance enhancing substances," and that such testing was "currently underway." *Id*. at 115, n.49.

After its June 27 renewal application for the Servis phone, and initial application for a wiretap on Mr. Rhein's phone, the Government continued to assert that SGF-1000 was a PED containing growth factors and continued to withhold the information it had obtained from the HKJC in all of its subsequent Title III submissions. *See* Glavin Aff., Ex. 3A at 7 (July 8, 2019 Periodic Report); Glavin Aff, Ex. 3B at 11, 12-13 (July 17, 2019 Periodic Report); Glavin Aff., Ex. 4 at 68, 69, 128, 130, 136, 139 (July 30, 2019 Agent Affidavit for renewal application); Glavin Aff., Ex. 4A at 8 (August 9, 2019 Periodic Report); Glavin Aff., Ex. 4B at 6 (August 19, 2019 Periodic Report).

Moreover, the Government did not reveal that Medivet Equine was the known source of SGF-1000, or that such substance was being publicly marketed for sale on that company's website. To the contrary, in the initial wiretap application and thereafter, the Government repeatedly informed the Court that a wiretap was necessary to learn Mr. Servis's sources of supply. *See* Glavin Aff., Ex. 1 at 76.

IV.     The Government Misled the Issuing Courts Concerning Clenbuterol

The Government also consistently misled the issuing courts about Clenbuterol to further its wire and mail fraud theory, characterizing it in its initial wiretap application on April 30, 2019, as an illicit performance-enhancing drug "prohibited or banned" under New York and

New Jersey rules, "absent certain exceptions."  Glavin Aff., Ex. 1 at 55.  As for the Florida rules regarding Clenbuterol, the Government stated: (1) "trainers are prohibited from administering performance-enhancing substances to a horse to affect the outcome of a race," and (2) Clenbuterol is considered a "Class 3 substance under the Florida rules," which is a drug that "may or may not have generally accepted medical use in a horse."  *Id.*

As an initial matter, contrary to the Government's characterizations, Clenbuterol is not "prohibited or banned" in New York and New Jersey.  Clenbuterol is a legal drug with therapeutic value in the jurisdictions where Mr. Servis raced horses.  For instance, a July 31, 2018 publicly available "Equine Medical Advisory" released by the New York State Gaming Commission expressly states that: "Clenbuterol use *is not prohibited* when used in compliance with existing NYSGC rules, 9 NYCRR 4043.2(i)(3) (14 day restriction) and 4043.3(5) (ARCI threshold)."  Glavin Aff., Ex. 15 (emphasis added).  In other words, Clenbuterol was permitted in New York at that time, although a horse could not race with Clenbuterol present within its system above a certain threshold, *see* 9 NYCRR § 4043.3(a)(5),[14] and it must not receive Clenbuterol within fourteen days of a race.  *See* 9 NYCRR § 4043.2(i)(3).[15]  Clenbuterol was also permitted in New Jersey and Florida.  New Jersey permitted the use of Clenbuterol but requires that a horse not have the drug in its system at the time of a race above a certain threshold.[16]  Florida operated in a

---

[14]    9 NYCRR § 4043.3(a)(5) provides that "[a] horse shall have raced in violation of this section if" Clenbuterol is found at levels "in excess of" "140 pg/ml in urine" or at any level if found in plasma.

[15]    9 NYCRR § 4043.2(i)(3) provides that "a horse may not race . . . for at least 14 days following an administration of clenbuterol" and that "it shall be the trainer's responsibility to prevent such ingestion within such time period[]."

[16]    N.J.A.C. § 13:70-14A.1 at subsection (b)(14) provides that "no horse entered to start in or participating in any race shall carry in its body any . . . [c]ontrolled therapeutic medications equal to or in excess of the threshold levels set in the Association of Racing Commissioners International

similar fashion, providing that it "shall not be" a violation if a horse tests as having less than or equal to "a urinary concentration of 140 picograms per milliliter, or a blood serum concentration at the lowest level of detection" in its system at the time of a race. Fl. Admin. Code Rule 61D-6.0008.[17]  None of this information was provided in the Government's April 30, 2019 initial application for a wiretap on Mr. Servis's phone.

Critically, in pursuit of its wire and mail fraud theory, the Government repeatedly characterized Clenbuterol as performance-enhancing due to its bronchodilating effects, stating that it "assists a horse's breathing, which enhances a horse's performance." Glavin Aff., Ex. 1 at 55 (April 30, 2019).  This too was misleading.  As a leading equine pharmacology and toxicology expert has stated, Clenbuterol does <u>not</u> have a bronchodilation effect at low levels of detection. Glavin Aff., Ex. 16 at 133-34, 136 (testimony of Dr. Steven Barker dated Sept. 1, 2015). Indeed, the Government's own equine expert in this case (Dr. Cynthia Cole) also shares this view, having previously stated years ago that "the effects for bronchodilation [from Clenbuterol] only would last 12 hours, give or take." *Id*. at 51; *see id*. at 50.  Indeed, the Government's expert testified when a horse raced with 20 picograms of Clenbuterol in its system, the "concentration [was] unlikely to produce bronchodilation and alter the horse's performance in regard to bronchodilation." *Id*. at 108.  This fact should have been known to the Government, as it is well-

---

(RCI) Controlled Therapeutic Medication Schedule (Schedule), version 2.1 (Revised April 17, 2014)."  That Controlled Therapeutic Medication Schedule in turn sets the threshold for Clenbuterol at "140 picograms per milliliter or Level of Detection in plasma or serum."

[17]    In a footnote, the government tacitly acknowledged that Clenbuterol is not *per se* banned in Florida, noting that it must be at the "lowest level of detection" on "the date the horse is tested." Glavin Aff., Ex. 1 at n.26 (April 30, 2019 Agent Affidavit).  Actually, Florida rules provide that Clenbuterol must be at the lowest level of detection *before or immediately after a race*.  *See* Fla. Stat. § 550.2415.

known in the industry.   To achieve the performance-enhancing effect described in the Government's wiretap applications, Clenbuterol would have to have been administered to the horse shortly before the race—which would have resulted in a failed post-race drug test if the horse won.   As the Government surely must have known (or was reckless in not knowing), Clenbuterol is among the many substances tested for in post-race testing.

Notwithstanding the Government's assertion that Mr. Servis was engaged in a wire and mail fraud through the use of a performance-enhancing bronchodilator to effect his horse's breathing, it knew or should have known, but failed to disclose, that none of Mr. Servis's horses failed a post-race drug test during the period of the Government's investigation.   By withholding this information, the Government implied to the Court that Mr. Servis's horses had, in fact, won races through the use of Clenbuterol, stating: "[T]hree horses trained by SERVIS placed first in three races held at Gulfstream Park. . . in Florida on February 14, 2019."   Glavin Aff., Ex. 1 at 55 n.26 (April 30, 2019 Agent Affidavit); "I believe on this [February 18, 2019] call, SERVIS is discussing the fact that three horses under his care who had won faces recently had been administered a substance called Clenbuterol." *Id.* at 54.   The Government must have known those three horses would have been tested following their races and that none of them failed any post-race test.   Contrary, to the Government's wire and mail fraud theory, therefore, none of those three horses could have won their races based on the illicit use of Clenbuterol, and there was no evidence that Mr. Servis administered Clenbuterol to those horses in violation of Florida's rules.

The Government continued to mislead courts about Clenbuterol in its subsequent submissions, though unlike its initial April 30, 2019 affidavit, which characterized Clenbuterol as "prohibited and banned," the Government gradually altered its description of the drug in its T-III submission to the court.   *See e.g.,* Glavin Aff., Ex. 1A at 4 (May 10, 2019 Periodic Report

describing Clenbuterol as "banned or restricted").  However, the Government still continued to characterize Clenbuterol as a performance-enhancing, due to its ability to "assist[ ] a horse's breathing," in almost all of its subsequent submissions.  Glavin Aff., Ex. 1A at 4 (5/10/19 Period Report ) (". . . [C]lenbuterol . . . assists a horse's breathing, which enhances the horse's performance.");  Glavin Aff., Ex. 1B at 4-5 (May 17, 2019 Periodic Report);  Glavin Aff., Ex. 2 at 63 (May 29, 2019 Agent Affidavit); Glavin Aff., Ex. 2A at 8 (June 10, 2019 Period Report); Glavin Aff., Ex. 3 at 62 (June 27, 2019 Agent Affidavit);  Glavin Aff., Ex. 3A at 14 (July 8, 2019 Periodic Report);  Glavin Aff., Ex. 3B at 17 (July 17, 2019 Period Report);  Glavin Aff., Ex. 4 at 64 (July 30, 2019 Agent Affidavit).  And it did so while withholding from the courts the crucial fact that Clenbuterol does not cause this purported performance-enhancing effect at low levels of detection and that none of Mr. Servis's horses failed a post-race drug test during the course of the FBI's investigation.

In multiple submissions after the April 30 initial application, the Government stated that "under the regulations and related rules that govern racing in New Jersey, [C]lenbuterol may not be administered within 4 days of a race."  Glavin Aff., Ex. 1A at 4 (May 10, 2019 Period Report); Glavin Aff., Ex. 2 at 63, 86 (May 29, 2019 Agent Affidavit) ("[U]nder the regulations and related rules that govern racing in New Jersey, Clenbuterol may not be administered within 4 days of a race."); Glavin Aff., Ex. 2A at 8 (June 10, 2019 Period Report) ([U]nder the regulations and related rules that govern racing in New Jersey, [C]lenbuterol may not be administered within 4 days of a race.").  Such claims were incorrect.  Unlike in New York, which requires a fourteen-day withdrawal period,[18] neither New Jersey nor Florida impose a mandatory withdrawal period.

---

[18]   The Government later acknowledged in its May 17, 2019 Periodic Report that New York imposes a 14-day withdrawal period, tacitly conceding that Clenbuterol is not *per se* prohibited in the state, despite its characterization of Clenbuterol as a banned substance.  *See* Glavin Aff., Ex. 1B at 4-5.

Reversing course, and without notifying the issuing court of its prior errors, for the

first time in its June 27, 2019 affidavit for a renewal (and in other submissions thereafter),[19] the

Government stated:

> From my discussions with a New Jersey State licensed veterinarian,
> I have learned that, under the New Jersey Rules, clenbuterol may
> not be present in a horse's body above certain thresholds, meaning
> that, effectively, clenbuterol may not be administered to a horse
> within 14 days of a race, consistent with the 14-day withdrawal
> period present in several other jurisdictions.

Glavin Aff., Ex. 3 at 100-101 (June 27, 2019 Agent Affidavit); *see* Glavin Aff., Ex. 3A at 14 (July

8, 2019 Periodic Report); Glavin Aff., Ex. 4 at 77 (July 30, 2019 Agent Affidavit).  Yet even this

description of New Jersey's rules regarding Clenbuterol was wrong.  Notwithstanding the

Government's implication that Clenbuterol cannot be used within fourteen days of a race in New

Jersey, no such mandatory withdrawal period exists.[20]

---

[19]    The June 27, 2019 Servis wiretap renewal application was made before Judge Andrew L
Carter, who was not the judge for the April 30, 2019 initial wiretap application (Judge Loretta A.
Preska) or the judge for the May 29, 2019  wiretap renewal application (Judge Alison J. Nathan).
The July 30, 2019 wiretap renewal application was made before Judge Ronnie Abrams.

[20]    The Government's initial application contained other misrepresentations as well.  For
instance, the Government quoted a February 18, 2019 intercepted call between Mr. Servis and Mr.
Navarro, wherein Mr. Navarro said: "Alright the only thing—any medications, pills and stuff you
have to have it under lock."  Glavin Aff., Ex. 1 at 53.  The Government characterized this call as
an instruction to hide substances.  *Id*. at 54.  In fact, Mr. Navarro was informing Mr. Servis that,
under Florida law, "[a]ll prescription medications, regardless of method of administration, shall be
safeguarded under lock and key when not being actively administered." Fl. Admin. Code Rule
61D-6.008 (Permitted Medications for Horses).  If the FBI Agents on this matter possessed the
relevant horseracing expertise that they purported to have through their "training and experience,
and from [their] involvement in this investigation," (Glavin Aff., Ex. 1 at 53), they certainly would
have known of this Florida rule about locking up medications.

This fits within the larger pattern of misrepresentations by the Government in a rush to
secure evidence against Mr. Servis.  For example, in a March 20, 2020 affidavit to secure a search
warrant of Mr. Servis's emails, the attesting FBI agent combined two separate and entirely
innocuous communications and presented them as though they were a single, incriminating

# I.    LEGAL STANDARDS

Covert eavesdropping by the Government of wire and oral communications is circumscribed by constitutional and statutory limits.  In *Katz v. United States*, 389 U.S. 347 (1967) and *Berger v. New York*, 388 U.S. 41 (1967), the Supreme Court made clear that, because "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices," 388 U.S. at 63, the Fourth Amendment restricts the Government's use of wiretaps to record private telephone conversations.[21]    Indeed, because wiretaps are conducted without notice to the individuals affected and indiscriminately capture all conversations regardless of relevance, more

---

email.  It alleged that Mr. Servis had sent Mr. Rhein "an announcement by the New York State Gaming Commission Equine Medical Director" that "medications are ONLY to be administered to the horse for which they were prescribed" and maintained that "in the email from SERVIS forwarding the announcement to RHEIN, SERVIS wrote, 'No good he's going to be a problem / Call me when free.'"  Glavin Aff., Ex. 20.  In fact, Mr. Servis had sent Mr. Rhein the New York State Gaming Commission announcement.  Glavin Aff., Ex. 21.  Then, in an entirely separate email regarding a March 2018 invoice that Mr. Rhein was slated to send to a horse owner, and because this particular owner had a habit of complaining that bills were too high, Mr. Servis informed Rhein that, to avoid an inevitable conflict with the client, Rhein would likely need to provide the client a discount, stating: "Not good he's going to b a problem."[1]  Glavin Aff., Ex. 22.  What the Government presented as a single, incriminating email was in fact two separate and entirely innocuous communications on entirely different subjects.

Notably, in that email search warrant affidavit, FBI Agent Turpin, who had received the June 7, 2019 HKJC email, continued the unfounded claim that SGF-1000 as performance-enhancing without disclosing what the HKJC test results on SGF-1000 showed.  See Glavin Aff., Ex. 20 at ¶ 10(a) (characterizing Mr. Servis as "a Thoroughbred race horse trainer who has discussed procuring, transporting, and administering . . .  performance-enhancing drugs" and stating he had previously discussed SGF-1000, described as a "PED distributed by Medivet Equine," with others); id. (". . . Servis was interviewed by New York State troopers regarding his administration of the adulterated and misbranded PED SGF-1000."); *id.* at ¶ 12(d) (" . . . Rhein sought to convey . . . that there were no "growth hormones" and "nothing illegal" in the PED[.]"); *id*. at ¶ 13 (". . . Rhein subsequently gave a post-arrest statement regarding . . .  various PEDs, including SGF-1000.").

---

[21]    The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.

than the ordinary standard of probable cause used to support "conventional warrants" is required. *Berger*, 381 U.S. at 60.  For a wiretap to pass constitutional muster, a fully informed court must independently determine that "special facts" demonstrating "exigency," *id*., create a "genuine need" for Government officials to secretly intercept private conversations.  *Dalia v. United States*, 441 U.S. 238, 250 (1979).

"To guard against the realization of Orwellian fears and conform to the constitutional standards for electronic surveillance operations elaborated in [*Katz* and *Berger*], Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968[.]" *United States v. Marion*, 535 F.2d 697, 698 (2d Cir. 1976).  "[H]eed[ing] the Supreme Court's admonitions," Title III "prohibits, in all but a few instances, the interception and disclosure of wire or oral communications," *id*. at 700, by establishing a "comprehensive scheme for the regulation of wiretapping and electronic surveillance."  *Dalia*, 441 U.S. at 249; *see Scott v. United States*, 436 U.S. 128, 130 (1978); *Gelbard v. United States*, 408 U.S. 41, 46 (1972).

To that end, Title III imposes "important preconditions to obtaining any intercept authority at all."  *United States v. Giordano*, 416 U.S. 505, 527 (1974); *Gelbard*, 408 U.S. at 46 (approval for a Title III wiretap "may not be given except upon compliance with stringent conditions").  "Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval."  *Gelbard*, 408 U.S. at 46 (citing 18 U.S.C. § 2516, 2518(1)-(8)).

Prior judicial approval must be predicated on a finding that probable cause exists for the belief that: (1) "an individual is committing, has committed, or is about to commit a particular offense" enumerated in Section 2516; (2) "that particular communications concerning that offense will be obtained through such interception," and; (3) the particular device being tapped

23

is itself being used in connection with the commission of the offense.  18 U.S.C. § 2518(3).

Additionally, because of the extraordinary intrusion of a wiretap, Congress required a strict

showing of necessity.  Specifically, Title III expressly requires that a judge find that such wiretap

is necessary because "normal investigative procedures have been tried and have failed or

reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. §

2518(3)(c).

To ensure the Government meets these exacting standards, Title III requires that

law enforcement provide the authorizing court with "a full and complete statement of the facts and

circumstances relied upon by the applicant" to establish probable cause as to the "particular

offense" being investigated.  18 U.S.C. § 2518(1)(b).  Law enforcement must also provide "a full

and complete statement as to whether or not other investigative procedures have been tried and

failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18

U.S.C. § 2518(1)(c).[22]

Interceptions of wire and oral communications that fail to meet these preconditions

are not authorized in Title III are therefore "flatly prohibited."  *Gelbard*, 408 U.S. at 46.  In addition

to the traditional exclusionary rule that applies for Fourth Amendment violations, § 2515 contains

a distinct statutory rule of exclusion that prohibits the use "in any trial, hearing, or other proceeding

in or before any court," "any wire or oral communication [that] has been intercepted," and any

"evidence derived therefrom," if the "disclosure of that information would be in violation of" Title

III.  18 U.S.C. § 2515.  Indeed, Title III's statutory rule of exclusion "require[s] suppression where

there is a failure to satisfy any of those statutory requirements that directly or substantially

---

[22]     If the requisite showing is met, the resulting warrant must prescribe precisely which
conversations of which individuals on which telephones may be sought and for what period of
time.  *See* 18 U.S.C. §§ 2518(1) and (4).

implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527.

In sum, unless a wiretap order complies with the jurisdictional, probable cause, and necessity standards established by *Katz*, *Berger*, and Title III, suppression is required.

Although Title III's expressly enumerates certain statutory requirements that must be met for a wiretap application, the Second Circuit has determined that "the appropriate analytical framework" for "addressing a motion to suppress the proceeds of a wiretap on the ground that the application contained misrepresentations or omissions" is that set forth in *Franks v. Delaware*, 438 U.S. 154 (1978). *United States v. Lambus*, 897 F.3d 368, 396 (2d Cir. 2018) (citing *United States v. Rajaratnam*, 719 F.3d 139, 143-44 (2d Cir. 2013)).

Under the *Franks* standard, "as applied to a challenge to a wiretap authorization's findings of probable cause or necessity," a defendant must show that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding." *Id*. at 397 (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)."

"To determine whether misstatements are material, a court must set aside the falsehoods in the application, and determine whether the untainted portions of the application suffice to support a probable cause or necessity finding.  If the untainted portions of the application are sufficient to support the probable cause or necessity findings, then the misstatements are not material and suppression is not required." *Id*. (quoting *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)) (internal quotations and citations omitted).

25

"Where the defect in the affidavit is omissions, the ultimate inquiry under the *Franks* standard is whether, after putting aside erroneous information and [correcting] material omissions, there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity]." *Id.* (quoting *Canfield*, 212 F.3d at 718) (internal quotation marks omitted).

## II.    ARGUMENT

The Government's Title III application submissions—which contained gross misrepresentations and material omissions that cut to the heart of its efforts to show probable cause and necessity—violated Mr. Servis's Fourth Amendment rights and Title III's requirement that law enforcement provide the authorizing court with "a full and complete statement" of probable cause and the need for a wiretap of Mr. Servis's phone.  18 U.S.C. § 2518(1)(c).  Those wiretaps, and the evidence obtained as a result, must be suppressed.

### a.    The Government's material misstatements and omissions were dilberate or reckless and affected each issuing court's probable cause determination.

Under the *Franks* standard, suppression of wiretap evidence is required where "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding." *Lambus*, 897 F.3d at 397.  The Government's misrepresentations concerning SGF-1000 and Clenbuterol satisfy both elements.

### i.    *The Government's misrepresentations concerning SGF-1000 and Clenbuterol were deliberate or, at the very least, made in reckless disregard for the truth.*

There is ample reason to believe the Government's material misrepresentations and omissions concerning SGF and Clenbuterol were "designed to mislead" or, at the very least, made with "reckless disregard" for truth. *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013).

First, the timing of the Government's last-minute disclosure that it did not know what was in SGF (a reality it could have disclosed in any prior submission), coupled with the Government's decision to omit from that eventual disclosure the information it received from the HKJC, itself evidences an intent to misled.  *Id*. ("[A] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.") (quoting *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001).

Second, the Government not only withheld the HKJC's information, it used its monopoly over the information as a weapon to falsely discredit the defendants.  As noted *supra*, in FBI Agent Bergen's June 27, 2019 affidavit to renew the wiretap of Mr. Servis's phone and obtain a wiretap on Mr. Rhein's phone, Agent Bergen quoted a June 5, 2019 conversation between Mr. Servis and Rhein, wherein Rhein told Mr. Servis that the Jockey Club had tested SGF-1000 and that it did not contain any performance enhancing elements.  Although Rhein's statement was consistent with the information the Government had received from the HKJC, the Government still did not disclose what it had learned from the HKJC.   Rather, Agent Bergen dismissed Mr. Rhein's remarks as untrue, telling the Court the he "believe[d] that the 'SGF' may be a reference to 'SGF 1000,' an equine performance-enhancing substance," and then again asserting that he had "learned that SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue repair" and that "growth factors are on the 2017 Association of Racing Commission International's Model Rules of Racing classification of restricted substances." Glavin Aff., Ex. 3 at 75.

Similarly, in its July 30, 2019 affidavit for a renewal of the wiretap on Mr. Servis's phone, the Government cited an intercepted call between Mr. Rhein and Mr. Chan, wherein Mr. Rhein stated that SGF-1000 had been "tested at two independent labs[,] [a]nd there's nothing, no

find." Glavin Aff., Ex. 4 at 124. Without disclosing the information it had received from the HKJC, the Government dismissed Rhein's statement as a lie, characterizing Rhein as "falsely reassuring" Chan regarding SGF-1000's compliance. *Id*. at 129. Thereafter, in that same submission, and notwithstanding the countervailing information from the HKJC, the Government repeatedly asserted that "SGF is a performance-enhancing substance which contains growth factors, and that growth factors, among other things, promote tissue repair." *Id*. at 69 and 98 (". . . SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue repair").

The efforts to discredit the defendants by withholding the HKJC's information continued through the Government's final periodic report on August 19, 2019 periodic report. In that report, the Government quoted an August 14, 2019 call between Mr. Chan and Mr. Servis, wherein they said, *inter alia*:

> SERVIS:   Well is it okay to use that?
> CHAN:     Use what?
> SERVIS:   The SGF.
> CHAN:     Yeah like New York rules there is nothing like against—like it's—you know like it says unless it's not specifically written in there then it's seven days, you know. So like—it's not illegal.

Glavin Aff., Ex. 4B at 7. That periodic report also quoted an August 16, 2019 call between Mr. Servis and Mr. Rhein wherein they said, *inter alia*:

> SERVIS:   And the SGF is okay[?]
> RHEIN:    Yeah yeah I mean it's been tested. Months ago I had it tested there is nothing in it. I have all the reports. I have everything. Like it's been tested three times there's absolutely nothing in it because I heard down in Florida that they were . . . I'll tell you what people have been saying it's growth hormone and it's not and it's not it's never been ever anything like that[.]

*Id*. at 9. Later in that call, Mr. Rhein told Mr. Servis:

28

> [I]t's considered a biologic so it's 48 hours.  I mean it's by the rules
> of racing we are doing everything . . . it falls under that category of
> biologics so we've used it . . . So everything we've done is by the
> letter of the law.

*Id*. at 10.

Notwithstanding the HKJC's information provided to the FBI about testing of SGF-1000, the Government dismissed these calls, again asserting, contrary to the HKJC's testing, that "Agents have [ ] learned that 'SGF-1000' is a custom-made performance-enhancing substance known as a growth factor," *id*. at 6, and "[b]ased on their training and experience and their participation in this investigation, including their review of prior and subsequent intercepts, agents believe that, as discussed above, SGF contains several ingredients prohibited under the New York Rules." *Id*. at 11.

Third, Government submissions made shortly after the wiretap ended in in connection with other evidentiary matters reflects that the Government understood the extraordinarily damaging nature of HKJC's prior testing of SGF-1000—of which the FBI was aware.  Just a month after its last periodic report for the wiretap of Mr. Servis's phone, the Government submitted an application for a search warrant for Michael Kegley, Jr.'s email.  In this application, and unlike the Government's Title III submissions, an FBI agent finally disclosed the HKJC's test results, stating:

> I have also learned from my participation in this investigation that, several
> years prior to 2019, a drug testing laboratory located in Hong Kong (the
> "Hong Kong Lab") conducted analysis of a powder substance represented
> to be a product named "SGF-1000" at the direction of a private client. ***I have
> further learned that the Hong Kong Lab did not detect the presence of any
> growth factors or growth hormones in the sample that was analyzed***, but
> did detect the presence of sheep amino acids.

Glavin Aff., Ex. 18 at n.7 (emphasis added).

In February 2020, in connection an application for a search warrant for Medivet's premises, the Government included this same disclosure with the exception that *it excised the specific reference to the HKJC's test results regarding the lack of growth factors such that the February 2020 application read*:

> I have also learned from my participation in this investigation that, several years prior to 2019, a drug testing laboratory located in Hong Kong (the "Hong Kong Lab") conducted analysis of a powder substance represented to be a product named "SGF-1000" at the direction of a private client. I have further learned that the Hong Kong Lab detected the presence of sheep amino acids.

Glavin Aff., Ex. 19 at n.7. This deliberate act of deleting the reference HKJC's test results about not detecting growth factors from the disclosure language provides important context for the Government's prior wiretap submissions. *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) ("[A] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.") (quoting *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001)).

Fourth, the Government's misrepresentations concerning Clenbuterol were also intentionally or recklessly misleading. The various rules and regulations it mischaracterized were all publicly available for anyone to confirm. Further, even though the Government repeatedly called Clenbuterol performance-enhancing due its ability to "assists a horse's breathing," the Government's own expert in this case has previously testified that any such effect lasts only a few hours after administration. This was certainly easy to verify with any reputable equine pharmacologist or toxicologist. Finally, at the same time the Government cited bans and post-race drug testing failures for Christopher Oakes and Nick Surick (both of whom have no connection to Mr. Servis), *see* Glavin Aff., Ex. 1 at 25-26, the Government omitted from *all* of its Title-III court submissions that *none of Mr. Servis's horses failed a post-race drug test throughout the*

*Government's investigation from 2017 through March 9, 2020 (when criminal charges were publicly filed).*

Simply put, there is "credible and probative evidence that the omission of information in a wiretap application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'"  *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013).

### ii.     *The Government's misrepresentations and omissions were necessary to each issuing court's determination of probable cause.*

The Government's misrepresentations were material and directly affected each issuing court's probable cause determination.  In an application for a wiretap, the Government must specify the offense for which evidence is sought.  *See* 18 U.S.C. § 2518(1)(b)(i).  Wiretaps may only be authorized to investigate certain enumerated offenses.  *See* 18 U.S.C. § 2516.[23]  Here, the Government argued in its initial wiretap application that a wiretap of Mr. Servis's phone was intended to investigate "misbranding of drugs and devices, in violation of 21 U.S.C. § 352." Although false or exaggerated marketing claims might be sufficient to establish "misbranding" under 21 U.S.C. § 352, misbranding is <u>not</u> a delineated offense which would legally justify the use

---

[23]     When a wiretap intercepts "communications relating to offenses other than those specified in the order of authorization," 18 U.S.C. § 2517(5), "disclosure or use" of those communications is permissible provided "a subsequent application . . . made to a judge of competent jurisdiction [demonstrates] the good faith of the original application."  *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976).  In *Marion*, the Second Circuit held that § 2517(5) requires a "subsequent application" before the government uses a wiretap to prosecute a non-wiretap-eligible offense (either before a grand jury or at trial) to ensure that wiretaps are "sought in good faith and not as subterfuge" for an investigation into that non-wiretap-eligible offense.  *Id*.  More recently, however, the Second Circuit held that a "subsequent application" is not needed, and § 2517(5) is not violated, "when the Government forthrightly discloses the probability of intercepting 'communications relating to other offenses' *ex ante*, at the time it makes its initial wiretap application."  *United States v. Goffer*, 721 F.3d 113, 123 (2d Cir. 2013).

of a wiretap under 18 U.S.C. § 2561(1).  Knowing this, the Government had to look elsewhere to give its wiretap application a patina of legality.

In doing so, it presented a wire and mail fraud theory grounded in Mr. Servis's purported use of "performance-enhancing drugs," claiming that the wiretap was "necessary to discover the scope and extent of SERVIS's sourcing and use of performance-enhancing substances, and the identities of any co-conspirators who assist SERVIS in administering such substances."  Glavin Aff., Ex. 1 at 76, 77 ("[O]ne of the goals of the investigation is to determine . . . the sources of supply of the performance-enhancing substances, and the number of customers who receive performance-enhancing substances.").  The Government's wire and mail fraud theory—and the wiretap application as a whole—was premised entirely on allegations that Mr. Servis was engaged in a scheme to "defraud racetracks, competitors and the betting public" by "doping" horses with prohibited performance-enhancing substances before races to obtain an improper advantage.  Glavin Aff., Ex. 1 at 3, 7. Thus, the Government's representations about SGF-1000 and Clenbuterol—the only allegedly prohibited performance-enhancing substances that Mr. Servis purportedly used—were central to each issuing court's determination of whether probable cause existed to believe Mr. Servis was perpetrating mail and/or wire fraud.   As the Government's assertions concerning SGF-1000 and Clenbuterol were false and/or materially misleading, the claim that there was probable cause to be believe Mr. Servis was engaged in a wire and mail fraud premised on allegations of his improper use of "performance-enhancing" drugs with thoroughbred racehorses crumbles.

### b.    The Government's Title III application failed to demonstrate necessity in compliance with 18 U.S.C. § 2510, et seq.

To ensure the drastic intrusion of a wiretap is only granted when necessary, Title III requires that the government provide "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  "The plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed."  *Dalia*, 441 U.S. at 250.  Indeed, Title III was "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Lilla*, 699 F.2d 99, 102 (2d Cir. 1983) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).

When scrutinizing the Government's compliance with the necessity requirements of § 2518, "[courts] must be careful not to permit the government merely to characterize a case as a [ ] 'conspiracy' . . . that is therefore inherently difficult to investigate."  *United States v. Robinson*, 698 F.2d 448, 453 (D.C. 1983).  Further, the government cannot improperly "cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *United States v. Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001); *see United States v. Lilla*, 699 F.2d 99, 105 (2d Cir. 1983) (suppressing wiretap evidence where "[t]he Government's argument [of] a 'far flung . . . conspiracy involving numerous unknown persons'" whose identities and activities "could be discovered only through wiretapping simply [did] not square with common sense.").  That is precisely what the Government did here.

Because the Government's investigation into Mr. Servis's use of SGF-1000 and Clenbuterol was insufficient on its own to meet the standards laid out in § 2518, the Government misled the issuing courts by indicating that a wiretap of Mr. Servis' phone was necessary because of a vast racehorse doping network.[24]  In its April 30, 2019 initial wiretap application, the

---

[24]     Even the agent's description of his credentials implied that a wiretap of Mr. Servis's phone was necessary to take down a far-flung criminal enterprise.  *See* Glavin Aff., Ex. 1 at 3-4 (April 30, 2019 Agent Affidavit)  ("Through my training, education and experience, I have become

government claimed in boilerplate terms that it had probable cause to believe that "one or more" of more than sixty "Target Subjects"[25] would be committing "Target Offenses" through use of Servis's phone.[26] Next, the government tethered the "objectives" of a wiretap of Mr. Servis's phone to this sweeping list of "Target Subjects," stating that it was seeking a wiretap of Mr. Servis's phone to investigate "to the greatest extent possible" the "nature, extent and methods" of

---

familiar with the structure, hierarchies, and organization of organized criminal groups and complex criminal networks, and the manner in which such groups and networks operate to engage in various fraudulent schemes, extortion, illegal gambling, and other offenses, and the "lingo" and coded language used by the members and associates of such groups and networks.").

[25]     "Target Subjects" included:



; and others unknown.

Glavin Aff., Ex. 1 at 4-6.

[26]     The government stated:

> [T]here is probable cause to believe that *one or more of the Target Subjects* have committed, are currently committing, and will continue for at least the next 30 days to commit one or more of the Target Offenses [and] that *one or more of the Target Subjects*, during the period of interception sought, will use the Target Cellphone in furtherance of, in connection with, to facilitate, to accomplish, and to commit the Target Offenses specified herein[.]

Glavin Aff., Ex. 1 at 16-17 (emphasis added).

those "Target Subjects'" commission of the "Target Offenses."  Finally, the government argued

that only a wiretap of Mr. Servis' phone could reveal the full scope of the "Target Subjects'"

criminal activities, stating:

> "Despite the evidence obtained so far, *there is still much to be learned about
> the Target Subjects that can only be determined through wire* interception
> of [Mr. Servis's] Cellphone and electronic interception over [Mr. Servis's]
> Cellphone."

Glavin Aff., Ex. 1 at 76 (emphasis added).

Yet, with the exception of Jorge Navarro, the government failed to even allege a

connection between those dozens of "Target Subjects" and Mr. Servis.[27]

Moreover, the government littered its wiretap application with scores of highly

prejudicial allegations of misconduct relating to Surick, Fishman, Oakes, Gianelli, Zuluetta, and

Navarro, which Mr. Servis had nothing to do with.[28]  This was done to stain Mr. Servis with the

---

[27]     Notably, in the "Analysis of Communication Records for the Target Cellphone" section of
the application, the Government disclosed that toll records for Mr. Servis's phone revealed that
over a one-year period from April 2018 to April 2019, Mr. Servis had engaged in over 21,000 calls
and over 30,000 text messages.  Glavin Aff., Ex. 1 at 60.  However—notwithstanding the
government's sweeping "Target Subjects" list and its assertion that probable cause existed to
believe one or more of these "Target Subjects" were using Mr. Servis's phone in furtherance of
predicate offenses—the government only identified calls from Mr. Servis's phone with: (i) ███
█████████ who also trains horses and the government alleged was sanctioned in
2016 for a drug test that tested positive for clenbuterol); (ii) ███████████ (a horse owner that
Navarro had discussed with Target Subject ███████████ on an intercepted call, in which ██████
claimed was "always the one guy that says get the juice let's roll" ); and (iii) Gulfstream Park (a
race track) among those 21,000 calls.  *Id.* at 60-62.  Given the obvious personal and professional
relevance of such communications, as well as the lack of any suggestion these calls were in any
way in furtherance of a "Target Offense," those calls could not lend any support for wiretap of Mr.
Servis's phone.

[28]     In sections entitled "Background to the Investigation" and "Background to the Current
Investigation," the government detailed intercepted calls concerning, *inter alia*: (i) Surick's
purported use of Flunixin; (ii) Surick's purported procurement of Viagra for use on horses; (iii)
Surick's purported distribution of Viagra to others for use on horses; (iv) Surick's purported
administration of Viagra to horses through a "drench"; and (v) a video wherein Navarro and ██████
██████ refer to using "juice."  Glavin Aff., Ex. 1 at 23-29.  In its "Prior Intercepted Use of Phones
in Furtherance of the Target Offenses," the government referenced, *inter alia*: (i) purported

alleged misconduct and schemes of others, and to set up the Government's attempt to launder the information concerning the alternative investigative efforts of this unrelated conduct into the Jason Servis wiretap application for purposes of 18 U.S.C. § 2518(1)(c).  Critically, the Government's entire effort at demonstrating the futility of alternative investigative techniques with respect to Mr. Servis rested on its prior investigative efforts concerning this unrelated conduct with others.  For instance:

- With respect to confidential informants and cooperating witnesses, the Government cited to five confidential sources who provided information regarding Target Subjects Surick, Fishman, Oakes, and/or Navarro, and why *those* five sources would not be useful with Jason Servis.  Glavin Aff., Ex. 1 at 63-64.  Specifically, with the exception of ███████, those sources were developed in connection with the investigation of the criminal activities of those four specific Target Subjects based on relationships with those subjects—not Mr. Servis.  The Government describes no effort to develop any confidential source with respect to Jason Servis or precisely why such effort would not be fruitful.

- With respect to physical surveillance, the government cited: (i) the FBI's surveillance of a delivery of Viagra from CS-3 to Surick; (ii) the FBI's surveillance of Surick at Freehold

---

conversations between Surick and Navarro concerning the use of "shock machines" on horses; (ii) a purported conversation between Surick and Navarro concerning Surick's sale of Navarro's horses; (iii) Surick purported use of "red acid"; (iv) Surick's alleged efforts to hide a horse from members of the New Jersey Racing Commission; (v) Surick's purported use of epogen or a synthetic version of epogen on a horse; (vi) Surick's purported sale to Navarro of a substance the government characterizes as performance-enhancing; (vii) a purported call wherein Marcos Zulueta and Navarro discussed "orange stuff"; (viii) a purported call wherein Oakes and Navarro discuss "drenching" horses with performance enhancing drugs; (viiii) Oakes' alleged procurement of performance enhancing drugs from Fishman; (x) Fishman's alleged supply of performance enhancing drugs to Oakes and Navarro; and (xi) a purported call wherein Oakes discuss "block" with Navarro.  Glavin Aff., Ex. 1 at 30-49.  Notwithstanding their inclusion in the wiretap application, Mr. Servis had no involvement in this alleged conduct.

Raceway; and (iii) the FBI's surveillance of Navarro at Gulfstream Park.   No surveillance

of Mr. Servis was done—despite the fact that the Government had identified Mr. Servis as

a Target Subject as early as February 18, 2019 (two and a half months before the April 30,

2019 initial wiretap application).  Glavin Aff., Ex. 1 at 51-55.

- With respect to grand jury process, the government stated that the FBI had obtained records
  from InCompass and banks associated "with certain of the Target Subjects, including
  NAVARRO, OAKES, and FISHMAN," and as well as "bank account records associated
  with the Target Subjects," and that it was working with a forensic accountant in reviewing
  those records.  However, other than obtaining toll records for Jason Servis's phone, the
  government made no assertions about using grand jury subpoenas to obtain relevant
  information about Jason Servis, *i.e.*, subpoenas to racetracks, subpoenas to banks, etc.

- With respect to search warrants, the government cited: (i) a search warrant related to
  Surick, which granted the Government access to a farm house where Surick had
  purportedly been concealing a horse that he did not want to be drug tested; (ii) a search
  warrant related to Oakes, which permitted the government to conduct a blood draw of two
  horses under Oakes's care and to collect samples of "homemade and mass-produced
  substances OAKES kept in a medicine room in his barn in Pennsylvania"; and (iii) a search
  warrant related to Fishman, which permitted a border search of two phones used by
  Fishman when Fishman entered the United States.  No search warrants targeting Mr. Servis
  were attempted.

- With respect to financial investigations, the Government cited: (i) bank account records of
  Navarro, Oakes, Surick, and Fishman obtained via subpoena; (ii) InCompass financial
  records of Navarro; and (iii) Venmo transactions of ███████ obtained via subpoena.

The Government made no assertion that it had done or even attempted to do any financial investigation of Mr. Servis.

Because these allegations regarding alternative investigative techniques that did not pertain to Mr. Servis, they were insufficient to satisfy § 2518(1)(c), either as a matter law and as a matter of fact.

With respect to the former, the Ninth Circuit has held that § 2518(1)(c) does not permit the imputation of alternative investigative techniques to co-conspirators. *See United States v. Abascal*, 564 F.2d 821, 826 (9th Cir. 1977). Specifically, the Court in *Abascal* held that "a particularized showing" of the improbability of success or high degree of danger from the use of alternative techniques is required, and that because "[l]ess intrusive investigative procedures may succeed with one putative participant while they may not succeed with another[,]" it "is not enough that [ ] agents believe the telephone subscribers they wish to tap are all part of one conspiracy." *Id*. While we have not found controlling Second Circuit precedent on this issue, we submit the logic of *Abascal* is particularly persuasive here.

Even if the fact that alternative investigative techniques would not be fruitful against one conspirator can be imputed to another Target Subject, a *bono fide* conspiracy must exist *with both individuals as members* to justify such imputation. Here, the purported failure of alternative investigative techniques targeting the unrelated conduct of Surick, Oakes, Fishman, Navarro, and others, has no evidentiary value vis-à-vis Mr. Servis. This is fatal to the government's cause because nothing remains to demonstrate it satisfied 18 U.S.C. § 2518(1)(c).

The Government's Title III application failed to articulate a single investigative technique that was tried with respect to Mr. Servis but failed or was ineffective. The reason for this is simple: notwithstanding the Supreme Court's express admonishment that wiretaps are "not to be routinely employed as the initial step in criminal investigation," *Giordano*, 416 U.S. at 515,

the Government's Title III wiretap was essentially the first investigative effort in respect of Mr. Servis.

Astoundingly, the Government did not bother to attempt even the most basic investigative procedures before seeking the extraordinary intrusion of eavesdropping on Mr. Servis's phone.  SGF-1000 was not a secret, black-market product whose source would have been unknown to Government. A simple Google search would have revealed that SGF-1000 was sold by Medivet Equine, which openly advertised SGF-1000 for sale on its website.  The Government knew, or most certainly should have known, that SGF-1000 was freely available for purchase.  Yet the Government did not even bother to obtain a sample of SGF-1000 to test whether its assertions about the substances were true before seeking the wiretap.   That the Government failed to do so prior to obtaining this wiretap is stunning, both because it would have rendered its claims about SGF-1000 false and because it demonstrates that the Government did not even attempt the critical (yet basic and feasible) alternative investigative techniques before seeking a wiretap of Mr. Servis's phone.

As for the Government's allegations regarding Jason Servis's use of Clenbuterol, the Government similarly did not attempt other investigative techniques or demonstrate why they would not be fruitful.  For example, the Government could have subpoenaed racetracks for post-race test results of horses trained by Mr. Servis to determine what, if any, levels of Clenbuterol were present at the time of the race.  The Government must have known that horses trained by Jason Servis did not fail any post-race drug tests during its three-year investigation of the industry, and that post-race samples are routinely tested for Clenbuterol.   Further, with respect to Clenbuterol, the Government could have and should have consulted with an authoritative thoroughbred horseracing expert and/or expert in equine pharmacology and toxicology.  Instead,

in the initial wiretap application, Agent Bertsson essentially held himself out as the expert in terms of laying out the various rules regarding Clenbuterol (which he got wrong in several respects as discussed *supra*) and its purported performance-enhancing impact on a given race day.

Further, even if the Government could rely on the alternative investigative techniques used against the unrelated conduct of Fishman, Oakes, Surick, and Navarro (and it cannot), it offered only boilerplate assertions to argue these techniques would not work vis-à-vis Mr. Servis. For example, the Government's application stated that "none of the confidential sources recruited to date obtained direct access to . . . SERVIS" and that existing confidential sources were therefore "unlikely to be in a position to develop information regarding" the Target Offenses. Glavin Aff., Ex. 1 at 65. This is a threadbare conclusion that fails to disclose the most basic elements of necessity, including whether the government even attempted to have its confidential source approach Mr. Servis (*i.e.*, the statutory requirement that the government disclose whether alternative techniques were tried but failed) and, if not, whether the government tried to secure additional confidential sources to approach Mr. Servis.[29]

---

[29]    Similarly, the Government offered only boilerplate assertions to argue these techniques would not work vis-à-vis Mr. Servis. For instance, with respect to the use of "undercover officers," the Government stated—in wholly conclusory terms—that "there is no expectation that an undercover officer can be introduced to the Target Subjects." Glavin Aff., Ex. 1 at 63. This "generalized and conclusory statement" is inadequate. *See Lilla*, 699 F.2d at 104 ("Like other courts, [the Second Circuit] reject[s] generalized and conclusory statements that other investigative procedures would prove unsuccessful."). The Government's only support for that statement is the equally threadbare assertion that "individuals are reticent to discuss their criminal activity with outsiders[.]"   *Id*. Yet this platitude is simply an obvious truth of each and every criminal investigation and therefore fails to meet the requirements of § 2518(1)(c). *See Blackmon*, 273 F.3d at 1210-11 (finding statement in wiretap application that the subjects  "know that it is their best interest to reveal as little as possible" to others concerning how their business is conducted insufficient and holding that the application "d[id] not meet the full and complete statement requirement of § 2518(1)(c) because it ma[de] only general allegations that would be true in most narcotics investigations."). To deem this generalized statement enough would be to eviscerate the necessity requirement altogether.

Indeed, subsequent submissions reveal the Government obtained several additional confidential sources after April 30, 2019, including a confidential source with direct access to Medivet, the seller of SGF-1000.  Shockingly, the Government withheld this information from the courts.   Indeed, at the same time the government was citing the use of unrelated confidential sources connected to Surick, Fishman, and others to persuade courts that confidential sources were "not expected to provide direct information regarding SERVIS's or RHEIN's criminal activities, particularly, their sources of supply, network of distribution of prohibited performance-enhancing substances, or their administration of performance-enhancing substances" (Glavin Aff., Ex. 3 at 105; Glavin Aff. Ex. 4 at 144), the Government was withholding the existence of an additional confidential source ("CS-8") with access to Medivet by at least June 2019.  In various affidavits *submitted after termination of the wiretap of Mr. Servis's phone*, the Government disclosed:

> Beginning at least in or about June 2019, KEGLEY has been in contact with CS-8 regarding Medivet's development, marketing, and distribution of SGF-1000, including by providing CS-8 with a fact sheet providing information regarding SGF-1000.

Glavin Aff., Ex 20 at 9.

A June 17, 2019 text message from Mr. Kegley to CS-8 reflects the two setting up an in-person meeting.  Glavin Aff., Ex. 23.  A text two days later reflects CS-8 requesting contact information for a veterinarian in New Jersey that Mr. Servis used.  *Id.*  A June 20, 2019 email between CS-8 and Mr. Kegley indicates CS-8 had purchased SGF on or before that day.  Glavin Aff., Ex. 24.  Meetings and calls took occurred between CS-8 and Kegley on July 19, 24, and 26, 2019, which reflect, *inter alia*, that: (i) Mr. Kegley had sold CS-8 SGF-1000; (ii) Mr. Kegley had agreed to put CS-8 in touch with Mr. Rhein so that Mr. Rhein could "consult [CS-8] on the use of SGF-1000"; (iii) Mr. Kegley had told CS-8 that Medivet purchased the formula and rights for their products from Australian companies and organizations, including the University of Sydney; (iv)

labs in California and Australia produced Medivet's substances and shipped them to Medivet in Kentucky, where they were packaged, labeled, and distributed; (v) Mr. Kegley disclosed to CS-8 the name of several trainers Mr. Rhein worked for, noting that a trainer not a defendant in this case was "willing to do a lot of things to horses and could keep quiet about the work he performed"; (vi) that CS-8 had spoken to Mr. Rhein about Mr. Rhein "consulting for [CS-8] on performance enhancing drugs, produced by Medivet Equine."  Glavin Aff., Ex. 25.  By omitting the existence of CS-8 in each of its T-III submissions (while directing the courts to unrelated confidential sources to show futility), the Government necessarily misled the courts when it claimed that no confidential source would provide evidence of Mr. Servis's alleged "source of supply or network of distribution of" SGF-1000.  *See* Glavin Aff., Ex. 3 at 105; Glavin Aff. Ex. 4 at 144.

In essence, the Government did little to nothing in terms of investigative steps regarding Jason Servis from the time they identified him as a "Target Subject" on February 18, 2019 through the Navarro wiretap and when the government sought a wiretap on April 30, 2019. This alone requires suppression of the wiretaps.  Where the Government did take a relevant investigative effort in securing CS-8, it withheld that information, further compounding the need for suppression. [30]

---

[30]    Indeed, the evidence would suggest that after the Government secured the initial April 30, 2019 wiretap application, it slow-walked taking other investigative steps (or simply did not take them at all) so that it could continue to claim "necessity" to stay up on the wiretap on Mr. Servis's phone.  As noted above, the fact that the Government did not make a purchase of SGF-1000 until July 2019 from Medivet is inexcusable given that they had been intercepting Jason Servis's phone since April 30 and knew about SGF-1000 since an interception over Navarro's phone on February 18, 2019.  As is the fact that the Government did not obtain any racetrack's post-race test samples or test results from horses trained by Jason Servis.

c. **The Government's Title III application relied exclusively on the fruits of a previous illegal wiretap**

Title 18 authorizes an "aggrieved person" to seek suppression of any communication that "was unlawfully intercepted" under Title III or the Fourth Amendment. 18 U.S.C. § 2518(10)(a). An "aggrieved person" includes "a person who was a party to any intercepted wire, oral, or electronic communication," in addition to those against whom the interception was directed. 18 U.S.C. § 2510(11). Given this, Mr. Servis has standing to challenge the interception of his calls incidental to the prior order granting a Title III wiretap of Mr. Navarro's phone.

Mr. Servis joins the motion to suppress the Title III wiretap on Jorge Navarro's phone made by Erica Garcia, as well as any exhibits and factual statements made in support of Ms. Garcia's motion. *See* Dkt. 445, 446, and 446. In the Government's initial April 30, 2019 affidavit to secure a wiretap of Mr. Servis's phone, the only allegations with a nexus to Mr. Servis's phone were communications intercepted pursuant to the wiretap of Mr. Navarro's phone. Thus, Mr. Servis is an aggrieved party with standing to bring and/or join that motion, pursuant to 18 U.S.C. § 2510(11). Hence, to the extent the Court grants the Ms. Garcia's motion to suppress, the Government's Title III application for a wiretap of Mr. Servis's phone must also be suppressed as poisonous fruit of that impermissible wiretap. *See* 18 U.S.C. § 2515 (codifying "fruit of the poisonous tree" doctrine).

## CONCLUSION

For the reasons set forth above, the Court should suppress the wiretaps, and any evidence obtained as a result therefrom, on Mr. Servis's phone, Mr. Rhein's phone, and Mr. Navarro's phone.

Respectfully Submitted,

_____/s/_____
Rita M. Glavin, Esq.
Glavin PLLC

_____/s/_____
Michael G. Considine, Esq.
Noah S. Czarny, Esq.
Seward & Kissel LLP

*Counsel for Jason Servis*