UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

JASON SERVIS, et. al,

Defendant.

20 Cr. 160 (MKV)

**JOINT REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS JASON SERVIS AND ALEXANDER CHAN'S MOTIONS TO
SUPPRESS T-III WIRETAP INTERCEPTIONS**

Rita Glavin, Esq.
Glavin PLLC

Michael Considine, Esq.
Noah Czarny, Esq.
Seward & Kissel LLP

*Attorneys for Jason Servis*

Robert Baum, Esq.
Federal Defenders, S.D.N.Y.

*Attorney for Alexander Chan*

<u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 9

I.      THE GOVERNMENT ATTEMPTS TO REWRITE ITS WIRETAP
        SUBMISSIONS BY OFFERING POST HOC RATIONALES FOR ITS
        MATERIAL MISREPRESENTATIONS AND OMISSIONS ....................................... 9

II.     THE GOVERNMENT'S OPPOSITION CONFIRMS THAT ITS WIRETAP
        SUBMISSIONS FAILED TO SATISFY TITLE III'S NECESSITY
        REQUIREMENT ............................................................................................... 21

III.    THE GOVERNMENT OPPOSITION FAILS TO REBUT MR. CHAN'S
        ARGUMENT THAT THE AFFIDAVITS DO NOT ADDRESS TITLE III
        DESIGNATED OFFENSES .................................................................................. 25

## TABLE OF AUTHORITIES

Page

### **Cases**

*Baldwin v. Placer Cnty.*,
   418 F.3d 966 (9th Cir. 2005) .................................................................. 11

*United States v. Lilla*,
   699 F.2d 99 (2d Cir. 1983) ....................................................................... 23

*United States v. Lahey*,
   967 F. Supp. 2d 698 (S.D.N.Y. 2013) ............................................... 16, 17

*United States v. Awadallah*,
   349 F.3d 42 (2d Cir. 2003) ................................................................... 6, 11

*United States v. Canfield*,
   212 F.3d 713 (2d Cir. 2000) ..................................................................... 4

*United States v. Giordano*,
   416 U.S. 505 (1974) ................................................................................. 20

*United States v. Harris*,
   464 F.3d 733 (7th Cir. 2006) .................................................................. 11

*United States v. Reilly*,
   76 F.3d 1271 (2d Cir. 1996) .................................................................... 22

### **Statutory Authorities**

18 U.S.C. § 2518(3) ....................................................................................... 6
18 U.S.C. § 2561(1) ..................................................................................... 19

## PRELIMINARY STATEMENT

The Government's wiretap applications of April 30, 2019 (Judge Loretta Preska), May 29, 2019 (Judge Ali Nathan), June 27, 2019 (Judge Andrew Carter) and July 30, 2019 (Judge Ronnie Abrams) for the cellphones of Jason Servis and Kristian Rhein were premised on a claim that Jason Servis had a "doping" scheme to illegally give two performance-enhancing substances—*i.e.,* SGF-1000, described by the Government as a purported "performance-enhancing substance known as a growth factor," and Clenbuterol, described as a purported performance-enhancing drug due to its bronchodilating effects—to thoroughbred racehorses to obtain an illegal advantage in and win races.[1]   However, had each of the four issuing judges been informed of the truth and key facts about the only two substances that Jason Servis was alleged to have used, *e.g.,* that SGF-1000 did not contain growth factors or improper performance-enhancing elements and that Clenbuterol was a permissible therapeutic drug that racetracks tested for in post-race testing and Servis never failed such a post-race test during the investigation—those judges never would have approved use of the extremely invasive wiretap search.  Because of this, the Government's opposition brief is nothing more than a strained effort to rewrite the wiretap applications with "after-the-fact" rationales to save the wiretaps on Mr. Servis's and Mr. Rhein's phones they rushed to secure as their first investigative step and desperately wanted to maintain.

The Government's material omissions and misrepresentations about those substances misled the four issuing judges and were either intentional or made in reckless disregard for the truth.  Thus, the wiretaps must be suppressed.  Alternatively, given the "substantial preliminary showing" made by the defense about those serious omissions and misrepresentations,

---

[1]   Mr. Chan as an aggrieved party is moving to suppress the Servis and Rhein wiretaps and the evidence derived therefrom.

as well as the fact that the Government offers no affidavit from any of the FBI agent wiretap affiants in its opposition to address those issues and their knowledge, a *Franks* hearing must be held.

With respect to the SGF-1000, the Government's opposition brief does not dispute that it failed to inform each judge that its affirmative representations were not based on any scientific evidence or any effort to confirm the substance's contents. The Government's opposition also does not dispute that the Government withheld from the judges the critical fact that the world-renowned laboratory the Government relied upon for testing in this investigation—the Hong Kong Jockey Club[2]—informed Government confidential source "CS-1" as early as June 7, 2019 that, *despite Medivet's advertisement that SGF-1000 contained growth factors, HKJC obtained SGF-1000 from MediVet and determined that it did not contain growth factors.* Glavin Aff., Ex. 11. CS-1 forwarded this email to the FBI and, in that email, the HKJC specifically noted that it had obtained SGF-1000 and knew that it was being advertised to contain growth factors— which was clearly why the HKJC obtained a sample for testing. *Id.* Yet, despite this knowledge, the Government kept asserting to judges in periodic reports and wiretap applications that SGF-1000 was a "performance enhancing substance known as a growth factor." *See* Glavin Aff., Ex. 3 at 115, n.49; Glavin Aff., Ex. 3A at 7 (July 8, 2019 Periodic Report); Glavin Aff, Ex. 3B at 11, 12-13 (July 17, 2019 Periodic Report); Glavin Aff., Ex. 4 at 68, 69, 128, 130, 136, 139 (July 30, 2019 Agent Affidavit for renewal application); Glavin Aff., Ex. 4A at 8 (August 9, 2019 Periodic Report); Glavin Aff., Ex. 4B at 6 (August 19, 2019 Periodic Report). Nor does that Government dispute that other labs had come to the same conclusion about SGF-1000 between 2014 and 2018, determining that

---

[2]   In the Government's April 30, 2019 application, the HKJC is referred to as "Lab-1," and the Government asserted that Confidential Source-1 was reliable and corroborated based on, among other things, drug testing results from horse blood samples furnished by "Lab-1"/HKJC in this investigation.  April 30, 2019 Aff. at 19.

it did not contain prohibited substances. *See* Servis Br. At 6-7. Notably, the Government's opposition says nothing about whether the Government knew or had reason to know about those other SGF-1000 test results and, instead, argues that the Servis and Chan motions "speculate" about the Government's knowledge. It is difficult to believe that the FBI did not seek out as much information as possible about SGF-1000 once it became central to this investigation many weeks before the April 30, 2019 wiretap application. The absence of any affidavit from the Government on this point regarding the Government's knowledge about SGF-1000 is telling.

Nor does the Government dispute that, despite its knowledge from the HKJC that it had tested MediVet's SGF-1000 and it did not contain growth factors: (1) the Government's July 30, 2019 wiretap application discredited intercepted statements by Mr. Rhein that SGF-1000 does not contain performance-enhancing growth factors and was compliant with racing rules (*see* Glavin Aff., Ex. 4 at 129); and (2) the Government deliberately excised language from subsequent evidentiary submissions that disclosed the HKJC's prior testing, reflecting a considered choice to conceal from courts the information it had learned from the HKJC. *See* Servis Br. at 16, 27-30. The Government predicated its wire fraud theory (and therefore, the wiretap application) on the presence of performance-enhancing "growth factors" in SGF-1000 (Servis Br. at 8-9, 31-32), yet the Government did not disclose to issuing courts its knowledge that SGF-1000 contained no growth factors and that it did not even attempt to obtain a sample of SGF-1000 until July 2019, even though it was publicly available for purchase on the internet from MediVet. Indeed, the Government's opposition brief does not even claim a lack of knowledge that SGF-1000 was publicly available for purchase on the internet, nor does the Government deny they could have made a recorded call to MediVet to discuss SGF-1000 and make a purchase *at any time*.

With respect to Clenbuterol, the Government's opposition did not dispute that its April 30, 2019 wiretap application misled the issuing judge by affirming that Clenbuterol was "prohibited or banned" in New York and New Jersey "absent certain exceptions"—when, in fact, and not disclosed, Clenbuterol was a legal drug with therapeutic value permitted in the jurisdictions where Mr. Servis raced horses, provided the horse did not have the drug in its system at the time of a race above a certain threshold. There is no excuse for not getting this right—Clenbuterol is well-known in the racing industry, the Government had confidential sources to educate them, and the rules regarding use of Clenbuterol are public.

Nor does the Government's opposition dispute the fact it never disclosed to the issuing courts that: (1) its own expert has opined that any bronchodilation effect of Clenbuterol lasts only a few hours (Servis Br. At 18; Chan Br. at 17-18);[3] (2) racetracks test for Clenbuterol in post-race testing of winning horses (id.); and (3) none of Mr. Servis's horses failed a post-race test since the investigation began in 2017. *See* Servis Br. at 17-18; Chan Br. at 18-19. Again, the fact that the Government's opposition did not include an affidavit from any of the FBI agent affiants addressing these misrepresentations and omissions is telling. It defies common sense that, had all of this information been disclosed to the issuing judges regarding the only two substances that Mr. Servis is alleged to have used in a purported "doping" scheme, the issuing courts would have authorized the intrusive wiretap surveillance of Mr. Servis and Mr. Rhein's phones.

Instead, in the opposition, the Government attempts to excuse these actions through improper *post hoc* rationales that are legally deficient and practically untethered to the original wiretap submissions.[4] In essence, the Government's opposition papers are nothing more than an

---

[3]   Indeed, Mr. Servis did not cause Clenbuterol to be administered to any horses under his care within the period the Government's own expert claims a bronchodilation effect lasts.

[4]   The Government's argument that the wiretap orders are entitled to "substantial deference" (Gov. Opp. at 121) is misplaced. This is not a motion challenging the sufficiency of a district court's findings when authorizing a wiretap.

effort to rewrite the wiretap applications and focus on arguments they did not make in those applications as they relate to Jason Servis. For instance, the Government justifies withholding the exculpatory HKJC's test results that SGF-1000 did not contain growth factors—reported to the FBI as early as June 7, 2019—by arguing that MediVet's advertising materials somehow conflicted with the test results by the very lab the FBI relied upon to analyze horse blood samples obtained during the investigation. There are several problems with this argument. First, the HKJC—via the June 7, 2019 email to CS-1—specifically informed the Government that it was aware of MediVet's advertising claims about SGF-1000 and that they had specifically tested MediVet's SGF-1000 because of those claims and found no growth factors to be present. Second, the Government did not obtain any such MediVet marketing materials until sometime in June 2019—*after two wiretap applications were submitted*. Third, the Government never referenced any such MediVet marketing materials as the basis for their belief that SGF-1000 contained growth factors until their final wiretap application on July 30, 2019—yet they still did not disclose that their own lab in this investigation essentially concluded that MediVet's advertisement about growth factors was not true based on their testing of the product.

The Government now also cites intercepted calls—fruits of the illegal wiretap—to argue that its misrepresentations concerning SGF-1000 and performance enhancing growth factors were justified because the contents of SGF-1000 were "untestable." The Government also claims that their investigation of Mr. Servis and Mr. Chan was about the "administration of drugs that they intended to be untestable." Gov. Opp. at 86. Notably, those arguments were not made in any of the wiretap applications at issue—because they are not true. Clenbuterol is testable, as are the

_____

Rather, the motion posits that the issuing courts were misled in the course of determining whether to grant the wiretaps. Therefore, "the issuing judge's . . . determination is not due any deference because he [or she] did not have an opportunity to assess the affidavit without the inaccuracies," and the "untainted" portions of the affidavit must be reviewed *de novo*. *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) (citations omitted).

contents of SGF-1000.  And Mr. Rhein made that clear to Mr. Servis in intercepted conversations. Moreover, on the issue of Clenbuterol, the Government tries to rewrite its wiretap applications by claiming—in another "after-the-fact" rationale—that Mr. Servis was obtaining and using some type of "irregular" non-FDA approved Clenbuterol (*see* Gov. Opp. at 122), even though the Government advanced no such argument in any of the four wiretap applications.  The Government drew no distinction about the type of Clenbuterol Mr. Servis used in its wiretap applications.

These newly-crafted theories fail as a matter of law because the governing standard limits the Court's inquiry to what was presented to the issuing courts and the Government cannot rewrite its defective wiretap by fashioning new arguments in an opposition brief.[5]  *See United States v. Awadallah*, 349 F.3d 42, 70 n.22 (2d Cir. 2003).  Even if these new theories were permissible at this stage, as explained below, they fail as a matter of fact.

The Government also has no valid response to the misrepresentations identified in Mr. Servis and Mr. Chan's motions concerning the need for a wiretap under 18 U.S.C. § 2518(3)(c).  As noted in Mr. Servis and Mr. Chan's motions, the Government concealed from the issuing courts that it had an additional confidential source, CS-8.  The Government suggests that CS-8 was referenced in a footnote in its last wiretap affidavit.  *See* Gov. Opp. at 119.  Yet this does not advance the Government's position for several reasons.  First, that footnote merely states that a source who worked for "5 Stone" obtained MediVet promotional materials.  There is no specific reference to a "CS-8."  Nor is there indication that the source referenced in that footnote was working at the direction of the FBI.  Second, this footnote—which is not even a footnote in the

---

[5]    Moreover, even if the Government had originally claimed SGF-1000 was "untestable," that would not excuse the Government's: (i) failure to disclose that it had not attempted to determine the substance's contents before seeking a wiretap; (ii) decision to conceal from the issuing courts the information it received directly from the HKJC, which refutes the Government's assertions that SGF-1000 contains performance-enhancing growth factors; and (iii) failure to disclose historical SGF-1000 testing, to the extent it was aware of it.

specific wiretap application section discussing the use of confidential informants—does not disclose the extent of this source's direct access to the sourcing and sale of SGF-1000 to Mr. Rhein's clients.  In fact, in the opposition, the Government discloses new information concerning CS-8's access to Mr. Rhein that is undeniably material to the issuing court's understanding of the success of alternative techniques and was never disclosed.  Critically, the Government's opposition also fails to identify a single investigative effort used against Mr. Servis[6] and continues to rely solely on its investigation of unrelated individuals and conduct.

The Government ignores the case law cited in Mr. Servis's motion that § 2518(1)(c) does not permit the imputation of alternative investigative techniques to co-conspirators or that, at a minimum, a *bona fide* conspiracy must exist *with both individuals as members* to justify such imputation.

For these reasons, the wiretaps should be suppressed.  At a minimum, Mr. Servis and Mr. Chan are entitled to a *Franks* hearing to address critical issues ignored by the Government in its opposition, including: (1) why the Government only disclosed in its final submission that it had not even tested SGF-1000 to confirm its affirmative claims regarding the contents of the substance;[7] (2) why the Government withheld from the issuing courts the information it received

---

[6]   It appears that the only step that the Government took to investigate Mr. Servis was to obtain his telephone toll records, which demonstrated a paucity of contact with the "Target Subjects."  Obtaining toll records is a standard practice taken when the Government wants to obtain a wiretap.  Thus, it is telling that the only records the Government obtained here were toll records.  Despite representing to the courts that "there is still much to be learned about the Target Subjects that can only be determined through wiretap" (Glavin Aff., Ex. 1 at 76), the Government makes no effort to justify its sweeping list of "Target Subjects" by drawing a nexus between those dozens of individuals and Mr. Servis's phone.  As noted in Mr. Servis's motion (Servis Br. at 35, n.27), the Government disclosed that the toll records for Mr. Servis's phone revealed that over a one-year period from April 2018 to April 2019, Mr. Servis had engaged in over 21,000 calls and over 30,000 text messages.  But the Government only identified calls from Mr. Servis's phone with three counterparties, none of which lend any support for wiretap of Mr. Servis's phone.  Laughably, the Government continues to argue that calls between Mr. Servis and ███████ "demonstrate the Servis Phone's use for a criminal purpose."  Gov. Opp. at 123.  That argument defies common sense, is counter to the established facts in this case, and demonstrates the weakness of the Government's position.

[7]   The Government's argument that "agents are not confined to drug test results" (pg. 90) shifts the goal posts and fails to seriously engage with the straightforward points made in Mr. Servis and Mr. Chan's motions that: (i) to make certain affirmative claims about SGF-1000's contents (as the Government did throughout its wiretap submissions),

from the HKJC regarding its prior testing of SGF-1000;[8] (3) when the Government first became aware of the plethora of prior tests of SGF-1000 that were conducted by respected laboratories over the course of several years, all of which showed no presence of performance-enhancing growth factors;[9] (4) why, when the HKJC's information was eventually disclosed a month after the last wiretap submission, the Government quietly excised that disclosure in a later court filing; (5) why the Government failed to disclose that Mr. Servis's horses had been tested for Clenbuterol post-race without a single failed test since at least this investigation began in 2017; (6) why the Government failed to disclose to the issuing courts that Clenbuterol was a therapeutic drug permitted in the jurisdictions where Mr. Servis's horses raced so long as it was not above a certain threshold at the time of a race; and (7) what CS-8 revealed to the FBI and why that was never disclosed to the issuing courts.

Each of these unresolved questions bears directly on whether the Government provided a "full and complete" account of the probable cause and need for a wiretap, as required by Title III and the Constitution.

---

the Government needed to undertake some effort to confirm the composition of SGF-1000 and (ii) when the Government did in fact learned from a leading laboratory about the composition of SGF-1000, it had an obligation to inform courts that its statements regarding SGF-1000 were directly contradicted by its own expert or to cease making those claims.

[8]   The Government bizarrely characterizes the withholding of the June 2019 HKJC information as a "purported omission."  *See* Gov. Opp. at 94 ("Servis and Chan's motions focus particularly on the affiants' purported omission . . . of a June 2019 email by a drug testing laboratory[.]"); *id.* at 105 ("In an effort to salvage their claim regarding the purported 'omission' of an email from a drug testing laboratory . . ."). The Government does not deny the FBI received the HKJC's email.  Nor does the Government point to any submission where it discussed the HKJC's email to any issuing court.  Its failure to disclose the information is therefore no longer a "purported omission," it is now as definitive an omission as can be (and a material one at that).

[9]   Tellingly, although the Government characterizes the Mr. Servis and Chan's Motions as "speculat[ing] that the FBI knew or should have known that third parties who had tested what they believed to be SGF-1000 had failed to detect" PEDs (Gov. Opp. at 92), the Government's brief does not actually disclaim such knowledge.

# ARGUMENT

**I.      The Government attempts to rewrite its wiretap submissions by offering *post hoc* rationales for its material misrepresentations and omissions**

The Government claims that it based its SGF-1000 assertions on MediVet's marketing materials.  *See* Gov. Opp. at pg. 86 ("Servis and Chan's respective motions ignore the ample evidence, reported in each wiretap application, reflecting that SGF-1000 was promoted as containing some purportedly potent drug capable of increasing a horse's performance[.]"); *id.* at 90 ("[G]iven the promotional material advertising SGF-1000 as a drug containing growth factors . . . the affiant had a firm basis to describe his beliefs regarding SGF-1000[.]").  This is demonstrably not the case.  The Government made no reference to MediVet's marketing materials anywhere in its April 30, 2019 wiretap submission because, by its own account, it had not even acquired those materials by that time.  *See* Servis Br. at 41; Glavin Aff., Ex. 20 at 9.  Indeed, the first time the Government referenced MediVet marketing materials advertising SGF-1000 as containing growth factors was in the final wiretap application on July 30, 2019.  Particularly disturbing about the July 30, 2019 "disclosure" regarding MediVet's advertising claim that SGF-1000 contains growth factors is what the FBI did not disclose to the issuing judge:  the FBI knew that the HKJC had obtained a sample of SGF-1000 from MediVet and that even though HKJC knew MediVet advertised SGF-1000 to contain "growth factors," HKJC tests specifically found no presence of growth factors.  The only reason not to disclose the HKJC June 7, 2019 email to CS-1 to the Court was because it made clear that this MediVet advertising claim about SGF-1000 containing growth factors—upon which the FBI was purporting to rely upon for a wiretap at that time—was *false.*  Moreover, those same promotional materials also state that SGF-1000 "is safe and legal for all equine disciplines and does not test or swab because it is an all-natural regenerative

therapy"—information the FBI agent did not include in the July 30, 2019 affidavit.  Glavin Aff.,
Ex. 5.

As noted in Mr. Servis's motion, the Government, in an unrelated evidentiary filing
after its last wiretap submission, disclosed that it had received MediVet's marketing materials via
a confidential source, CS-8, in June 2019, after the initial April 30, 2019 wiretap affidavit and the
May 29, 2019 first renewal affidavit.  *Id*.  Therefore, the Government could not have relied on any
MediVet marketing material when it began affirmatively (and falsely) representing to courts that
SGF-1000 contained performance-enhancing growth factors.[10]

The Government then argues that it was proper to affirmatively represent to courts
that SGF-1000 contained performance enhancing growth factors—without disclosing (a) that it
had not actually tested the substance, (b) the exculpatory information it received from the HKJC
in June 2019, and (c) prior testing results of SGF-1000 going back years (to the extent it was
aware)—because the contents of SGF-1000 were "untestable."  *See* Gov. Br. at 86-87.  This too is
an improper *post hoc* explanation untethered to the actual contents of the Government's original
wiretap submissions.  Indeed, as the opening brief highlights in detail, the Government's affidavits
were built on numerous affirmative representations that SGF-1000 contained growth factors, not
on allegations that SGF-1000's contents were unknowable or untestable.  *See* Servis Br. at 9-10
(compiling Government's affirmatively representations that SGF-1000 contains performance-
enhancing growth factors, none of which claim SGF-1000 was untestable).

---

[10]   While in certain later submissions the Government began stating that "SGF-1000 is advertised as containing
growth factors," it never revealed the HKJC's countervailing conclusion and continued making additional
representations unconnected to MediVet marketing materials.  *See* Glavin Aff., Ex. 3 at 76 (6/27/19 Agent Aff. stating:
"I have learned that SGF-1000 is a performance-enhancing substance known as a growth factor that promotes tissue
repair.").

Notwithstanding the Government's newly-crafted claim that courts were "well aware" that the Government was investigating "untestable" drugs (Gov. Br. at 87), the opposition does not identify a single allegation in the hundreds of pages of wiretap submissions where the Government alleged SGF-1000 was untestable.  Nor has the Government ever alleged—then or now—that growth factors are "untestable."  Instead, the Government relies on its single, stand-alone quotation of a Kentucky regulation forbidding "masking" agents for this purpose.  *See* Gov. Opp. at 87.  However, this reference does not support the Government's new "untestable" theory because the Government has never alleged that SGF-1000 is a masking agent.  Nor has the Government ever alleged Mr. Servis has ever used a masking agent (because there was no evidence that he did, as he did not).  And even if this single reference were directed at SGF-1000, it would be insufficient on its own to support the Government's claim that courts were "well aware" of the Government's newfound theory, particularly in light of the myriad affirmative allegations concerning SGF-1000's contents throughout the Government's wiretap submissions.

In its struggling effort to rewrite its wiretap application via its new "untestable" theory, the Government also references a call between Mr. Surick and Mr. Navarro regarding Epogen, a call between Mr. Oakes and Mr. Navarro regarding the use of a "drench," and intercepted calls regarding Mr. Fishman.  But these calls have no bearing on the contents of SGF-1000, and the Government offers no valid nexus between this alleged conduct and Mr. Servis or his phone.[11]

The Government's attempts to minimize its prior misrepresentations by offering after-the-fact explanations untethered to its original wiretap submissions should be rejected as a

---

[11]   The Government continues its pattern of improperly deploying evidence related to Mr. Surick, Mr. Oakes, and Mr. Fishman against Mr. Servis.  Mr. Servis has no connection to these individuals or their alleged misconduct. The Government cannot use its broad, industry-wide investigation of unrelated conduct as an evidentiary "grab bag" to taint disparate individuals.

matter of law.  Second Circuit precedent is clear: under the *Franks* standard, a court must confine

its analysis to probable cause as alleged to the issuing courts, not *post hoc* explanations.  *See*

*Awadallah*, 349 F.3d at 70 n.22 ("[R]elated facts which were also known at the time of the

application . . . lie outside the scope of a proper *Franks* inquiry because the relevant question is

whether the remaining portions of the affidavit give rise to probable cause.").  Other circuits are

in accord.  *See United States v. Harris*, 464 F.3d 733, 739 (7th Cir. 2006) ("Allowing the

government to bolster the magistrate's probable cause determination through post-hoc filings does

not satisfy the Fourth Amendment concerns addressed in *Franks*."); *Baldwin v. Placer Cnty.*, 418

F.3d 966, 971 (9th Cir. 2005) ("[W]hat will sustain the warrant must already be within it.") (*Franks*

case). [12]

Even if the Government could rewrite its wiretap submissions at this stage, its new

"untestable" theory would still be meritless.  The Government fails to articulate how it could have

characterized a substance "untestable" without undertaking any effort to test the substance. [13]  The

Government's theory also fails to account for its affirmative statements concerning the contents of

SGF-1000: namely, that it contained performance-enhancing growth factors.  Moreover, the theory

would still be insufficient to excuse the Government's efforts to conceal the exculpatory

information provided by the HKJC that it tested SGF-1000 and did not find growth factors.

---

[12]  Notably, the Government's reliance on MediVet's marketing material and its argument that SGF-1000 was undetectable are in conflict.  The Government would have the Court believe that MediVet designed SGF-1000 to contain undetectable performance-enhancing growth factors, while at the same time openly advertising the inclusion of these growth factors in its product.  Further, the Government's "untestable" theory conflicts with its own belated efforts to test SGF-1000, only disclosed in its final period report.  *See* Glavin Aff., Ex. 48 at 18-19 ("Agents have [ ] obtained a sample of SGF-1000 and sent the substance to a laboratory in Hong Kong for testing to determine the precise chemical contents of that substance.").

[13]  Indeed, growth factors, which the Government alleged in in its wiretap applications were the performance-enhancing element of SGF-1000, are testable and the Government has never alleged otherwise. The Government does not affirmatively allege that SGF-1000 or growth factors are untestable because scientific evidence does not support that claim. Instead they allege only that Mr. Rhein alleged SGF-1000 was untestable while at the same time claiming that it would not test for growth factors because none are in it.

Additionally, the Government's new theory improperly rests on calls intercepted pursuant to the wiretap of Mr. Servis's phone to prop up its defective application.[14]  Constitutional and Title III's statutory safeguards would be entirely illusory if the Government could rescue an illegal wiretap by using the fruits of that wiretap.[15]

Moreover, the Government presents a disingenuous analysis of those calls in support of its "untestable" theory.  For example, the Government argues that the "context" of intercepted calls "indicated, not that Rhein or Servis were using a product they believe to be in compliance with racing rules, but one that would not be detectable" (Gov. Opp. at 102) and that it is "clear from Rhein's representations that he was not assuring Servis that SGF-1000 complied

---

[14]  The Government suggests, as it has in the past, that Mr. Servis advised his veterinarian to "falsely list[ ] 'dex' on veterinary records to obscure his use of SGF-1000." Gov. Opp. at 98.  This is not true.  As the intercepted call makes quite clear, the horse at issue was, in fact, given Dex.  *Id*.

[15]  The *post hoc* nature of the Government's argument is evident from AUSA Andrew Adams's affidavit, wherein he relies upon documents created after the last wiretap application, and only *obtained by the Government after the February 2020 Indictment*. *See* Exs. H (8/8/19 Industrial Laboratory report); Ex. I (9/3/19 MediVet email to Industrial Lab); Ex. J (Lab report dated 10/14/19); and Ex K (9/10/19 letter from RMTC to MediVet).

To manufacture some relevance for these materials, the Government conflates the RMTC's 2014 testing of SGF-1000 (referenced at page 6 of Mr. Servis's motion) with MediVet's testing (not referenced in Mr. Servis's motion).  MediVet's testing is irrelevant for purposes of this motion because it was conducted after the Government's last wiretap application, and only obtained by the Government after the initial Indictment was returned in this case.  While no response is necessary, it is worth noting that MediVet tested SGF-1000 in direct response to regulatory scrutiny to confirm prior testing, which had not detected growth factors.  Therefore, MediVet's decision to test SGF-1000 when it did does not support a view that SGF-1000 was "likely both performance enhancing and generally untestable," (Gov. Opp. at 94, n.41) as the Government asserts.  Indeed, MediVet would not have undertaken internal efforts to test SGF-1000 if it believed the substance was "untestable."  Nothing about MediVet's tests excuses the Government's repeated misrepresentations to courts that SGF-1000 contained performance-enhancing growth factors without any effort to confirm the contents of SGF-1000.  Indeed, as noted in Mr. Servis's motion (Servis. Br. at 11), in its applications, the Government characterized statements from Mr. Rhein to Mr. Chan that SGF-1000 was compliant with state racing rules as "false" precisely because the Government claimed Mr. Rhein "[did] not know the precise chemical composition of SGF-1000, and [had] expressed interest in having the substance tested in the future." Glavin Aff., Ex. 4 at 129 (July 30, 2019 Agent Affidavit).  Simply put, the Government did not know the composition of SGF-1000 when it claimed it did.

The Government's recitation of MediVet's testing is also materially incomplete.  Initial MediVet tests indicated no growth factors as well as trace amounts of substances the Government has never alleged (and do not now allege) are performance-enhancing.  Documents provided in discovery indicate that MediVet's expert believed those trace amounts may have been residual traces of therapeutic medications, likely associated with harvesting of placental fluid.  Further, the Government neglected to disclose that (i) although an October 2019 test indicated potential trace presence of FGF, MediVet's expert believed that to be a likely false-positive and (ii) follow-on testing in December 2019 did not detect any FGF.

with applicable racing rules, or had no illicit contents--instead, Rhein reassured Servis that the drugs would not show up on drug tests." Gov. Opp. at 97-98.  Critically, however, this is <u>not</u> the position the Government staked out in previous filings.  In subsequent submissions unrelated to the wiretap, the Government argued:

> RHEIN has also been intercepted on calls indicating his belief that SGF-1000 does not require FDA approval because RHEIN, as a licensed veterinarian, can prescribe any drug. RHEIN has also been intercepted discussing testing that has been conducted of SGF-1000 by two separate laboratories that revealed no growth hormone in SGF-1000. **RHEIN, in substance and in part, has assured others that, due to this testing, SGF-1000 is in compliance with applicable state racing rules**.

Glavin Aff. II, Ex. 28 at 30, n.26.  The Government is simply shifting position midstream to suit its present needs.  The Government's characterization of Mr. Rhein's statements in September 2020—before it found reason to interpret the calls differently in response to this motion—was correct.  Numerous intercepted calls support this finding.  For example:

- On a June 6, 2019 call, Mr. Rhein told Mr. Servis: "As a veterinarian you're allowed to use any drug you think would be . . . and [SGF-1000] isn't even considered a drug, it has no drug in it.  It's literally just a purified protein from a sheep's placenta.  This isn't a drug, this isn't manufactured.  So the Federal Drug Administration they wouldn't approve it anyone just because it's not a drug."  Glavin Aff., Ex. 2a at 14-15.

- On an August 16, 2019 call, in light of state investigators' questions, Mr. Servis asked Mr. Rhein: "And the SGF is okay?" Mr. Rhein responded: ""Ya, ya. I mean it's been tested.  There's nothing in it.  I have all the reports.  I have everything.  Like it's been tested three times.  There's absolutely nothing in it . . . People have been saying its growth hormones and it's not."  Mr. Rhein continued: "[E]verything we've done is by the letter of the law."  Glavin Aff., Ex. 4B at 9, 10.

- On an August 19, 2019 call, Mr. Chan assured Mr. Servis: "I'm a stickler to the rules all the time. I came from NYRA, I know all the rules and stuff . . . I always look out for the best interest of my clients because I'm the one doing the work . . . all the horses under my care they're covered, it's all legal . . . I do what's the best interest for my horses and it's all legal." Glavin Aff. II, Ex. 26.

- On an August 28, 2019 call, referring to SGF-1000, Mr. Servis told Mr. Argueta: "I can't imagine [Mr. Rhein] would tell me [SGF-1000] is all compliant and it then is not. I just can't imagine." Mr. Servis continued: "Kristian and Chan always told me 'no, it is not growth hormone.'"[16] Glavin Aff. II, Ex. 27.

These calls reflect that Mr. Servis was consistently told by his veterinarians that SGF-1000 was valid and legal. The calls also make clear that, even if the Government had based its wiretap submissions on a theory that SGF-1000 was an untestable performance-enhancing substance containing growth factors (and it did not), and even if it could use intercepted calls to rescue its defective wiretap (and it cannot), such a theory is not born out by the subsequent calls intercepted on Mr. Servis's phone.

In the opposition, the Government also argues that it disclosed prior SGF-1000 testing by excerpting certain intercepted calls with Mr. Rhein. *See* Gov. Opp. at 106.[17] This argument is similarly disingenuous. The excerpts of intercepted calls could not, and did not, alert courts that the Government had learned directly from its own lab in this investigation—the world-

---

[16] Calls intercepted on Mr. Rhein's phone also reflect that he was telling people that the tests of SGF-1000 reflect that the substance did not contain anything illegal, not, as the Government contends, that it was untestable. On a July 11, 2019 call, Mr. Rhein informed Mr. Chan "there is nothing illegal with" SGF-1000. He further informed Mr. Chan that SGF-1000 was tested by the University of Kentucky, stating: "[E]verything came back fine. There's no growth hormones. There's nothing scary."

[17] Again, the Government cannot use the fruits of its illegal wiretap to cure its defective application.

renowned HKJC—that SGF-1000 did not contain performance-enhancing growth factors. Moreover, the context in which the excerpts were included in the wiretap submissions made clear the Government was arguing that the defendants' statements were false, not that they should be credited. Thus, the references of prior testing discussed on calls by Mr. Rhein—a target of the investigation whom the Government was seeking to discredit throughout its wiretap submission—actually supports the misleading nature of the Government's omissions. For example, as noted in the opening brief (Servis Br. at 27-28), in its July 30, 2019 affidavit, the Government wrote:

> I believe that, on the July 11 call, RHEIN reassures CHAN that SGF-1000 has been tested by two separate laboratories at RHEIN's insistence, and that the test results revealed no growth hormones in SGF-1000. I believe that RHEIN is falsely reassuring CHAN regarding SGF-l000's compliance with State racing rules[.]

Glavin Aff., Ex. 4 at 129. This passage appears designed to mislead. The court should have been told that the Government's own laboratory in this investigation had confirmed Rhein's remarks. Instead, the Government discredited Mr. Rhein, painting him as a liar, while concealing the HKJC information, which actually corroborated Mr. Rhein's remark. Moreover, the Government again represented to the issuing court—again, without disclosing the HKJC's information—that SGF-1000 contained performance-enhancing growth factors. Thus, passages such as the one quoted above offer strong evidence that the Government intended to bolster probable cause through a material omission (or at a minimum, was reckless in doing so) and do not excuse its conduct.

Footnote 39 of the Government's opposition neatly summarizes the flaws of its opposition. The Court in *U.S. v. Lahey*, which the Government cites, held that "[t]o determine if misrepresentations or omissions are material, a court corrects the errors and then resolves *de novo* whether the hypothetical corrected affidavit still establishes probable cause." 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). However, that standard does not permit the Government to amend its prior

affidavits, as it proposes in footnote 39, to include new information that it now wishes it had included. Rather, the standard requires courts to delete false or misleading statements and insert the omitted truths. In this case, "correcting" the affidavits requires: (1) deleting the Government's affirmative statements concerning the presence of performance-enhancing growth factors in SGF-1000; (2) inserting statements disclosing that the Government had made no efforts to confirm the contents of SGF-1000; (3) inserting the email disclosing that the Government had been told by the HKJC that it obtained SGF-1000 from MediVet for testing and that, although the HKJC knew that MediVet claimed that SGF-1000 contained growth factors, the HKJC's testing concluded that growth factors were not present; (4) deleting the Government's claims that Clenbuterol is prohibited or banned; (5) inserting statements disclosing that (a) Clenbuterol is a therapeutic drug permitted in the jurisdictions where Mr. Servis's horses raced so long as that drug is not present above a certain threshold at the time of a race, (b) Clenbuterol only has bronchodilation effects in the hours immediately after its use, when the drug is detectable by post-race tests, and (c) Mr. Servis's horses were tested post-race and none tested positive during the entirety of this investigation that began in 2017. With these corrections, nothing would remain in the wiretap application to demonstrate probable cause for a wiretap on Mr. Servis's and Mr. Rhein's phones.

Instead, relying on its faulty reading of *Lahey*, the Government argues that a "corrected" description of SGF-1000 would still support probable cause because the "affidavit *would instead state*" that the "affiant believed, based on prior intercepted conversations and promotional literature available online . . . that SGF-1000 contained, among other substances, growth factors." Gov. Opp. at 92, n.39. This concedes that the Government's original wiretap submissions were not based on such statements, and therefore cannot be properly considered on this motion. The Government also contends that a corrected affidavit would "instead state" that

"no drug testing of SGF-1000 had occurred *as part of the investigation* because the affiant had not yet procured a sample of the drug." *Id* (emphasis added).  This concedes that the Government failed to disclose to courts that its affirmative representations concerning SGF-1000 were not based on efforts to identify its contents and that this omission was material.  It also reveals the utter lack of investigative efforts made by the Government regarding SGF-1000.  The Government knew, or most certainly should have known, that SGF-1000 was freely available for purchase and was advertised for purchase by MediVet on the internet (and the Government's opposition does not state otherwise).  This was not disclosed to the issuing court.  Yet the Government did not even bother to obtain a sample of SGF-1000 to test whether its assertions about the substances were true before seeking the wiretap.[18]   Finally, the Government argues that a corrected affidavit would "instead state" that "drug testing may not conclusively establish the contents of the drug given that (sic) many in the racehorse industry use drugs that can circumvent drug tests." *Id*.  This tacitly concedes that the Government made no such statements in the original wiretap submissions.[19]  Moreover, the Government had no evidence that Jason Servis used masking agents, and the Government does not even allege that a masking agent exists for SGF-1000 or Clenbuterol.

As with SGF-1000, the Government's discussion of Clenbuterol avoids the wire fraud theory it actually presented to the issuing courts.  Conspicuously absent from the Government's opposition is any discussion of misrepresentations and omissions raised in Mr. Servis and Mr. Chan's motions regarding the Government's claims concerning the bronchodilation effect of Clenbuterol as to why it is performance-enhancing.  These allegations were the crux of

---

[18]   When the Government did obtain a sample of SGF-1000 in July 2019, months after securing the wiretap, it did not inform the court it had done so until its very last periodic report.

[19]   Further, even this "correction" would not address the Government's omission concerning its failure to determine the contents of SGF-1000.  Even if the Government believed the contents of SGF-1000 were maskable (and no such evidence was presented in its wiretap submissions), this belief would not justify concealing from courts the evidence it possessed that contradicted its claims concerning the composition of SGF-1000.

its wire fraud theory regarding Clenbuterol.  By failing to offer a valid explanation for why the courts were not informed: (1) that the bronchodilation effects of Clenbuterol last only a few hours and (2) that Mr. Servis's horses would have tested positive post-race had they received Clenbuterol during that period, the Government necessarily concedes that courts were materially misled regarding probable cause for the wire fraud it had alleged.

Instead, the Government relies on allegations that underpin its misbranding claim, which cannot form the predicate for a wiretap under 18 U.S.C. § 2561(1).  For instance, the Government argues that intercepted calls reflect that Mr. Servis wished to obtain Clenbuterol "not through a veterinarian and a valid prescription" and that Mr. Servis fails to "point to any rule that would allow for" the use of "unprescribed" Clenbuterol.  Gov. Opp. at 110.  The Government also argues that intercepted text messages indicate that Mr. Servis's horses were administered Clenbuterol "within 14 days of the days" of a race.  *Id*. at 111.  Further, the Government seeks to excuse the errors in its application, including that it falsely told Courts that Clenbuterol was banned in New Jersey within 14 days of a race (when, in fact, New Jersey did not have any mandatory withdrawal period), arguing that its mistakes do "not reflect any ill intent by the affiants[.]" However, the significance and volume of Government errors permits an inference of recklessness.

Moreover, as with its SGF-1000 misrepresentations, the Government attempts to rewrite its wiretap applications by claiming—in another "after-the-fact" rationale—that Mr. Servis was obtaining and using some type of "irregular" non-FDA approved Clenbuterol (Gov't Br. at 122) *even though the Government advanced no such argument in any of the four wiretap applications*.  The Government drew no distinction about the type of Clenbuterol Mr. Servis used in its wiretap applications.

Given all the above material omissions and misrepresentations, there can be no doubt that Mr. Servis is entitled to a *Franks* hearing, having made a "substantial preliminary showing" that the Government's wiretap relied on material intentional or reckless misrepresentations and omissions in respect of probable cause.   Each of the four wiretap applications materially misled the four issuing judges about the only two substances Mr. Servis was alleged to use.

## II.   The Government's opposition confirms that its wiretap submissions failed to satisfy Title III's necessity requirement

The Government's opposition tacitly concedes that it conducted virtually no investigation of Mr. Servis prior to securing the wiretap.  Despite its length, the Government <u>fails to identify a single investigative effort</u> utilized against Mr. Servis, other than obtaining his cellphone toll records that demonstrated a paucity of connections to alleged industry-wide doping investigation and Target Subjects.  This alone requires suppression of the wiretap.  *See United States v. Giordano*, 416 U.S. 505, 515 (1974) (wiretaps are "not to be routinely employed as the initial step in criminal investigation.")

Further, the Government simply ignores the case law cited in Mr. Servis's motion that § 2518(1)(c) does not permit the imputation of alternative investigative techniques to co-conspirators or that, at a minimum, a *bona fide* conspiracy must exist *with both individuals as members* to justify such imputation.  *See* Servis Br. 38.  Instead, it continues to improperly rely on alternative techniques deployed against people and conduct bearing no nexus to Mr. Servis or his phone.  *See* Gov. Opp. at 117.  For instance, the Government claims that Mr. Servis and Mr. Chan's motions "ignore the many months of investigation, including use of subpoenas, the execution of search warrants, the use of confidential sources, and other methods, that revealed [ ] the conspiracy in which Servis was implicated[.]"  Yet the warrants cited in the Government's initial wiretap

affidavit targeted Mr. Surick, Mr. Oakes, and Mr. Fishman, individuals with no nexus to Mr. Servis (then, or even now, as reflected in the Superseding Indictment).  The investigative efforts targeting these disparate individuals hold no evidentiary value (within the context of § 2518(1)(c) or otherwise) vis-à-vis Mr. Servis or Mr. Chan.  Further, Mr. Servis is alleged to have used only SGF-1000 and Clenbuterol, in stark contrast to the alleged activities of Mr. Surick, Mr. Oakes, and Mr. Fishman.

Other arguments in the opposition further demonstrate that the Government has improperly used its broad, industry-wide investigation of unrelated conduct as an evidentiary "grab bag" against Mr. Servis.  For instance, it argues that Mr. Servis and Mr. Chan's motions "abandon common sense" and "propose a world in which the FBI had not expended considerable efforts to infiltrate [ ] criminal enterprises."  Gov. Opp. at 116.  Elsewhere, the Government argues that "[t]he lessons learned" from its industry wide investigation "regarding investigative techniques were disclosed in detail in each wiretap application."  Gov. Opp. at 117.  Again, the showing of necessity required for a Title III wiretap cannot be based on "the lessons learned" from other investigations without showing a factual nexus to Mr. Servis or Mr. Chan.

The Government also mischaracterizes Mr. Servis and Mr. Chan's motion by claiming they propose a "*post hoc* wishlist" of proposed alternative techniques that the FBI should have taken.  Gov. Opp. at 117. In fact, the motions argued that at least some basic investigative steps needed to be taken (rather than none) and identified obvious steps the Government could have pursued to highlight the sheer paucity of investigative efforts before seeking the wiretap. Notably, the Government does not address why these easy investigative efforts were not done.  For instance, the Government offers no explanation why it did not obtain a sample SGF-1000 until July 2019, when it was freely available for purchase and advertised on the internet.

Where the Government does address certain techniques, its explanations defy logic. The Government makes the incredible claim that a covert barn search was impossible because "the opportune time for conducting such a search" could only have been identified through evidence secured via a wiretap. Gov. Opp. at 117. In fact, the timing of a search could easily be informed by common sense and basic physical surveillance. Further, to explain why the Government failed to obtain covert blood draws, the Government argues that the warrants for covert blood draws on Mr. Surick and Mr. Oakes's horses relied on probable cause built on previous wiretaps of those individual phones. *See id.* Yet this concession only undermines the probable cause for a wiretap on Mr. Servis's phone. If the Government did not have probable cause for a blood draw, it could not have had probable cause for a wiretap, which requires a more exacting showing.[20]

With respect to confidential sources, the Government argues that any suggestion that it should have attempted to secure a confidential source with access to the "means and method of sourcing and administering illicit drugs is [ ] divorced from reality." Gov. Opp. at 118. This argument is perplexing given the existence of CS-8 (who certainly had such access), the fact that the HKJC obtained a sample of SGF-1000 from MediVet for testing well before the wiretaps, and the cooperation with the FBI by the Jockey Club and 5 Stones (who undoubtedly could have obtained a sample of SGF-1000 at the FBI's request). *See* Servis. Br. at 41-42. Crucially, the Government now acknowledges, for what appears to be the first time to a court, that CS-8 "discussed Rhein's involvement in the sale of SGF-1000 and Rhein (and others') willingness to lie to regulators if and when questioned about sales of MediVet product." Gov. Opp. at 119. Although the Government casually divulges this new information in passing, it is undeniably

---

[20] This argument also neglects the fact that, after the wiretap, and without a warrant, agents obtained covert blood samples of Mr. Servis's horses through a state investigator posing as an employee of the Gaming Commission.

material to a court's understanding of the success of alternative techniques and should have been disclosed. *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) ("[R]ecklessness may be inferred when omitted information was clearly critical to assessing the legality of a search.) (internal quotations omitted).

The Government retorts that "Servis does not establish that [CS-8] was privy to discussions about the means by which Servis was purchasing, shipping, inventorying, or falsely billing drugs, including but not limited to SGF-1000." Gov. Opp. at 119.  This carefully worded argument does not deny that CS-8 had such access.  While a *Franks* hearing would fully reveal what CS-8 knew and when, given the discovery to date[21] and the Government's latest revelation in the opposition concerning CS-8's interactions with Mr. Rhein, there is sufficient reason to believe CS-8 provided (or would have provided) the Government with Mr. Rhein's sourcing and administration of SGF-1000 on behalf of clients.  Like in *U.S. v. Lilla*, the Government's "use of the wiretap was merely a useful additional tool and therefore should never have been authorized." 699 F.2d 99, 104 (2d Cir. 1983).

The Government also argues that CS-8 was not tantamount to "achieving insight into the actual content of SGF-1000" and that "the actual formula" for SGF-1000 remained unachievable through CS-8.  Gov. Opp. at 119.  This argument reads into the original affidavits a goal of the wiretap that was never actually proffered.  Indeed, identifying "the actual content of SGF-1000" could not have been a goal of the wiretap because, as described at length in Mr. Servis and Mr. Chan's motions, the Government never acknowledged not knowing SGF-1000's contents and instead falsely represented to courts that SGF-1000 contained performance-enhancing growth

---

[21]  *See* Servis Br. at 41-42 (discovery has indicated that Mr. Kegley disclosed to CS-8 the name of several trainers Mr. Rhein worked for, including that a trainer not a defendant in this case was "willing to do a lot of things to horses and could keep quiet about the work he performed").

factors.  In any event, it is nonsensical to believe Mr. Servis's phone would be more likely to yield the "actual formula" of SGF-1000 than a confidential source with direct access to Mr. Kegley, the provider, and Mr. Rhein, a veterinarian, concerning the substance.

Significantly, the Government fails to adequately account for its non-disclosure of CS-8, particularly given its claim in wiretap submissions that no confidential source could provide access to Mr. Servis or Mr. Chan's sourcing of SGF-1000.  In passing (and without expressly referencing CS-8), the Government asserts that the source was disclosed in footnote 47 on page 128 page of its final wiretap affidavit.  *See* Gov. Opp. at 119.  However, footnote 47 indicates that a source working for "5 Stones" (not the FBI), had obtained MediVet marketing materials.  *See* Glavin Aff., Ex. 4 at 128, n.47.  This leaves two possibilities: the source referenced in footnote 47 is not CS-8, or the footnote intentionally and materially mislead the court by failing to disclose that CS-8 was working at the FBI's direction.  And, of course, even if CS-8 was disclosed in footnote 47, the full scope of his access to information relating to the investigations of Mr. Servis and Mr. Chan was not.  Therefore, the Government's attempt to explain the non-disclosure of CS-8 only adds to the showing of recklessness already sufficient for suppression or, at a minimum, a *Franks* hearing.

### III.   The Government opposition fails to rebut Mr. Chan's argument that the wiretap applications do not address Title III designated offenses

Government arguments that there was probable cause to authorize wiretaps for enumerated offenses such as wire or mail fraud are unavailing.  For one, they are all premised on the speculative and false statements made in the affidavits that substances acting as PEDs, specifically SGF-1000 and Clenbuterol, were used to commit a fraud on racetracks, owners and the public.  Since there is no evidence that PEDs were employed, other than the agents speculative unfounded statements, there is no fraud nor could a case of probable cause be made

out to believe a fraud was committed.  The Government's arguments that a Grand Jury found evidence of wire or mail fraud "in part on the basis of evidence developed through wiretaps" (Gov. Opp. at 121) ignores the statutory requirement that evidence derived through illegally obtained wiretaps must be suppressed.  Pursuant to 18 U.S.C. §2515, if the interception of a communication violates Title III, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court ... ."  Since it is based "in part" on wiretaps illegally obtained, it also proves the point that additional evidence was obtainable without the wiretaps.  It is noteworthy that the initial Grand Jury indictments did not contain any wire or fraud counts.  The Government's opposition acknowledges that there were no allegations set forth in the affidavits that either purse winnings or the registration of horses for races involved wires or mail.  They do so by arguing that there was a claim that purse winnings may be received by hand rather than through wire transfers, calling this a "possibility."  Opp. Br. at 122.  In fact, the affidavits submitted raised the argument that internet wire transfers of purse winnings "typically" occur but could be done by hand.  *See* Baum Aff., Ex. A at 29. However, while intimating that Jason Servis engaged in this wire transfer process, ("I have learned that Servis has entered horses ... at tracks ... which requires submission of information and distribution of purse money, through the systems described above ... "), there was no allegation in the affidavit that such wire transfers occurred.  Absent the use of wires or the mail to enter horses in races or collect purse winnings, any argument of fraud on this basis falls short of probable cause. The Government's opposition memorandum dismisses this argument without any statement that wire transfers in fact occurred.

## CONCLUSION

For the reasons set forth above, the motion to suppress should be granted or, alternatively, a *Franks* hearing held.

Respectfully submitted,


_____/s/_____

Rita M. Glavin, Esq.
Glavin PLLC

_____/s/_____
Michael Considine, Esq.
Noah Czarny, Esq.
Seward & Kissel LLP


_____/s/_____
Robert Baum, Esq.
Federal Defenders, Southern District of New York

26