**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

JASON SERVIS,

                    Defendant.

20 Cr. 160 (MKV)

## SENTENCING MEMORANDUM ON BEHALF OF JASON SERVIS

Rita Glavin
Katherine Petrino

GLAVIN PLLC
156 West 56th Street, Ste. 2004
New York, NY 10019
Tel: (646) 693-5505
rglavin@glavinpllc.com

Michael Considine
Noah Czarny

SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004

*Attorneys for Jason Servis*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................1

II.   THE OFFENSE CONDUCT AND PRESENTENCE INVESTIGATION REPORT ............2

   A.   The Offense Conduct ............................................................................ 2

   B.   The Plea Agreement................................................................................ 2

   C.   The Presentence Investigation Report ................................................. 5

III.   THE COURT SHOULD IMPOSE A BELOW-GUIDELINES SENTENCE ........................6

   A.   Mr. Servis's History and Characteristics ........................................... 7

   B.   Mr. Servis's State of Mind Regarding the Offense Conduct ........................... 13

   C.   Mr. Servis's Conduct Was Less Egregious Than Other Defendants ................................ 27

   D.   A Below-Guidelines Sentence Would Reflect the Seriousness of the Offense and Provide Adequate Deterrence................................................................. 39

   E.   Recommendation to the Bureau of Prisons.................................................... 41

IV.   CONCLUSION ...............................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................ 7

*Tapia v. United States*, 564 U.S. 319 (2011) .............................................................. 40

*United States v. Article of Drug Bacto-Unidisk*, 394 U.S. 784 (1969) ....................... 26

*United States v. Boykins-Jenkins*, No. 09-cr-861-01, 2011 WL 4424467 (S.D.N.Y. Sept. 22, 2011) ............................................................................................................................. 7

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (en banc) ................................ 7

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ................................................ 37

*United States v. Emmenegger*, 329 F.Supp. 2d 416 (S.D.N.Y. 2004) ......................... 37

*United States v. Johnson*, 567 F.3d 40 (2d Cir. 2009) ................................................ 7

*United States v. Johnson*, No. 16-cr-457, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ........... 37

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .................................................. 7

*United States v. N.Y. Fish, Inc.*, 10 F. Supp. 3d 355 (E.D.N.Y. 2004) ........................ 26

**Statutes**

18 U.S.C. § 3553(a) ................................................................................................ 1, 6, 39

18 U.S.C. § 3621 .................................................................................................... 40

21 U.S.C. § 331(a) .................................................................................................. 2

21 U.S.C. § 333(a) .................................................................................................. 2

Federal Food, Drug, and Cosemetic Act, 21 U.S.C. § 301 *et seq* ............................... 3

United States Sentencing Guidelines § 2B1.1(b) ....................................................... 4

United States Sentencing Guidelines § 3E1.1 ........................................................... 4

United States Sentencing Guidelines § 5E1.2 ........................................................... 5

## I.   PRELIMINARY STATEMENT

This sentencing memorandum is respectfully submitted on behalf of Jason Servis, who is to appear before the Court for sentencing on July 26, 2023.

Mr. Servis, 66 years old and a first-time nonviolent offender, comes before the Court with deep remorse for his decisions and actions.  Mr. Servis has spent his entire life around horses: from visiting the track with his father (and former racetrack steward), to the saddle as a jockey, and to becoming a well-respected and professional trainer.  Horsemanship is both an art and a skill combining personal experience and knowledge—and across the board, colleagues, friends, and family observe that Jason is a superlative horseman.  The conduct for which Mr. Servis will be sentenced is a regrettable aberration from his decades-long career as a trainer.

In imposing a sentence, we respectfully ask that the Court carefully consider the 18 U.S.C. § 3533(a) factors, particularly: (i) Mr. Servis's history and characteristics; (ii) Jason Servis's state of mind when the offenses occurred; and (iii) the conduct of, and resulting sentences imposed on, certain similarly situated defendants in this matter.  We recognize that because Jason Servis caused substances—SGF-1000 and Clenbuterol (both in FDA-approved and compounded form)—to be administered to horses under his control in violation of the rules, the health and welfare of those horses were compromised, in some undetermined fashion.  He has accepted responsibility for his actions and is prepared to be sentenced for this conduct.  In light of Mr. Servis's background, state of mind, and relative culpability, we respectfully request that the Court impose a sentence in accordance with the U.S. Probation Office's ("Probation") recommendation that, "taking into consideration the sentences imposed for several of the co-defendants to date and in order to avoid any unwarranted disparities," a downward variance from the Guidelines sentence is appropriate. (PSR at 56).

1

## II.   THE OFFENSE CONDUCT AND PRESENTENCE INVESTIGATION REPORT

### A.   The Offense Conduct

Between 2016 and 2019, Mr. Servis committed misbranding offenses in violation of 21 U.S.C. §§ 331(a), 333(a)(1), and 333(a)(2), related to his use of SGF-1000 and Clenbuterol (both in a compounded version and an FDA-approved form).  Following the recommendation of his New York veterinarian, Dr. Kristian Rhein, Mr. Servis (i) authorized veterinarians to order bottles of the injectable drug SGF-1000 and (ii) permitted those same veterinarians to administer this substance to horses under his care.  (PSR ¶ 75).  Mr. Servis approved veterinary bills that his New York veterinarian created and sent to owners knowing that those veterinary bills included concealed charges for SGF-1000 (PSR ¶ 77) and permitted Clenbuterol to be regularly administered to Mr. Servis's horses without a specific prescription issued in the name of each individual horse that received the prescription drug, as was required.  (PSR ¶ 81.)  Finally, Mr. Servis caused a misbranded and compounded form of Clenbuterol to be administered to his horses and also caused that substance to be transported from New Jersey to New York on or about May 8, 2019.  (PSR ¶ 82).  On this occasion, Mr. Servis caused that compounded form of Clenbuterol to be placed in a soda bottle that was concealed in a bucket of poultice to avoid detection.  (PSR ¶ 82).

### B.   The Plea Agreement

On December 9, 2022, Mr. Servis pled guilty, pursuant to a written plea agreement with the Government, to an Information charging one count of felony misbranding, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), and one misdemeanor count of misbranding, in violation of 21 U.S.C. §§ 331(a) and 333(a)(1), for offense conduct involving Clenbuterol and SGF-1000, respectively.    Specifically, Count One of the Information charged Mr. Servis with introducing

into interstate commerce adulterated and misbranded drugs—here, Clenbuterol and a compounded form of the same—with the intent to defraud and mislead in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq*.  Count One carries a maximum term of imprisonment of three years.  Count Two, a one-year misdemeanor, charged Mr. Servis with a strict-liability violation of the FDCA for causing others to ship SGF-1000 on his behalf.  Both Counts carry a maximum of one year of supervised release.

Under the terms of the plea agreement, Mr. Servis agreed not to challenge the following facts (*see* Change of Plea Tr. at 43:15–44:12; 47:11–50:17):

> 1.  Between 2016 and 2019, after Servis' New York veterinarian recommended SGF-1000 to Servis, Servis caused veterinarians to order hundreds of bottles of the injectable drug SGF-1000 for the veterinarians to administer to Servis-trained horses. That veterinarian repeatedly assured Servis that SGF-1000 was legal and not violative of racing rules, as reflected in intercepted calls in June and August of 2019. Medivet, the manufacturer of SGF-1000, marketed it as a substance containing growth factors that increased stamina and endurance, as well as a substance that was "safe and legal for all equine disciplines and does not test or swab because it is an all-natural regenerative therapy." In September 2019, the New York State Gaming Commission released an advisory stating: "All forms of growth hormone and growth factors (e.g., Medivet SGF1000, RMR, TB 1000) are prohibited" under the racing rules. The advisory stated that the rule had "been in effect since August 2018" and that "[t]hese substances were prohibited by a previous version of this rule in July 2012." Servis was aware of the advisory and continued to have his veterinarian administer SGF-1000 in New York.

> 2.  A single bottle of SGF-1000 cost up to $300. Servis approved veterinary bills that his New York veterinarian provided to owners knowing that those bills included concealed charges for SGF-1000. Specifically, that veterinarian falsely billed SGF-1000 under the line item "Acupuncture & Chiropractic."

> 3.  Under the Food Drug and Cosmetic Act ("FDCA") and related regulations, SGF-1000 was misbranded and/or adulterated insofar as it was a new animal drug without FDA approval and/or was manufactured in facilities not registered with the FDA.

> 4.  On or about August 14, 2019, Servis was approached without advance warning by New York State Troopers and questioned regarding his use of SGF-

3

1000. Servis falsely stated that he only used SGF-1000 on "four or five" racehorses at most. Servis had previously stated in a private conversation with trainer Jorge Navarro that SGF-1000 was administered to virtually all Servis-trained horses.

5. Clenbuterol, a prescription drug, was regularly administered to Servis' horses during the course of the offense conduct without a specific prescription issued in the specific name of every individual horse that received the clenbuterol. One of Servis' New York veterinarians, Alexander Chan, informed him on May 21, 2019 that Chan had issued Clenbuterol prescriptions under the name of a single horse, Sunny Ridge, for use on other horses, to avoid scrutiny from racing regulators.

6. Servis caused to be transported an adulterated and misbranded compounded form of Clenbuterol, which he understood was more effective than the FDA-approved version of Clenbuterol known as "ventipulmin," when administered to horses. On or about May 8, 2019, Servis arranged to transport that drug from Servis' barn in New Jersey to Servis' barn in Belmont, New York, by causing the drug to be placed in a soda bottle that was concealed in a bucket of poultice to avoid detection. The bottle was transported in a horse van to New York.

Mr. Servis also stipulated to a Guidelines calculation pursuant to the plea agreement. Mr. Servis's base offense level of 6 is increased by 22 levels because the intended loss amount is greater than $25,000,000 but less than $65,000,000. United States Sentencing Guidelines ("U.S.S.G") § 2B1.1(b)(1)(L). The offense level is increased by 2 because the conduct involved 10 or more victims. U.S.S.G. § 2B1.1(b)(2)(A). Mr. Servis agreed to 2-level enhancements for organizer-leader status and abuse of a position of trust. With a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)-(b), the stipulated Guidelines total offense level is 31. Because Mr. Servis has no criminal record, his Criminal History Category is I.

Mr. Servis's stipulated Guidelines sentence is 48 months' imprisonment, and he consented to forfeiture in the amount of $311,760 and restitution totaling $163,932. Under the Guidelines, the applicable fine range is $30,000 to $300,000. U.S.S.G. § 5E1.2.

C.      **The Presentence Investigation Report**

       *i.  Offense Level Calculations*

The Guidelines calculations set forth in the Presentence Investigation Report ("PSR") match the stipulated Guidelines calculations in the plea agreement.  Accordingly, Mr. Servis has no objections to those calculations.

       *ii.  Factual Objections*

Following receipt of the initial draft of the PSR, Mr. Servis submitted objections, edits, comments, and requested revisions to Probation.  The Government opposed most of these objections, and Probation similarly rejected many of them when it issued the final PSR on April 27, 2023.  After consideration, we withdraw all of our pending objections to the PSR.

That said, we note that the Government cited two test results of SGF-1000 in response to our objections, which are contained on pages 40–41 of the PSR.  Although we believe those test results are irrelevant to sentencing (and we understand the Government agrees with our view), if the Court were in any way inclined to consider this testing information summarized by the Government in response to our withdrawn objections, we ask the Court also to consider the following facts.  First, while the Government reports that the Hong Kong Jockey Club ("HKJC") informed the Government that they had "detected trace evidence of ovine Transforming Growth Factor-beta" in an SGF-1000 sample, the HKJC did not produce to the Government the actual lab report, lab worksheets, or any back-up documentation.  The defense specifically requested this information from the Government, and the Government made the request of HKJC for that information.  HKJC did not provide that information and our understanding is that HKJC was unwilling to provide it.

Second, with regard to testing by Industrial Laboratories, the Government noted that while an initial test of SGF-1000 did not detect growth factors, a subsequent test detected a trace amount

of "Fibroblast Growth Factor." (PSR at 40–41). Although this issue need not be resolved for purposes of sentencing, we note the following: this testing by Industrial Laboratories was conducted with the input of well-known equine pharmacology expert Dr. Thomas Tobin, who worked at the University of Kentucky at the time and had been retained by MediVet to consult on testing SGF-1000. In reviewing the result from that subsequent test, Dr. Tobin expressed concern that the particular growth factor detection might not be a true positive, but instead, a "cross reaction" in the testing. (*See* Ex. 1 (USAO_20CR160_00260902). Dr. Tobin then caused another sample to be sent to Industrial Labs to perform another test, which reported *negative* for that growth factor. (*See* Ex. 2 (USAO_20CR160_00261076 – 00261077)).

Nonetheless, these test results are irrelevant to Mr. Servis's state of mind because he did not receive any testing documentation. Mr. Servis was told that testing showed no banned substances, as described in detail below.

### iii.   Probation's Sentence Recommendation

Probation recommended 36 months' imprisonment—a variance well below the stipulated Guidelines sentence—and a fine of $30,000. (PSR at 56–57). Probation reasoned that, given the sentences imposed on other co-defendants and in recognition that Mr. Servis is 66 years-old and has lived an otherwise law-abiding life, a 36-month term of imprisonment would avoid unwarranted sentencing disparities and provide adequate punishment and deterrence.

## III.   THE COURT SHOULD IMPOSE A BELOW-GUIDELINES SENTENCE

The defense respectfully submits that application of the factors set forth in 18 U.S.C. § 3553(a), warrant a below-Guidelines sentence. The Court is empowered with "considerable discretion" in determining whether a non-Guidelines sentence is appropriate. *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008); *see United States v. Cavera*, 550 F.3d 180, 188 (2d Cir.

2008) (en banc).  Though the Guidelines are the "starting point and the initial benchmark[,]"

*United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009) (quoting *Gall v. United States*, 552 U.S.

38, 49 (2007)), in fashioning such a sufficient sentence, the Court may consider:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
> (5) any pertinent policy statement ... [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

*United States v. Boykins-Jenkins*, No. 09-cr-861-01, 2011 WL 4424467, at *1 (S.D.N.Y. Sept. 22,

2011) (quoting § 3553(a)).

## A.       Mr. Servis's History and Characteristics

Jason Servis is a hard-working, family-oriented man who has spent his entire adult life

working with horses in the racing industry.  Born to Joseph and Delores Servis in 1957, Mr. Servis

grew up with his three siblings in Charles Town, West Virginia.  Mr. Servis's family is entrenched

in the racing industry: his father worked as a racetrack steward and for the Jockeys' Guild, and his

brother, John, is a racehorse trainer.  Beginning as a teenager, Mr. Servis worked various jobs at a

barn in Charles Town, West Virginia and on a racetrack. (PSR ¶ 160.) In 1975, Mr. Servis completed his formal education when he graduated from high school at the age of 18 in West Virginia and began working as a jockey around the same time. (PSR ¶¶ 155, 160.) Thereafter, he relocated to New Jersey where he continued working as a jockey and then as a jockey valet at Monmouth Park in Oceanport, New Jersey and Meadowland Racing & Entertainment in East Rutherford, New Jersey, and at racetracks in Florida. (PSR ¶ 159.) Mr. Servis would also pick up work as an exercise rider, working horses out in the morning. (PSR ¶ 159.) While working in the Meadowlands, Mr. Servis worked six days a week, both morning and night. On weekends, he would typically race nine times per day on top of exercising horses in the morning. (PSR ¶ 159.) Mr. Servis worked as a jockey valet from approximately 1976 to 2000, while maintaining a full-time job exercising racehorses as well. (PSR ¶ 159; Ex. 3 (Natalie Servis))

In 1978, Mr. Servis met and married his wife Natalie (Imbriana) who was also working in the industry at the time. (PSR ¶ 139.) Jason and Natalie (age 67) have been married for approximately 45 years and have a strong and supportive marriage. Natalie at times worked for Jason's training business, but Mr. Servis has served as the family's primary financial provider. Jason and Natalie have two adult sons: Jason Evan Servis (35) and Garrett Quinn Servis (32), who reside in Hawaii and Florida, respectively. (PSR ¶ 141.) Natalie observed that Jason worked hard to make sure he always provided for them. Ex. 3 (Natalie Servis). An owner and trainer who has known Mr. Servis since 1978 detailed that during these years, Mr. Servis's "day would begin at approximately 5:00am for a daytime card [and] would end at [approximately] 6:00pm. For a nighttime card, his day [] would end at approximately 11:00pm. To say the least, day or night, it was a grueling endeavor. He had a wife and young sons and lived up to his responsibilities." Ex. 4 (Imbesi).

8

Mr. Servis maintained a well-regarded reputation as a rider, "known for his ability to handle horses that could be headstrong or had shown unruly behaviors." Ex. 3 (Natalie Servis). He used his skills and knowledge to help horses settle down and reach their full potential. *Id.* During this time, he also "gained a wealth of knowledge" from working with various trainers that he eventually utilized when he became a trainer himself. *Id.* From 2000 to 2020, Mr. Servis was a self-employed racehorse trainer and met many of the people who wrote the dozens of letters to the Court in support of Mr. Servis. Owners, veterinarians, former employees, colleagues, and clients alike tout Jason's strong moral character and work ethic, describing him as an "honest, loyal, and trustworthy person who truly cared for horses and put them first." Ex. 5 (Drazin, the Servis family attorney and a horse owner). Mr. Drazin further stated: "Jason always recommended giving horses time to rest and recover when they showed any sign of wear and tear. Jason always advocated making sure a horse was healthy and sound before trying to race." Ex. 5; *see* Ex. 6 (Ketner) (a veterinarian who noted Mr. Servis's dedication); Ex. 7 (former employee Matthew Hartman described Mr. Servis's barn as a "family" and noted that Mr. Servis "never over raced his horse and would never put them in harms way."). Dr. Patty Hogan, an equine surgeon, similarly highlights Mr. Servis's "horsemanship skills, integrity, level of professionalism, and concern for the welfare of the horses in his charge," which she observed firsthand. Ex. 8. A former vet assistant described that, "[i]f a horse were even the slightest bit off, he would call to have them checked out and jogged up, with X-rays done to ensure it was safe to train." Ex. 9 (Dembner). She saw that Mr. Servis's horses were "well maintained and happy" and opined that "Jason Servis is one of the best horsemen I have ever had the opportunity to learn from….He truly puts the horse first, something I wish more equine professionals would do. His love for horses is apparent." *Id.*

9

Over time, these attributes brought Mr. Servis and his clients success in the ultracompetitive racehorse industry, garnering increased winnings, additional clients, and better horses. He remained, however, "an outstanding horseman with an emphasis on care for the animals." Ex. 10 (Roberts). Another owner observed that although he was a smaller client than others working with Jason, "Mr. Servis treated my horse with the same care and concern as" highly competitive horses, and always did "what was in the best interest of the horse…first and foremost." Ex. 11 (O'Mealia); *see also* Ex. 12 (Kirk, a business associate) (describing Jason as "extremely compassionate and caring about the horses in his barn"). A colleague and friend of Mr. Servis similarly noted that he "had a great sense of duty and pride with the horses in his care and his racing stable…He has a gentlemanly way with people, horses, and family." Ex. 13 (Komlo); Ex. 14 (Poston) (an owner who worked with Mr. Servis from 2007 to 2020, "valued his opinion on the care and management of [his] horses," and found him to be very "trustworthy").

Visitors to his barn observed Mr. Servis's great care for his employees and former employees described a family-like environment. Employees and colleagues noted that Mr. Servis treated everyone with respect and displayed professionalism and dedication to his horses. *See* Ex. 7 (Hartman); Ex. 15 (Fee). Another employee noted Mr. Servis's "patience" and the positive work environment that he fostered, even when she made mistakes. Ex. 16 (Adams); *see also* Ex. 17 (Wadsworth-Mahoney) ("Jason has a love and passion for the thoroughbred horse racing business and it shows. He cared about his horses and staff and if you walked in his barn you would see this."); Ex. 18 (Scannapieco) ("he always put the health and welfare of the horses above anything else"); Ex. 19 (Vance) (describing that his horses were "always well taken care of, turned out lovely, healthy and trained with care and caution"); Ex. 20 (Codey) (noting that his son interned with Jason and observed that Jason "treat[ed] everyone in the barn with respect and dignity"); Ex.

21 (Kerber) (noting that Jason has "helped his employees resolve their immigration status"); Ex. 22 (Charles Lewis) ("[h]e is a fine caretaker of his horses and his help"); Ex. 23 (Dr. Chinnici) (noting Jason's "dedication to his profession"); Ex. 24 (J. Krynicki) (describing Mr. Servis as "always incredibly kind and accommodating"); Ex. 25 (Brown) (Jasons would consistently tell him that "horses come first"); Ex. 26 (Goldstein) ("Jason is truly caring and kind, always going out of his way to help others in need"); Ex. 27 (Smith) (Jason "loved and dedicated himself to the horses, his profession and all those he worked with"); Ex. 28 (Cooper) (recalling his experience with Jason as "positive" and noting his "strong work ethic"); Ex. 29 (Weber) (characterizing Jason as "honest, accommodating, and ethical in all his interactions with us, and he became a more than an employee to our family"); Ex. 30 (Wolfe) ("It was obvious that he cared deeply about the future welfare of his horses and made every effort to find them the very best homes possible"); Ex. 31 (M. Krynicki) ("Jason is a stand up person, caring and now worried for his family").

Family and longtime personal friends echo similar sentiments about Mr. Servis and demonstrate unwavering support for him notwithstanding their disappointment in the conduct he engaged in that led to this sentencing.   Mr. Servis's wife Natalie describes him as a "loving and honorable man….[who] has been a great father, husband and very good to all our family." Ex. 3 (Natalie Servis).  She observes the care he took of his horses and his reliance on the advice of "licensed veterinarian[s]" because "he trusted them to provide accurate answers and relied on their expertise." *Id.*  Since the Indictment, Mrs. Servis observes that "Jason is extremely regretful every day of his poor judgment and decisions and wishes that he had not talked to or taken the advice of certain individuals." *Id.*  She notes that he has "stayed very strong…and above all is mainly worried more about what he has put his family through." *Id.*  Nevertheless, she emphasizes that

she and her family are "all extremely blessed to have him in our lives" and urges "empathy towards him." *Id.*

Mr. Servis's siblings likewise describe him as a loving and devoted father who has always been there for his loved ones. Ex. 32 (John C. Servis); Ex. 33 (Plesa). His sons describe him as a "great father" who "afford[ed] us a wonderful childhood" and credit him with teaching them numerous lessons over the years. Ex. 34 (Garrett Servis); Ex. 35 (Jason Evan Servis). Specifically, his sons have seen Mr. Servis's work ethic and deep care for horses, noting in particular his hands-on approach which involved individually checking in on horses and ensuring each was well-fed and groomed. This compassion extended to other animals as well. Both sons recount that growing up, their home was down the street from an animal shelter and people would sometimes abandon animals at the end of the road. Mr. Servis would take it upon himself to transport them safely to the shelter, ensuring their comfort and safety. On one occasion, Mr. Servis took in an abandoned kitten, and "loved and took care of [the cat] her whole life." Ex. 35 (Jason Evan Servis). Mr. Servis was also generous at the barn, ensuring employees had gifts during the holidays and that the horses received extra mints and carrots. Ex. 34 (Garrett Servis).

Mr. Servis's nieces and nephews describe an uncle who has been a positive influence in their lives and a role model of a devoted husband and father—and acted as a father figure and mentor. Ex. 36 (Sransky); Ex. 37 (C. Imbriani); Ex. 38 (R. Imbriani); Ex. 39 (Nelson). Mr. Servis also plays a critical role in caring for his sister-in-law ██████████████████████████ ████████████████████. Ex. 36 (Sransky); Ex. 39 (Nelson). Mr. Servis's niece Jennifer recounts that Mr. Servis has never hesitated to help her mother and took care of things at her house, ran errands, and would check in on her daily. More recently, he and Natalie even

opened up their home to his sister-in-law when she was in the midst of a move to accommodate her health challenges.

As the Court is aware, Mr. Servis's parents are elderly and have faced critical health issues in recent years that have required Mr. Servis to travel frequently to West Virginia. ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ Though they speak regularly on the phone, Mr. Servis and his wife Natalie have traveled to West Virginia several times to be present for his parents' medical procedures and assist them in their recovery.  During those visits, Mr. Servis assists his parents by performing household tasks and making sure their medical needs are met.

## B.    Mr. Servis's State of Mind Regarding the Offense Conduct

Critical to the nature and circumstances of the offense conduct is that when Mr. Servis caused horses in his care to use SGF-1000 and Clenbuterol (both the FDA-approved and compounded forms), he viewed neither as harmful to the horses.  Mr. Servis takes full responsibility for the conduct charged in the Information and recognizes now that use of any banned substance could potentially harm horses.  He sincerely regrets this, particularly because in his career, Mr. Servis took pride in the stewardship of the horses under his care.  *See* Exs. 8 and 9 (Hogan and Dembner).  Whenever questions surfaced about whether a horse's health warranted continued racing or rest, the decision reached by Mr. Servis was simple:  the health of the horse came first, regardless of the economics of racing that horse.  And, critically, although Mr. Servis is a consummate horseman, he also trusted and deferred to the experts—veterinarians—when it came to their advice and course of treatment in the interest of the horse.

Perhaps Dr. Patty Hogan made this point best. Dr. Hogan is an equine surgeon who primarily treats Thoroughbred racehorses and Standardbreds, and runs a large regional referral hospital for horses. Dr. Hogan recounted that Mr. Servis's horses were always in good condition, and she observed his "special insight" into his horses that allowed him to at times catch injuries in their early stages. Ex. 8 (Hogan). When horses required more critical care, however, Dr. Hogan recalled that Mr. Servis consistently told her to do what is best for the horse—even when that meant sitting out of races. Specifically, Dr. Hogan recalls one situation where she was able to resolve a horse's bone infection and saved the horse's life, but her actions resulted in the loss of a high six-figure mortality insurance policy pay-out. Although the owner was unhappy with Dr. Hogan, Mr. Servis supported her. To Dr. Hogan, this exemplified Jason's connection to horses and concern for their welfare.

In addition to the many letters submitted to the Court from people who worked with Mr. Servis, calls intercepted by the Government during the investigation corroborate these points and demonstrate the concern Mr. Servis had for the horses in his barn. On several occasions, Mr. Servis discussed resting horses to ensure their soundness. (*See, e.g.*, Ex. 40, Linesheet Nos. 2424 (May 7, 2019 call) (referring to a recommendation for another 30 days off for a horse), and 3339 (May 10, 2019 call) (discussing a horse who needed rest and potentially sending the horse to another farm to rest). On another occasion when Dr. Alexander Chan expressed hesitancy about recommending an X-Ray for a horse, Mr. Servis encouraged him to speak up in the interest of the horse, saying "don't ever feel like you are intruding on my barn. If you see something say something." (Ex. 41, Linesheet No. 19495 (August 13, 2019 call)).

14

i.      *SGF-1000*

   a.   **Servis's Views on SGF-1000**

Count Two of the Information concerns Mr. Servis's use of SGF-1000.  Mr. Servis's views

on SGF-1000—that it did not contain banned substances and caused no harm to his horses—were

formed and repeatedly reinforced by his veterinarians Kristian Rhein and Alexander Chan. A June

6, 2019 call between Dr. Rhein and Mr. Servis, captured by the Government via wiretap, reflects

the message these veterinarians repeatedly conveyed to Mr. Servis about SGF-1000.   On that

particular call, Dr. Rhein said the following about SGF-1000:

> We finally have something that can help.  I mean [SGF-1000] is just
> so good for helping them … it's healing them .. it gets them into the
> best of what they can do.  It doesn't go above it…it keeps them
> healthy and not get hurt during training … we're preventing soft
> tissue injury.

> (Ex. 42, Linesheet No. 8537 (June 6, 2019 call)).[1]

Based on such conversations, Mr. Servis considered SGF-1000 safe and healthy for use by his

horses.

   Significantly, not only was Mr. Servis's state of mind concerning SGF-1000 was that it

was safe and healthy for horses, but he also understood the product did not contain any banned

substances, a point repeatedly emphasized to Mr. Servis by both Dr. Rhein and Dr. Chan.  In its

submission in connection with Dr. Rhein's sentencing (the "Rhein Sentencing Submission"), the

Government stated that during a June 5, 2019 recorded conversation, "Rhein – despite not knowing

---

[1]      While Mr. Servis does not recall being aware of specific MediVet advertising that SGF-1000 contained banned substances, it is undisputed that "MediVet…marketed [SGF 1000] as a substance containing growth factors that increased stamina and endurance as well as a substance that was 'safe and legal for all equine disciplines and does not test or swab because it is an all-natural regenerative therapy.'"  PSR at ¶ 75.

the precise contents of SGF-1000 at that time – nonetheless assuaged Servis' concerns, *not by saying SGF-1000 was legal or permissible* (which it was not), but by saying SGF 1000 would not be detectable on a drug test." *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 564 at 4 (emphasis added).  While Dr. Rhein did state that SGF-1000 was untestable, as explained below, *the Government knew that Dr. Rhein repeatedly emphasized that the product was legal because it contained no banned substances*.

Notably, the Government's position in the Rhein Sentencing Submission contradicts earlier submissions by the Government acknowledging that Dr. Rhein had, in fact, told Mr. Servis and others that SGF-1000 was permissible because it did not contain any prohibited substances. Specifically, in February 2020, as part of a Pen Register application, the FBI represented to the Court: "RHEIN, in substance and in part, has assured others that, due to this testing, SGF-1000 is in compliance with applicable state racing rules." *Id.*, Dkt. No. 514-3, at 30 (attached herein as Ex. 43).  The Government's position during the Rhein sentencing also conflicts with Mr. Servis's plea agreement, wherein the Government required Mr. Servis to agree not to challenge the fact that Mr. Servis's New York "veterinarian repeatedly assured Servis that SGF-1000 was legal and not violative of racing rules, as reflected in intercepted calls in June and August of 2019." *See* Change of Plea Tr. at 47:11–20.

Indeed, on June 6, 2019, the day after the June 5 conversation characterized by the Government in the Rhein Sentencing Submission, Mr. Servis asked Dr. Rhein if SGF-1000 was FDA approved.  Dr. Rhein replied as follows:

> Rhein:  No.  That's the beauty of being a veterinarian.  As a veterinarian you're allowed to use any drug you think would be … and this isn't even considered a drug, it has no drug in it.  It's literally just a purified protein from a sheep's placenta.  This isn't a drug, this isn't manufactured.  So the Federal Drug Administration they wouldn't approve it anyways just because it's not a drug."

(Ex. 42, Linesheet No. 8537 (June 6, 2019 call)).[2]

Dr. Rhein also created and submitted veterinary bills for Mr. Servis's approval that falsely billed SGF-1000 as "Acupuncture and Chiropractic."  Mr. Servis regrettably acquiesced to Dr. Rhein's approach to billing.  Dr. Rhein told Mr. Servis that he withstood past regulatory scrutiny for a substance that he later demonstrated contained all-natural products without banned substances.  Dr. Rhein told Mr. Servis that this prior inquiry caused him much aggravation and that although SGF-1000 was permissible because it did not contain any banned substances, his practice of removing SGF-1000 from bills was to avoid yet another "misguided" inquiry concerning a valid substance.  (Ex. 42, Linesheet No. 8537 (June 6, 2019 call)).  Nevertheless, Mr. Servis was responsible for these bills and regrets his decision to approve them.

After the state police approached Mr. Servis on August 14, 2019, and asked him about SGF-1000, Mr. Servis spoke to Dr. Rhein and Dr. Chan, and they continued to make reassuring statements to Mr. Servis.  Although Mr. Servis admitted to those investigators that he used SGF-1000, he misrepresented the extent of that use.  In a nutshell, Mr. Servis got scared and was not honest during that conversation about his extensive use.  However, that conversation with investigators led Mr. Servis to revisit the contents of SGF-1000, not only with Dr. Rhein but with his assistant, Dr. Chan, whom Mr. Servis understood had previously worked for NYRA and was a state-licensed veterinarian.

For instance, immediately after Mr. Servis was visited by the state investigators—the very same day—Mr. Servis asked Dr. Chan to confirm that SGF-1000's use was permissible.  Dr. Chan

---

[2]    It is worth noting that Dr. Mary Scollay, head of the RMTC, sent an email on September 27, 2019 to the F.D.A., inquiring whether the F.D.A. considers SGF-1000 a drug.  Ex. 44 (Scollay email).

responded unequivocally that SGF-1000 use was legal: "Ya, in New York rules there's nothing against … if it is not specifically written in there it's 7 days… ***It's not illegal***[.]"  (Ex. 45, Linesheet No. 19612 (August 14, 2019 call)) (emphasis added).  A few days later, on August 19th, Mr. Servis circled back with Dr. Chan, who again told Mr. Servis not to worry about SGF-1000, this time referencing his own experience with NYRA:

> "I'm a stickler to the rules all the time.  **I came from NYRA … I know all the rules and stuff** … I always look out for the best interest of my clients because I'm the one doing the work … all the horses under my care they're covered, **it's all legal.**"
>
> (Ex. 46, Linesheet No. 20071 (August 19, 2019 call)) (emphasis added).

But earlier that same week, unbeknownst to Mr. Servis, Dr. George Maylin, Director of the New York Drug Testing Programs, ominously warned Dr. Rhein: **"Either cease and desist or you're gonna go to jail.  One or the other.  What do you want to do?"** *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 564 at 5 (emphasis added).  The Government highlighted the significance of this conversation in the Rhein Sentencing Submission, arguing:

> As a medical professional, and in particular as a racetrack veterinarian, Rhein ought to have known that administering [SGF-1000] into racehorses is pernicious and potentially dangerous . . . **The injurious nature of such conduct was patently obvious to Rhein, both, because he was a veterinarian, and because he was directly told to 'cease and desist' his criminal activities**.
>
> *Id.* at 11 (emphasis added).

One would expect that Dr. Rhein would have shared this alarming exchange with Mr. Servis.  But he did not.  And that is telling.  Disturbingly, the very next day, August 16, 2019, Mr. Servis specifically asked Dr. Rhein whether his barn should stop using SGF-1000.  In response, Dr. Rhein concealed Dr. Maylin's dire warning, lied about what Dr. Maylin had told him, reconfirmed that SGF-1000 did not contain banned substances, and insisted that Mr. Servis should not stop using SGF-1000:

Rhein:  Months ago I had [SGF-1000] tested there is nothing in it. I have all the reports.  I have everything.  Like it's been tested three times there's absolutely nothing in it[.]

Servis:  Should we stop using it?

Rhein  **No.  I mean it's not illegal**.  That's what I am saying.  **And that's what I heard from the higher ups** [at the testing authority]. They know it's not illegal….It's considered a biologic so it's 48 hours….[B]y the rules of racing we're doing everything… everything we've done is by the letter of the law"

(Ex. 47, Linesheet No. 19752 (August 16, 2019 call) (emphasis added).

| Dr. Rhein's August 15, 2019 Conversation with Dr. Maylin | Dr. Rhein's August 16, 2019 Conversation with Mr. Servis |
|---|---|
| Dr. Maylin to Dr. Rhein regarding SGF-1000:  **"Either cease and desist or you're gonna go to jail**.  One or the other.  What do you want to do."  | Mr. Servis to Dr. Rhein regarding SGF-1000:  **"Should we stop using it?"**  Dr. Rhein responded:  **"No.  I mean it's not illegal**.  That's what I am saying.  And **that's what I had heard from the higher ups** [at the testing authority]."  |

### b. **Dr. Rhein Concealed his Pecuniary Interest in SGF-1000**

Eventually, Dr. Rhein's rationale for misleading Mr. Servis on SGF-1000 became clear: unbeknownst to Servis, Dr. Rhein had been promoting SGF-1000 because he had a direct financial interest in its sales.  Dr. Rhein concealed this interest from Mr. Servis, and failed to disclose to him that he was part owner of MediVet, which manufactured SGF-1000.  In an August 15, 2019 conversation, Dr. Rhein discussed this dilemma with his father-in-law, Michael Kegley, who also enjoyed an ownership interest in MediVet.  During that conversation, both Dr. Rhein and Mr.

Kegley discussed how to retain clients like Jason Servis in light of the increasing regulatory scrutiny:

<table>
<tr><td>Rhein</td><td>What they are going to do Mike [Kegley], is they are going the scare the shit out of these customers and the problem is these people talk to people … And the next thing you know, this [is] going to be a fire and everybody is going to go "I don't want to use that stuff."</td></tr>
<tr><td>Kegley</td><td>[F]or our clients we need to give them reassurance.</td></tr>
<tr><td>Rhein</td><td>Shit, I'll be surprised if [Servis] ever uses SGF . . . again.</td></tr>
<tr><td>Kegley</td><td>Yeah, I mean, we'll be fine.  I really, I'm not worried that they will do it.  But I think that we can keep them from ever damaging our business if we do this right.  That is what I am worried about.</td></tr>
</table>

(Ex. 48, Rhein Linesheet No. 5088 (August 15, 2019 call)).

In that same conversation, to minimize the likelihood of Mr. Servis halting SGF-1000 use after learning of Dr. Rhein's financial interest in MediVet, Kegley and Dr. Rhein created a rouse to share with Mr. Servis and others.  Dr. Rhein would downplay his role and interest in MediVet by describing himself as a minority shareholder without significant connection to the company. The next day, when Mr. Servis told Dr. Rhein that he been questioned by investigators about Dr. Rhein's ownership interest in MediVet, Rhein deployed the pre-arranged narrative, stating:

> Oh they gave me 10% when they had no money.  So I was like
> year sure I'll test the stuff.  Shit I have had five companies do
> that.  They bring me stuff in and say - - because they can't afford
> to pay anything.  Yeah I am beyond a minority holder in it.
> That's public knowledge.
> (Ex. 47, Linesheet No. 19752 (August 16, 2019 call)).

Critically, Dr. Rhein's concern that Mr. Servis would stop using SGF-1000 was understandable, as he feared that Mr. Servis would not use SGF-1000 if he knew it contained banned substances.  On this point, insight into Dr. Rhein's understanding of Mr. Servis's state of

mind can be discerned from two intercepted calls.  On June 29, 2019, Dr. Rhein was recorded

instructing trainer (and co-defendant) Michael Tannuzzo how to use "TB-1000," a substance

commonly understood to contain banned peptides, which Dr. Rhein supplied to Tannuzzo.

In contrast, Dr. Rhein had a markedly different conversation with Mr. Servis about that

same substance, TB-1000.  On August 16, 2019, Mr. Servis informed Dr. Rhein that the state

police investigators had inquired about TB-1000.  In response, Dr. Rhein continued duping Mr.

Servis by falsely claiming that Rhein would never use a substance like TB-1000 as it is *illegal*,

implicitly giving Mr. Servis comfort that had SGF-1000 contained banned substances, Dr. Rhein

would not recommend its use: "Yeah [TB-1000] is completely illegal. Nobody messes with that."

| Dr. Rhein's June 29, 2019 Conversation with Tannuzzo[3] | Dr. Rhein's August 16, 2019 Conversation with Mr. Servis[4] |
|---|---|
| Dr. Rhein to Tannuzzo regarding TB-1000: "**Yea you need to give it** to them right before the race. **You give like three – four days before the race**. They'll **freaking blow up**." | Dr. Rhein to Mr. Servis after Mr. Servis said he told investigators he has never used TB-1000: "Yeah, it's completely illegal. Nobody messes with that." |

This conversation reflects an important distinction between Dr. Rhein and Tannuzzo, on

the one hand, and Mr. Servis on the other.  Dr. Rhein saw in Tannuzzo a trainer willing to buy TB-

1000, a substance known to be "completely illegal."  And he thought Tannuzzo would find TB-

1000 appealing because it would cause Tannuzzo's horses to "freaking blow up."  In contrast, Dr.

Rhein never attempted to supply Mr. Servis TB-1000 and felt compelled to lie to Mr. Servis about

---

[3]     Ex. 49, Rhein Linesheet No. 102 (June 29, 2019 call).

[4]     Ex. 47, Linesheet No. 19752 (August 16, 2019 call).

his involvement with that substance altogether and never engaged in conversations with Mr. Servis remotely akin to "blowing up" horses.

### c.  Servis's Use of SGF-1000 Following the September 2019 Circular

The Government minimizes the impact of Mr. Servis's vets' betrayal by referencing a circular issued in September 2019 by the New York Gaming Commission stating that "[a]ll forms of growth hormone (e.g., Medivet SGF1000, RMR, TB1000)" were banned.  The Government argues that Mr. Servis's continued use of SGF-1000 after the circular was issued "indicates [his] state of mind, and his disregard for whether SGF-1000 was permissible under applicable rules.  Its permissibility was immaterial to him, because he used it for years without the assurances he is now citing and continued to use it after learning it was prohibited."  (PSR at 43).  There is no question that Mr. Servis continued to use SGF-1000 after the circular was issued.  There is important context, however, as it relates to Mr. Servis.

As a preliminary matter, Dr. Rhein had always assured Mr. Servis of SGF-1000's legality before and after the wiretap—and the wiretap that ran from approximately April 30, 2019 through to August of 2019 on Mr. Servis's phone captured conversations about SGF-1000 (as discussed above) between Dr. Rhein and Mr. Servis that were similar to other unrecorded conversations between them.  Moreover, although the Circular referenced SGF-1000, the codified prohibition cited in the Circular was the prohibition on the use of growth hormone and growth factors.   The Circular notified that growth hormones and growth factors are prohibited, citing to S2(5, 7) of ARCI "Prohibited List" annexed to Model Rule ARCI-001-015 version 7.0, 4043.12(a).   As explained above, Mr. Servis was led to believe that the RMTC was mistaken as to the actual content of SGF-1000 and that the product did not contain growth hormones or growth factors.

Accordingly, he did not think SGF-1000 contained the prohibited growth hormones or growth factors referred to in the Circular.

Furthermore, around the issuance of the September 2019 circular, Mr. Servis contacted a trusted horse-racing lawyer, Karen Murphy, who was representing MediVet at the time.[5]  When Mr. Servis inquired about the legal landscape of SGF-1000, Ms. Murphy reported that she was working with Dr. Mary Scollay—then head of the Racing Medications & Testing Consortium ("RMTC")—on issues related to SGF-1000.  During this time, Ms. Murphy worked together with Dr. Thomas Tobin and Industrial Labs to conduct testing that Dr. Scollay had requested.  Ms. Murphy provided these results to Dr. Scollay, who in turn advised Ms. Murphy that the product, SGF-1000, would no longer be considered prohibited.  Ms. Murphy advised Mr. Servis of Dr. Scollay's conclusion, and of Ms. Murphy's efforts working with Dr. Scollay on the issue of MediVet's website advertising SGF-1000, and whether or not FBA approval for the product was required.  These efforts continued through to early March 2020. *See* Ex. 50 (Karen Murphy); *see also* Ex. 51, Linesheet No. 20449 (August 23, 2019 call) (Mr. Servis relays to Michael Dubb that Ms. Murphy had told him that a consultant for the RMTC had tested SGF-1000 and it was completely safe and legal).

In an email to Ms. Murphy dated March 5, 2020, just four days before Mr. Servis was arrested and the Indictment was unsealed, Dr. Scollay informed Ms. Murphy that the RMTC was going to issue a formal release stating that the RMTC had "revise[d] its assessment of SGF-1000" because it "determined that SGF-1000 [ ] does not meet the criteria of a prohibited substance[.]"

---

[5]     Ms. Murphy had represented Mr. Servis in the past and he viewed her as a trusted source of information but was not consulting her in a representative capacity following the issuance of the Circular.

-----Original Message-----
From: Mary Scollay <mcscollay@rmtcnet.com>
To: karenamurphyesq@aol.com <karenamurphyesq@aol.com>
Sent: Thu, Mar 5, 2020 4:47 pm
Subject: For your consideration

Karen,

Below I what I intend to provide on RMTC letterhead.  Happy to discuss before I issue it as an official RMTC position.

Please be advised that the RMTC has revised its assessment of SGF-1000 RMR manufactured by Medivet Equine (Nicholasville, KY) in consideration of clarifications received and corrections made to the Medivet Equine website.   The RMTC has determined that SGF-1000 RMR does not meet the criteria of a prohibited substance as described in Annex I:  Prohibited Substances of ARCI **ARCI-025-015.**

Mary

(MediVet19882).

While MediVet may have misled people about the contents of SGF-1000, that has no bearing on the fact that Mr. Servis received comfort from Ms. Murphy concerning SGF-1000 following the issuance of the circular.  Indeed, Mr. Servis received the same message as the RMTC regarding the contents of SGF-1000.  If even the head of the RMTC (a highly trained expert on laboratory testing) was convinced by MediVet's assertions that she was prepared to declare SGF-1000 free of banned substances on the eve of the indictment filed against Mr. Servis, we respectfully submit that it was reasonable for Mr. Servis to have the same view.  Mr. Servis was not privy to MediVet's alleged maneuverings.  If the information provided to Ms. Murphy or Dr. Scollay was inaccurate or misleading, the same is true of the information conveyed to Mr. Servis.

Further, Dr. Rhein continued to push Mr. Servis to use SGF-1000 even *after* the Circular.  Mr. Servis recalls that Dr. Rhein insisted that Mr. Servis continue its use a few days after the Circular came out, explaining that he had already hired counsel and the Gaming Commission was misinformed about the nature of SGF-1000.

ii.   *Clenbuterol*

With respect to Count One of the Information, practices in the industry reinforced Mr. Servis's state of mind about Clenbuterol.  FDA-approved Clenbuterol was an orally administered substance that could legally be used, provided it was administered in accordance with applicable local rules ahead of races.  However, as set forth below, he did not follow those requirements, acted unlawfully, and is prepared to be sentenced accordingly.  Specifically, with respect to the FDA-approved Clenbuterol, Mr. Servis is responsible for allowing the administration of FDA-approved Clenbuterol to horses without a prescription for each individual horse.[6]  Although divergent from the rules, it was standard, industry practice for veterinarians to prescribe one bottle of Clenbuterol and spread the bill across numerous horses in the barn.  For example, Mr. Servis's veterinarians in Florida and New Jersey exhibited this industry practice.  Mr. Servis's veterinarian in Florida billed for each horse in hundredths of a bottle of Clenbuterol because the horse did not receive an entire bottle, but only a portion.  Similarly, Mr. Servis's New Jersey vet billed for one unit of Clenbuterol, but for a fraction of the price (around $50) rather than the approximately $300 that a bottle of Clenbuterol would cost, because that horse did not get the whole bottle.  In other

---

[6]   As far as we can tell, Mr. Servis is among the first trainers criminally charged in connection with the use of Clenbuterol.  Even after Mr. Servis's indictment, trainers who violate rules concerning Clenbuterol have been dealt with administratively.  *See* https://paulickreport.com/news/the-biz/trainer-jeff-mullins-fined-1500-suspended-15-days-for-clenbuterol-positive/ (in Jan. 2023, trainer fined and suspended 15 days for Clenbuterol detected in horse post-race); https://www.thoroughbreddailynews.com/parx-based-trainer-pearce-hit-with-1950-day-suspension/ (trainer suspended and fined in 2022 after six horses under her care tested positive for Clenbuterol during out of competition tests); https://paulickreport.com/news/the-biz/quarter-horse-owner-trainer-juan-torres-summarily-suspended-after-clenbuterol-positive-in-new-mexico/ (trainer suspended in 2022 after horse tested positive for Clenbuterol); https://paulickreport.com/news/the-biz/baltas-serving-15-day-clenbuterol-ban-through-may-17/ (trainer suspended 15-days for Clenbuterol detected in horse post-race).

words, the veterinarians split the cost of a single bottle of Clenbuterol amongst numerous horses to whom that single bottle was administered in accordance with industry practice.

With respect to the compounded form of Clenbuterol, Mr. Servis obtained approximately 15 bottles of that drug from co-defendant Jorge Navarro. Mr. Navarro, who was occupying the barn next to Mr. Servis, told him that this compounded Clenbuterol was produced by a veterinarian, and that it was more effective than the FDA-approved Clenbuterol. Mr. Servis made the grave mistake of purchasing that drug from Mr. Navarro and administering it to horses. Mr. Servis arranged for the transport of a compounded form of Clenbuterol from his barn in New Jersey to his barn in Belmont, New York, by causing that drug to be placed in a soda bottle that was concealed in a bucket of poultice to avoid detection. Mr. Servis concealed the substance because he knew it was against the rules. He knew he could not use a compounded version of Clenbuterol, but he did so under the gravely mistaken belief that this substance would not pose a danger to his horses. And Mr. Servis caused that substance to be administered the same way he had administered the FDA-approved Clenbuterol. He now knows that was a wrong-headed belief; by virtue of it being misbranded and adulterated, the compounded Clenbuterol he used endangered the welfare and health of horses to some extent. He is ashamed, embarrassed, and exceedingly remorseful for this inexcusable behavior.

In considering Mr. Servis's conduct as it relates to Clenbuterol, we note that *none of Mr. Servis's horses failed a post-race test for Clenbuterol during the entirety of the Government's investigation, which began in 2017.*[7] Further, Mr. Servis never used any masking agents and there

---

[7]     The Government has stated that hair tests performed on Mr. Servis's horses tested positive for Clenbuterol. (PSR at 46). These hair tests are irrelevant for three reasons: (i) Mr. Servis does not contest that he administered Clenbuterol and Clenbuterol is legal; (ii) the hair tests are not the

is no allegation that Mr. Servis used any masking agents to disguise the administration of Clenbuterol to his horses.  (PSR ¶ 35).

## C.    Mr. Servis's Conduct Was Less Egregious Than Other Defendants'

Section 3553(a)(6) requires considerations of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." As explained above, at the time of his misconduct, Mr. Servis did not understand his actions to be causing harm to the horses entrusted to his care.  Critically, that is not true of many of the other defendants, whose conduct, as described below, was far worse, and caused more harm, than Mr. Servis.

A central purpose of the statutes of conviction here (*i.e.*, violations of the FDCA) is to protect the welfare and safety of animals.  *See, e.g., United States v. N.Y. Fish, Inc.*, 10 F. Supp. 3d 355, 379 (E.D.N.Y. 2004) ("The goal and 'overriding purpose' of the FDCA is to 'protect the public health[.]'") (quoting *United States v. Article of Drug Bacto-Unidisk*, 394 U.S. 784, 798 (1969)).  For this reason, as the Court considers the appropriate sentence here, we respectfully ask the Court to consider Mr. Servis's conduct as compared to that of the other defendants.  (*See* PSR at 57 (Probation's recommendation that a variance below the Guidelines sentence would avoid unwarranted sentencing disparities)).

We respectfully submit that when compared to Dr. Rhein's conduct, Mr. Servis's was far less egregious and he should be sentenced to a lesser term of imprisonment than Dr. Rhein.  As noted above, the Government argued in the Rhein Sentencing Submission that "[t]he injurious nature of [using SGF-1000] was patently obvious to Rhein, both, because he was a veterinarian,

---

same as post-race drug tests; and (iii) hair tests do not indicate when Clenbuterol was administered or at what dosage.

and because he was directly told [by Dr. Maylin] to 'cease and desist'" from such conduct. *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 564 at 11.   Neither of these rationales apply to Mr. Servis.

As the Court acknowledged at Dr. Rhein's sentencing, Dr. Rhein had specialized training that he abused.   Given his position as a veterinarian, Dr. Rhein, more than Mr. Servis (a high school graduate), would know the potential harm a misbranded substance could cause to a horse.   And the wiretaps demonstrate that Mr. Servis relied on Dr. Rhein's education and superior knowledge and that Dr. Rhein used both to mislead Mr. Servis.   He lied to Mr. Servis about the nature of SGF-1000 and FDA regulatory requirements, hid Dr. Maylin's dire warning about using SGF-1000, and assured Mr. Servis that "the higher ups" like Dr. Maylin maintained that the substance was legal. As reflected in the wiretaps, Dr. Rhein also misled Mr. Servis to protect his pecuniary interest in MediVet sales.

Further, Dr. Rhein's conduct was more harmful to the safety and welfare of horses because it extended far beyond the horses in Mr. Servis barn.   In addition to Mr. Servis' horses, Dr. Rhein supplied and administered SGF-1000 to many other trainers, including Navarro and Tannuzzo. And, as a MediVet owner, he caused SGF-1000 to be distributed to hundreds of other customers. In fact, MediVet customer records included a 14-page invoice list, detailing hundreds of orders to hundreds of individuals—including dozens of veterinarians and/or veterinary practices—for SGF-1000.   Finally, the linesheets reflect that Dr. Rhein was engaged in the covert distribution of other substances like TB-1000, which was widely understood to be an illegal PED.

Mr. Servis's conduct was also less culpable than the other trainer defendants charged during the Government's investigation.   Below is a chart, which summarizes the conduct of

defendant trainers gleaned through the Government's sentencing submissions, charging instruments, and sentencing transcripts:

| | Navarro | Tannuzzo | Zulueta | Dane, Jr. | Oakes | Banca | Allard | Guido | Servis |
|---|---|---|---|---|---|---|---|---|---|
| Used SGF-1000 | X | X | | | | | | | X |
| Used Clenbuterol, Generic Clenbuterol, and/or Other Bronchodilators | X | X | | X | X | X | | | X |
| Used EPO a Class 1 drug: "one of the most potent performance-enhancing drugs" | | | | | X | X | | X | |
| Used unlawful masking agents, blood builders, pain blockers, or bleeder pills | X | X | X | X | X | X | X | X | |
| Milkshaked horses | X | | X | | | | X | | |
| Horse(s) died | X | | | | | X | | X | |
| Used shock machines | X | | | | | | X | | |
| Distributed illegal substances to other trainers | X | X | X | | X | | | | |
| Promoted/facilitated distributors of illegal substances | | | | X | | | | | |
| Committed perjury as to the scope of illegal conduct | | X | | | | | | | |
| Made straw purchases, used shell companies to conceal misconduct, or obtained prescriptions under a false name | X | | | | X | X | | | |
| Pressured veterinarians into misconduct | X | | | | | | | X | |
| Personally injected horses | X | X | | | | | | | |

(*See* Ex. 52 (chart)).

It is apparent that Mr. Servis's conduct, while certainly unlawful regarding the three substances he used improperly, was less egregious than that of other trainers. While Mr. Servis has pleaded to the same offense as many of these other trainers, his underlying conduct was markedly dissimilar. The conduct of other trainers included intentional harm to horses and callous indifference to their suffering. Some trainers administered highly potent EPO products to their horses. Still others mistreated horses through the improper use of numbing shockwave machines and drenches. Mr. Servis did ***none*** of that.

Further, the conversations intercepted on Mr. Servis's phone were qualitatively different than those intercepted on other defendants' phones. Marcus Zulueta, a trainer defendant sentenced to 33 months' imprisonment, apparently nearly killed a horse while administering a drench. Intercepted calls captured him bragging about the incident: "I'm crazy . . . I almost killed him. He started vomiting," Zulueta said. Tannuzzo, a trainer defendant (sentenced to 27-months

29

imprisonment), called Navarro's veterinarian a "pussy" for refusing to administer drenches.  No such depraved remarks were captured through the wiretap of Mr. Servis's phone because they did not occur.  While Mr. Servis admittedly placed his horses at some risk through his conduct and exercised extremely poor judgement, unlike many other trainers, he was not indifferent to the well-being of the horses in his barns.

Given the Court's commitment to weighing how defendants' "culpability compares to the other people [the Court] had sentenced and to other similarly situated defendants," (Tannuzzo Sentencing Tr., *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 1014 at 42:7–9), we focus on the conduct of certain other defendants sentenced in connection with the Government's investigation.  To be clear, by doing so, we do not excuse Mr. Servis's misconduct. Rather, we compare Mr. Servis's actions to the misconduct of others in support of the statutory imperative of avoiding unwarranted sentence disparities among defendants.

a. Marcus Zulueta (Trainer): 33 months' imprisonment

Marcos Zulueta, a horse trainer, was sentenced by the Court to 33 months imprisonment. Intercepted calls involving Zulueta reflect misconduct far more culpable than Mr. Servis.' Zulueta's misconduct involved the procurement and administration of several illicit PEDs, including "Monkey" (an illegal blood builder), illegal pills, an illegal liver injectable, and an orange substance, among others.  His misconduct extended beyond his barn, as he also "habitually supplied" PEDs to others.  *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 773 at 3–4.

Many intercepted calls demonstrate that Zulueta knew his misconduct was harmful—even lethal—to horses.  For instance, Jorge Navarro informed Zulueta that the individual selling Monkey had informed Navarro that: "the Monkey is breaking down the horses . . . It's breaking

down . . . it's breaking down the horses.  It's making their blood very thick." *Id.*  at 3. Notwithstanding this information, Zulueta continued using the substance. *Id.*

Zulueta's conduct was so egregious, he even concealed aspects of his doping from Navarro, fearing Navarro would "scold" him for going overboard. *Id.* at 6.  In one exchange, Zulueta bragged about almost killing a horse while illegally "drenching" it, telling Navarro "Yes, you know I'm crazy. I don't like to depend on anybody. I'm crazy," and repeated, "I almost killed him. He started vomiting." *Id.*  In a separate exchange, Zulueta stated: "I almost killed one, man.  I almost killed one . . . You know I'm crazy." *Id.* at 6–7.  On that occasion, Zulueta said the PED he had administered was "the one that fuck up the horses." *Id.* at 7.  In yet another call, Zulueta complained that his horses were "looking very bad when racing," to which Navarro responded "Well, well, it's because you continue hitting—hitting their liver[.]" *Id.*

These facts stand in stark contrast to Mr. Servis's behavior: the intercepted calls of Mr. Servis's conversations do not reflect callous indifference or intentional infliction of harm on the horses under his care.  And Mr. Servis was not involved in drenching or administering those several substances.

b.  <u>Michael Tannuzzo (Trainer): 27 months' imprisonment</u>

By any objective measure, Michael Tannuzzo's conduct was also far worse than Mr. Servis's.  Tannuzzo's misconduct included the use SGF-1000 and Clenbuterol, but many other substances as well.  As mentioned, *supra*, Dr. Rhein provided specific instructions to Tannuzzo on using TB-1000, an illegal drug broadly understood to contain banned substances.  According to the Government, Tannuzzo also used "bleeder pills," a drench PED developed by co-defendant Oakes, an unnamed generic blood builder, and other banned substances.  To make matters worse, Tannuzzo facilitated the transfer of red acid and other PEDs to others, including Navarro.  Further, Tannuzzo, despite not being a licensed veterinarian, personally administered the SGF-1000

injection to his horses.  Mr. Servis never personally injected SGF-1000 because the rules required

that any injections be performed only by a licensed veterinarian to protect the safety of the horse.

In addition, Dr. Rhein took on a markedly different tone and position when discussing

SGF-1000 with Tannuzzo versus his conversations with Mr. Servis.  For example:

| Dr. Rhein's June 6, 2019<br>Conversation with Mr. Servis | Dr. Rhein's June 29, 2019<br>Conversation with Tannuzzo[8] |
|---|---|
| Dr. Rhein to Mr. Servis regarding SGF-1000:<br><br>We finally have something that we can help.  I mean it is just so good for helping them . . . [I]t's healing them . . .  **it gets them into the best they can do.  It doesn't go beyond that . . it just keeps them healthy and not get hurt during training** . . . we're preventing soft tissue injury. | Dr. Rhein to Tannuzzo regarding SGF-1000:<br><br>**[P]op him with this thing** though before he runs. You know, three four days, doesn't matter. Whatever you want. I mean but just—it doesn't need anything else. Just give it and **he will come out of there [like] he was shot out of a fucking gun**. |

Beyond this, Tannuzzo appears to have reveled in his misconduct and to have misled the

Court regarding the extent of his offense conduct.  According to the Government, he called

Navarro's veterinarian a "pussy" for refusing to administer drenches to Navarro's horses.  *United*

*States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 966 at 5.  Moreover, during his allocution,

Mr. Tannuzzo was asked "what else" had made him guilty of the offense and he replied to the

Court: "That's basically what I did.  That's all I know."  Tannuzzo Change of Plea Tr. at 37:3–4;

*see also* Dkt. No. 966 at 2.  Nonetheless, the Government noted that Tannuzzo "selectively

admit[ted] to his offense offense….[but] his narrative…*belies the scope and extent of his offense*

*conduct*."  Dkt. No. 966 at 2 (emphasis added).  Specifically, Tannuzzo maintained that he never

personally administered PEDs, despite the weight of evidence to the contrary, including

---

[8]     *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 966 at 6.

conversations with Jorge Navarro about administration. *See id.* at 2–5. Although there was not a determination at sentencing that Tannuzzo administered PEDs, his allocution gave pause to both DOJ and the Court.[9]

In sum, the scope of Tannuzzo's use of misbranded substances was vast, covering not only the same products as Ms. Servis but many more. Unlike Mr. Servis, Tannuzzo distributed misbranded substances to others. Further, Tannuzzo's intercepted calls reflect an egregious flouting of the rules, including Tannuzzo and Navarro's tendency to "goad[ ] each other to dope racehorses," which is not the case for Mr. Servis. *Id.* at 3.

      c.   <u>Christopher Oakes (Trainer): 36 months' imprisonment</u>

Christopher Oakes, a horse trainer, was sentenced by the Court to 36 months imprisonment, and his misconduct was also more egregious than Mr. Servis's. The scope of illegal substances used by Oakes was vast, and included blood builders, vasodilators, "drenches," "bleeder" pills, pain shots, and growth factors. *Id.*, Dkt. No. 790 at 1–2. Oakes directed a family member to inject EPO (*id.* at 4), a Class 1 drug that the Government has described as "one of the most potent performance-enhancing drugs." *See United States v. Grasso, et al.*, 20-cr-163 (S.D.N.Y.), Dkt. No. 276 at 5. According to the Government, Oakes "maintained a small pharmacy's worth of drugs at his barn," which contained a host of illegal substances. *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 790 at 2. Moreover, Oakes created shell companies designed to conceal his doping program (*id.* at 5), a methodical and planned illicit scheme not present in Mr. Servis's case. These actions stand in stark contrast to Mr. Servis's misconduct.

---

[9]     During Tannuzzo's sentencing, the Court observed that it was "difficult to believe" that Tannuzzo never administered adulterated or misbranded performance-enhancing drugs to horses in his care. Tannuzzo Sent. Tr. at 40:12–17; *see id.* at 41:7–8 (declining to find that Tannuzzo administered drugs to his own horses).

### d.  Rick Dane, Jr. (Trainer): 30 months' imprisonment

Rick Dane, Jr., a trainer, was sentenced by the Court to 30 months imprisonment.  Dane used a range of misbranded substances, including bleeder pills, "EPM Double Kill," Oxygenator, Pentosan, "Fishman Pain Shot," and Fishman Frozen Pain."  *United States v. Navarro et al.*, 20-cr-160 (S.D.N.Y.), Dkt. No. 920 at 6.  The range of substances used by Dane stands in contrast to Mr. Servis.  Further, according to the Government, "[u]nlike many of the trainer-defendants charged in this matter," in addition to procuring misbranded drugs, "Dane took active steps to facilitate Equestology's business and help boost Giannelli's sales by providing her with background information on clients."  *Id*.  He assisted Giannelli in recruiting potential new clients by providing background on potential new clients *(id*. at 1), hoping to secure free drugs with which to dope his horses.  *Id*. at 6.  Mr. Servis, on the other hand, did not collude with MediVet in this way (indeed, as reflected above, was misled by Dr. Rhein about the company).  Nor did he facilitate misconduct outside his own barn.

### e.  Louis Grasso (Veterinarian): 50 months' imprisonment

Louis Grasso, a veterinarian, pleaded guilty to an adulteration and misbranding conspiracy in *United States v. Louis Grasso et al.*, 20 Cr. 163 (PKC) and was sentenced by the Honorable Kevin Castel to 50 months imprisonment.

In that proceeding, the Government described Grasso as a "recidivist veterinarian who . . . has repeatedly and persistently engaged in violations of federal drug laws and state racing rules."  *United States v. Grasso, et al.*, 20-cr-163 (S.D.N.Y.), Dkt. No. 276 at 1.  He had his own line of custom-made drugs and sold a variety of adulterated and misbranded drugs, including pain blockers (including experimental drugs like 'snake venom'), EPO (a Class 1 drug the Government characterized as "one of the most potent performance-enhancing drugs"), and bronchodilators.  *Id.*

34

1–2, 5.  Grasso's distribution of misbranded drugs was prolific.  He bragged: "Any script I write costs $100. Any piece of paper that has my name on it is $100. I don't give [a] fuck what it is." *Id*. at 2.  He was also recorded saying that "he would 'do anything for 400 . . . even break the law.'" *Id*.  Grasso "relished in his reputation as a corrupt vet" texting others that "he has 'ALWAYS been the bad guy'" and that "all it does it make [his] business even larger."  *Id*.  Grasso let one of his co-defendants (not a veterinarian) use Grasso's credentials to enable the co-defendant to secure restricted prescription drugs in bulk and then illicitly sell those drugs to trainers.  *Id.*  In this way, Grasso's misconduct was much more depraved than Mr. Servis's, in addition to being vaster in scope and reach.  Significantly, Grasso had previously been arrested on several occasions in connection with similar misconduct.  For instance, Grasso was convicted of distributing anabolic steroids.  *Id.* at 5.  Thereafter, Grasso was arrested for dispensing controlled substances (after having received a warning letter from the Delaware Board of Professional Regulation regarding his activity).  *Id.*  On top of his prior related offenses, after lying to state commissions to cover up doping, Grasso encouraged others to do the same, and bragged about his lies.  *Id.* at 2–3.  By contrast, Mr. Servis has no criminal history (much less a history of related criminal offenses, as did Grasso).

### f.   Rene Allard (Trainer): 27 months' imprisonment

Rene Allard, a *Grasso* trainer, pleaded guilty to adulteration and misbranding with intent to defraud for offense conduct that occurred in or about 2015 through January 2020.  *United States v. Grasso, et al.*, 20-cr-163 (S.D.N.Y.), Dkt. No. 228 (Superseding Information), at ¶ 1.  Mr. Allard's loss amount was over $20 million, and he was sentenced to 27 months imprisonment by Judge Castel.  *Id.*, Dkt. No. 277 at 2.  In the period leading to his arrest, Allard's horses tested positive for furosemide (Lasix), TCO2, isoflupredone, oxycodone, codeine, and morphine.  *See*

*id.*, Dkt. No. 277 at 2–3.  Allard's trainer's licenses were suspended on more than one occasion as a result of these positive tests.  *Id*.  The Government further stated that Allard maintained "a small pharmacy's worth of drugs" in his barn that included materials to mix his own drenches.  *Id*. at 2.  The Government's submission in connection with Allard's sentencing suggests Allard deployed Grasso to lie on his behalf to a state racing commission following one of these positive tests.  *Id*. at 2–3.  Allard's activities were so reckless that Grasso referred to his barn as the "Rene Allard death camp."  *Id*. at 5.  In one instance, Allard injected a horse with a cocktail of substances that required emergency care by Grasso because the horse could not walk or move.  *Id*.  Intercepted calls also reflect Allard seeking Grasso's assistance to inject a lame horse to permit it to run.  *Id*.  To obscure his misconduct, Allard's drugs were stored in a room misleadingly marked as if it were reserved for Grasso (a licensed vet).  *Id*.  Allard also had a "shockwave" machine, which he presumably used on horses in his care.  *Id*. at 2.  We respectfully submit that these facts stand in stark contrast to Mr. Servis.

g.   <u>Richard Banca (Trainer): 30 months' imprisonment</u>

Richard Banca, another *Grasso* trainer, pleaded guilty to adulteration and misbranding with intent to defraud and was sentenced to 30 months imprisonment by Judge Castel.  Banca used pain blockers, bronchodilators, and EPO (which the Government describes as "one of the most potent performance-enhancing substance[s]"), among other banned substances.  *See United States v. Grasso, et al.*, 20-cr-163 (S.D.N.Y.), Dkt. No. 263 at 1–2, 5.  Banca caused hundreds of false prescriptions for EPO to be issued in the name of a pet horse and in the name of a third party who disclaimed any knowledge of those prescriptions.  *Id*. at 2.  Specifically, the Government described that "the defendant created a paper trail of false records making it appear that hundreds of doses of a potent PED were: 1) legitimately prescribed; 2) obtained by a client other than Banca; and 3) intended to be administered to a single pet horse, 'Trymysocks.'  That deception enabled Banca to

36

indiscriminately administer this potent blood builder to his horses." *Id.*  Two horses under Banca's

care suffered injuries and were euthanized.  *Id*. at 4.  The Government believes Banca's use of

illegal substances contributed to their deaths.  *Id*.  This is not remotely comparable to Mr. Servis's

conduct.

### h.  Thomas Guido III (Trainer) – Sentenced to 20 months

Thomas Guido III, a *Grasso* trainer, pleaded guilty to adulteration and misbranding with

intent to defraud and was sentenced to 20 months imprisonment by Judge Castel.  Among the drugs

Guido used were "Red Acid," EPO, "sulker" (a mood-altering drug), and bronchodilators.  *United*

*States v. Grasso, et al.*, 20-cr-163 (S.D.N.Y.), Dkt. No. 284 at 2.  As described in the Government's

submission in connection with Guido's sentencing, Guido's doping killed a horse:

> In discussing what had been administered to the horse before it died,
> Grasso questioned, "Did you shake it up?," to which Guido
> responded, "Yeah," remarking that the bottle they used was "the
> regular" type that Grasso typically provided. . . . Grasso responded,
> "Yeah, well, guarantee that's the killer right there. Guarantee [N-
> butyl alcohol is] what killed him. . .guarantee you didn't shake it up
> enough, you grabbed too much N-butyl alcohol pure and you
> fucking killed him. I've seen that happen twenty times."  Guido,
> unfazed, questioned, "Well why wouldn't he [the horse] die when
> you give him the shot[?]" … Grasso responded, "Well it fuck him
> up enough . . . then you, then you stressed him and killed him. You
> know that's the way it goes, but don't worry about it, there are plenty
> other ones out there."  Guido laughed in response.

*Id.* at 4 (internal citations omitted).  This reflects a shocking indifference and

reckless disregard for horses that is not present in Mr. Servis's case.

\* \* \*

The Government may counter that Mr. Servis's length of offense conduct and purse

winnings were greater than these other defendants during the relevant period.  We submit that this

should not materially influence the sentence imposed for several reasons.

First, each defendants' purse winnings bear little relationship to the seriousness of their respective misconduct and the harm the statutes were designed to address. Courts in this district have noted that loss amount is often "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004); *see also United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) ("For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the Guidelines calculations in such cases are of diminished value to sentencing judges.") (citations omitted); *United States v. Johnson*, No. 16-cr-457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 26, 2018) ("[L]oss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime.").

As sentences to date have recognized, an emphasis on purse winnings clouds the relative culpability of the defendants' disparate conduct, as outlined above. Indeed, Dr. Rhein and Dr. Chan, who were sentenced to 36 months and 30 months respectively, also stipulated to the same loss amount, as did Navarro and Surick. *See United States v. Navarro et al.*, Dkt. No. 564 at 7; PSR ¶¶ 87, 89, 94, 97. In contrast, a *Grasso* trainer, Rene Allard, whose offense conduct occurred over five years and whose Guidelines loss amount was above $20 million, was sentenced to 27 months. *United States v. Grasso, et al.*, 20-cr-163 (S.D.N.Y.), Dkt. No. 277 at 2.

Second, with respect to Mr. Servis's use of Clenbuterol (which is the basis for Mr. Servis's felony guilty plea to Count Two), as set forth above, *none of Mr. Servis's horses failed a post-race test for Clenbuterol since this investigation was commenced in 2017.* Highly regarded veterinarian and equine pharmacologist, Dr. Steven Barker, has testified that for Clenbuterol to have an

improper anabolic steroid effect on a horse, there must be a "high-dose administration of Clenbuterol" and it is "very expensive, particularly if you use ventipulmin, and the dose that has to be administered is very close to the toxic dose." Ex. 52 (Barker Testimony Tr. at 138). [10]   If Mr. Servis had dosed his horses with Clenbuterol prior to races in a manner to achieve an improper steroid effect, he would have had to administer a dosage level that most certainly would trigger positive post-race tests.  That did not occur.  And there is no evidence that Mr. Servis ever administered anything but the standard doses to his horses.

Third, Mr. Servis's horses secured more purse winnings than horses trained by the other defendants because Mr. Servis trained horses with higher performance potential.  Simply put, Mr. Servis trained horses purchased at higher prices and that were secured after having demonstrated track records prior to entering Mr. Servis's barn.  Moreover, several people with firsthand knowledge have remarked that Mr. Servis was a skilled horseman.  *See, e.g.*, Ex. 8 (Hogan); Ex. 10 (Roberts); Ex. 9 (Dembner); Ex. 14 (Poston).

### D.  A Below-Guidelines Sentence Would Reflect the Seriousness of the Offense and Provide Adequate Deterrence

Probation recommends 36 months' imprisonment, a variance below the 48 month Guideline sentence, reasoning that such a term of imprisonment would, *inter alia*, adequately

---

[10]   Dr. Barker has been qualified as an expert in various proceedings, including in federal court, and has testified on behalf of the Department of Justice.  Dr. Barker has been a professor in the Department of Comparative Biomedical Sciences in the School of Veterinary Medicine in Louisiana State University since 1985.  He also has served as state chemist to the Louisiana State Racing Commission since 1987, and has served as a consultant to the Commission on drug regulations and drug chemistry.  Additionally, he worked as the administrative assistant director and director of research for the Comprehensive Mass Spectrometry Center at the University of Alabama.  Dr. Barker has published over 150 peer-reviewed scientific publication, most of which deal with horses and/or other species of animals, studying drug metabolism, drug clearance, and examining the effect of drugs on animals.  Ex. 52 (Barker Testimony Tr. at 117–20).

provide punishment and deterrence. To that end, we respectfully request that the sentence imposed reflect (i) a variance below the Guidelines sentence and (ii) Mr. Servis's relative culpability and the sentences imposed on similarly situated defendants. Indeed, any term of imprisonment imposed will have serious consequences for Mr. Servis and his family, including his frail parents, and provide specific and general deterrence. Although a first-time offender, because Mr. Servis is 66 years old, he will likely never work again once released from prison. He poses no risk of recidivism. If he were sentenced to Probation's recommendation of 36 months, Mr. Servis will be 69–70 years old by the time of his release.

We also note that a term of imprisonment will likely have the tragic consequence of cutting short what little time Mr. Servis has left with his parents, with whom he has a close relationship. Given their advanced age and health, it is likely Mr. Servis will never see them again. Imprisonment for a term above Probation's recommendation would cut against § 3553(a)(2)(A)'s notion of "just punishment" and would provide rapidly diminishing returns on the goal of affording adequate deterrence.

Moreover, Mr. Servis has stipulated to significant financial penalties. Mr. Servis has not worked since his arrest in March 2020 and this case has been financially costly to Mr. Servis, in addition to the severe emotional cost. The assets Mr. Servis and his wife have left after those penalties are remitted are what will be left for them to live on for the rest of their lives. We ask that the Court consider this in imposing any fine. Should the Court determine a fine is appropriate, we respectfully request that the Court impose a fine of no more than $30,000, the low end of the recommended Guidelines range and the fine amount recommended by Probation.

**E.      Recommendation to the Bureau of Prisons**

We respectfully request that the Court recommend that Mr. Servis be designated to FPC Pensacola, FCI Coleman Low's camp, or a Bureau of Prisons "camp" in Northern Florida, to enable his family to visit.  While the ultimate decision on where a defendant will serve an incarceratory sentence is made by the Bureau of Prisons, it is well settled that the Court has the authority to recommend a particular facility or geographical area.  18 U.S.C. § 3621(b)(4)(B) (directs that the BOP consider any statement by the sentencing court "recommending a type of penal or correctional facility as appropriate); *Tapia v. United States*, 564 U.S. 319, 331 (2011) (observing that a sentencing judge  can recommend that BOP place an offender "in a particular facility or program"); *see also* BOP Program Statement 5100.08, Ch. 4, Page 5, https://www.bop.gov/policy/progstat/5100_008cn.pdf (providing that the court may "recommend a specific institution" for a newly committed inmate and directing BOP to "enter the name of the recommended institution" in the system).  Thus, we request that the Court exercise its authority and recommend FPC Pensacola to BOP.

## IV.    CONCLUSION

Mr. Servis has spent his entire life and built his career around horses.  It is deeply painful that errors in his judgment concerning his care of horses led him here.  These grave errors, however, were an aberration from his character, as detailed in dozens of letters.  Moreover, his conduct was less egregious than that of his co-defendants in significant ways, including his state of mind and the type and number of substances involved.  Thus, for the foregoing reasons, Mr. Servis respectfully requests that the Court impose a significantly below-Guidelines sentence.


Dated:          July 13, 2023
                New York, New York

                                    Respectfully submitted,

                                       /s/   Rita M. Glavin

                                    Rita Glavin
                                    Katherine Petrino
                                    GLAVIN PLLC
                                    156 West 56th Street, Ste. 2004
                                    New York, NY 10019
                                    Tel: (646) 693-5505
                                    rglavin@glavinpllc.com

                                    Michael Considine
                                    Noah Czarny
                                    SEWARD & KISSEL LLP
                                    One Battery Park Plaza
                                    New York, NY 10004


                                    *Attorneys for Jason Servis*